114.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED.

Jun 3   4 52 PM '03

CLERK

BY _____
DEPUTY CLERK

HARLAND A. MACIA, III, d/b/a　　　　:
CATAMOUNT SOFTWARE,　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　Plaintiff,　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　:　　Docket No. 2:00-CV-299
　　　　　　　　　　　　　　　　　　:
MICROSOFT CORPORATION,　　　　　　:
INTUIT, INC., and　　　　　　　　:
MECA SOFTWARE, LLC,　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　Defendants.　　　　　　　　:

## OPINION AND ORDER

In this action involving claims of trademark infringement
and unfair competition under federal and state law, Defendant
Microsoft Corporation ("Microsoft") has moved for summary
judgment on all counts of Plaintiff's Second Amended Complaint.
Plaintiff Harland A. Macia, III, d/b/a Catamount Software
("Catamount") has moved for summary judgment on Microsoft's
counterclaim, pled in the alternative, for trademark infringement
and unfair competition.  For the reasons that follow, the motions
(Docs. 144 & 140) are denied.[1]

## Factual Background

The following facts are undisputed.  Catamount is a Vermont-
based developer and marketer of computer software.  Microsoft is

---

[1] Microsoft requested oral argument on its motion.  The
Court originally scheduled the pending motions for oral argument
pursuant to that request, but finds that the parties have
thoroughly and ably briefed the issues, and oral argument is,
accordingly, denied.  LR 7.1(a)(7).

a developer and marketer of computer software with its principal place of business in the state of Washington.  Since 1991, Microsoft has used the term "Microsoft® Money" and "Money" to identify personal finance software for desktop and laptop computers.  Microsoft has sold more than 75 million copies of Microsoft® Money desktop software to date.  It has spent more than $40 million in advertising, promotion and other marketing for Microsoft® Money software.  Microsoft® Money, however, does not run on handheld computers, also known as personal digital assistants, or PDAs.

In 1994 Catamount began marketing personal financial management software for PDAs under the mark "PocketMoney" for use on the Newton and, in 1999, the Palm operating system.  At that time Catamount was aware of Microsoft's use of the term "Money" in connection with financial management software for desktop and laptop computers.  PocketMoney does not run on desktop or laptop computers, however.  Between 1994 and 2001 Catamount sold more than 6,000 copies of PocketMoney in the United States and abroad, and spent an average of $3300 per year in advertising.  In 2000 Catamount's sales of PocketMoney were $74,319.  In 2001 its sales were approximately $262,409.

Meanwhile,[2] Microsoft developed a version of its Windows

---

[2]  The record does not reflect when Microsoft first released Windows CE.

AO 72A
(Rev.8/82)

operating system to run on PDAs, called "Windows CE."  As
Microsoft adapted some of its popular desktop and laptop software
programs for PDAs, it adopted a naming convention that placed the
word "Pocket" before the name of its desktop or laptop software:
thus, for example, Microsoft® Word was called "Pocket Word."  By
2000 Microsoft was referring to its platform for PDAs as "Pocket
PC."  PDAs that use Microsoft's operating system are now known as
"Pocket PCs."

Microsoft informed Catamount in 1999 that it intended to
market personal financial management software[3] to run on Pocket
PCs as Microsoft® Pocket Money.  Microsoft expressed concern over
potential consumer confusion with Catamount's PocketMoney if
Catamount intended to produce a version of its software that
would run on the Windows CE operating system.  Catamount
protested that it owned the mark PocketMoney, and was currently
developing a Windows CE-compatible version of its software.
Catamount demanded that Microsoft cease using the term.  In April
2000 Microsoft launched its personal financial management
software for Pocket PCs as "Microsoft® Money for Pocket PC."  It
distributed Microsoft® Money for Pocket PC to various original
equipment manufacturers ("OEMs") for installation in their Pocket

---

[3]   The parties dispute whether this software can be termed a
"version" of Microsoft® Money.

3

PC hardware products.[4]

Microsoft® Money for Pocket PC can be used as a stand-alone product or synchronized with the Money software designed for desktop and laptop computers to permit the transfer of information to and from each application.  Microsoft® Money for Pocket PC is pre-installed on many Pocket PCs; it is also available on Microsoft's web site, where consumers can download the software, and is available as part of the software package for Microsoft® Money 2003.

In 2001, Catamount released a version of PocketMoney designed to run on Pocket PCs.  Catamount uses the terms "PocketMoney® for Pocket PC" and "PocketMoney® for Windows CE, Pocket PC Edition" to describe the software to consumers.  This software also synchronizes to Microsoft® Money.  Catamount sells its software as a download through its own and third-party web sites and at retail sales outlets.

The term "pocket" is now widely used in the industry to indicate software designed to run on Pocket PCs.  More than 200 software programs, offered by more than 120 different companies, include "pocket" in the name or identification of the product. More than fifty of these software programs also run on the Palm

---

[4]  Microsoft instructed the OEMs that produce Pocket PCs to refer to its product as Microsoft® Money for Pocket PC. Microsoft's web site also refers to the software as "Microsoft® Money for the Pocket PC" or "Microsoft® Money for your Pocket PC."

operating system.   There is substantial evidence that consumers and occasionally retailers and the media refer to Microsoft's product as "Pocket Money."

The PocketMoney package at one time displayed the "Pocket" portion of the mark in black and the "Money" portion in red. Catamount asked its distributor to change the display to one color, in part because of Microsoft's use of "Money."

PocketMoney is a registered trademark in Switzerland and the European Union.   Catamount's application for federal registration of PocketMoney remains pending.

Catamount's Second Amended Verified Complaint brings suit for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and under Vt. Stat. Ann. tit. 9 § 2530; and makes additional claims of trademark appropriation, infringement, unfair competition, and trademark disparagement under the common law of Vermont.   Microsoft's counterclaim charges that if concurrent use of the marks Microsoft® Money for Pocket PC and PocketMoney is likely to cause confusion as to the source of the products, then Catamount's use of PocketMoney infringes Microsoft's mark Money or Microsoft® Money, in violation of the Lanham Act and the common law of Vermont.

### Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue as to any material fact and the moving party has shown that

5

it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002). The evidence is reviewed in the light most favorable to the nonmoving party, with all ambiguities resolved and all reasonable inferences drawn in its favor. EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 61 (2d Cir. 2000). Summary judgment in a trademark infringement action is appropriate "where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 478 (2d Cir. 1996).

## Discussion

Microsoft seeks summary judgment on all of Catamount's claims, arguing that it has senior rights in the mark Money, that Pocket PC is generic or merely descriptive and thus cannot enjoy trademark protection, that there is no likelihood of confusion between the products, and that Catamount is barred from relief under the clean hands doctrine because it has misused the registration symbol. Catamount seeks summary judgment on Microsoft's counterclaim, arguing that there is no likelihood of confusion between PocketMoney and Microsoft® Money.

## I. Microsoft's Motion for Summary Judgment

Catamount's claims against Microsoft are based on the assertion that Microsoft has caused reverse confusion with

6

Catamount's unregistered mark PocketMoney by using Microsoft®

Money for Pocket PC to identify its financial management software

for PDAs.  The Lanham Act protects unregistered marks as well as

registered trademarks.  <u>Banff, Ltd. v. Federated Dep't Stores,</u>

<u>Inc.</u>, 841 F.2d 486, 489 (2d Cir. 1988).  Reverse confusion is

"the misimpression that the junior user is the source of the

senior user's goods," <u>id.</u> at 490, in this case that Microsoft is

the source of Catamount's PocketMoney software.

Section 43(a) of the Lanham Act provides, in pertinent part,

that:

> [a]ny person who, on or in connection with any
> goods or services, or any container for goods, uses
> in commerce any word, term, name, symbol, or
> device, or any combination thereof, or any false
> designation of origin, false or misleading
> description of fact, or false or misleading
> representation of fact, which--(A) is likely to
> cause confusion, or to cause mistake, or to deceive
> as to the affiliation, connection, or association
> of such person with another person, or as to the
> origin, sponsorship, or approval of his or her
> goods, services, or commercial activities by
> another person . . . shall be liable in a civil
> action by any person who believes that he or she is
> or is likely to be damaged by such act.

15 U.S.C.A. § 1125(a)(1)(A) (1998).  A claim of reverse confusion

is actionable under this section.  <u>Banff</u>, 841 F.2d at 491; <u>see</u>

<u>also</u> <u>Sterling Drug, Inc. v. Bayer AG</u>, 14 F.3d 733, 740 (2d Cir.

1994); <u>Lang v. Ret. Living Publ'g Co.</u>, 949 F.2d 576, 583 (2d Cir.

1991).

7

A.    Entitlement to Protection

To ascertain whether an unregistered mark has been infringed, a plaintiff must first demonstrate that its mark merits protection.  Banff, 841 F.2d at 489.  Trademarks fall into four categories, determining the degree of protection afforded them:  "[a]rrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976); see also Banff, 841 F.2d at 489.  A generic term is one that actually defines the product, "and refers to the genus of which the particular product is a species."  Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999); see also Abercrombie & Fitch, 537 F.2d at 9.  A term is descriptive if it "describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put," Lane Capital Mgmt., 192 F.3d at 344; it "'forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.'"  Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1040 (2d Cir. 1992) (quoting Abercrombie & Fitch, 537 F.2d at 11).  A term is suggestive "if it requires imagination, thought and perception to reach a conclusion as to the nature of goods."  Id.  A term is

8

arbitrary if it applies a common word in an unfamiliar way, and
fanciful if the word has been invented for its use as a mark.
Lane Capital Mgmt., 192 F.3d at 344.

Although it is often difficult to distinguish between a term
that is suggestive as opposed to one that is merely descriptive,[5]
the distinction is important for trademark protection because in
order for a descriptive term to be eligible for protection it
must have "acquired a secondary meaning in its particular
market[, so] that the consuming public primarily associates the
term with a particular source." Bristol-Myers Squibb, 973 F.2d
at 1040.  A plaintiff need not prove secondary meaning in order
to gain trademark protection for a suggestive term.  Id.  Whether
a term is merely descriptive is determined in relation to the
product, and the possible significance that the term would have
to the average purchaser of the product.  Thus, "[t]he focus in
categorizing a mark is on how the words are used in context
rather than their meaning in the abstract."  Id. at 1041; see
also Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 213 (2d Cir.
1985) (determination whether mark is descriptive or suggestive
cannot be made in a vacuum; necessary to surmise mental processes

---

[5] Judge Learned Hand stated many years ago that "[i]t is
quite impossible to get any rule out of the cases beyond this:
That the validity of the mark ends where suggestion ends and
description begins." Franklin Knitting Mills, Inc. v. Fashionit
Sweater Mills, Inc., 297 F. 247, 248 (S.D.N.Y. 1923), aff'd 4
F.2d 1018 (2d Cir. 1925) (per curiam).

of those in marketplace at whom mark is directed).

PocketMoney is a composite mark, consisting of the words "Pocket" and "Money" joined together. "Pocket," when used in connection with computer hardware, is descriptive of its size, and in connection with computer software, by analogy, is descriptive of software designed to run on "pocket-sized" computers.

"Money" could well be characterized as suggestive; as used in connection with computer software, it does not immediately convey an idea about the product's characteristics, although it does not require a huge leap of the imagination to conclude that the product might be financial management software. Catamount at different times during this litigation appears to have taken the position that the term "money" is suggestive when applied to computer programs, see Pl.'s Mem. in Opp'n at 3 (Doc. 156), and also that it is a descriptive term that has acquired secondary meaning because potential consumers of computer software have come to associate "Money" with Microsoft. See Pl.'s Resp. to Microsoft's Mot. for Leave to File Alternative Countercl. at 3-4 (Doc. 99).

Regardless of whether the "Money" portion of Catamount's mark is suggestive or descriptive, the composite mark "PocketMoney" may well merit protection:  the consolidation of two descriptive terms may result in a composite mark that is

10

suggestive.  See, e.g., W.W.W. Pharm. Co. v. Gillette Co., 808 F. Supp. 1013, 1022 (S.D.N.Y. 1992) (consolidation of two descriptive or generic terms, "sport" and "stick," suggested both product's form and usage, but required some imagination to surmise nature of product, and thus was suggestive mark), aff'd, 984 F.2d 567 (2d Cir. 1993); see also Banff, 841 F.2d at 489 (combination of arbitrary and generic terms in mark "Bee Wear" resulted in suggestive or arbitrary mark).

At the time the terms were originally joined together, PocketMoney could not be considered to be "merely" descriptive. PocketMoney not only described features or qualities of the product, but also carried a suggestive connotation derived from an association with the phrase "pocket money," meaning money carried in a pocket to be used for occasional expenses.  A mark with suggestive as well as descriptive qualities may not be deemed merely descriptive.  See Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 699-700 (2d Cir. 1961) (mark "Poly Pitcher" not merely descriptive, although product was pitcher made of polyethylene).  As a suggestive mark therefore, PocketMoney was entitled to protection from infringement at the time of Catamount's first use of the mark.

A term that was originally suggestive can become descriptive over time through a change in the meaning or usage of the words, however.  See 20th Century Wear, Inc. v. Sanmark-Stardust Inc.,

11

747 F.2d 81, 87-88 (2d Cir. 1984) (by time of alleged
infringement, term "energy savers" used in connection with
women's flannel pajamas had shifted from suggestive to
descriptive); see also Thompson Med. Co., 753 F.2d at 213
(category of mark such as "thermos" or "escalator" changed as
usage evolved over time).

Microsoft has produced evidence that suggests that, at least
since 2000, the reasonably well informed potential buyer of
software for PDAs who sees a software product with "pocket" and
"money" in its name needs no imagination or extended reasoning to
conclude that it is financial management software designed for
Pocket PCs, and, in all probability, that it is associated with
the famous Money software produced by Microsoft.  Catamount,
however, has produced a survey conducted by RL Associates that
purports to test whether "Pocket Money" is descriptive.  The
survey consisted of 141 interviews of individuals selected at
random at five shopping malls around the country.  RL Associates
selected as its universe[6] all individuals aged eighteen or older.
The results of the survey suggest that most members of the
general public are not familiar with a software product called

---

[6] A survey's "universe" is the relevant population about
which the survey is intended to provide information.  See
Reference Manual on Scientific Evidence 239 (2d ed. 2000).

12

Pocket Money, and that the term is not descriptive.[7]  <u>But see</u>

<u>Blisscraft</u>, 294 F.2d at 699 (critical question is whether mark is

descriptive to prospective purchasers, not general public).

Because Catamount's evidence, if credited, could form the

basis for a finding that it has protectable rights in PocketMoney

as a suggestive mark, Microsoft is not entitled to summary

judgment on this ground.  <u>See, e.g.</u>, <u>N.Y. Stock Exch.</u>, 293 F.3d

at 557 (because trier of fact could find combination of

architectural facade and name inherently distinctive rather than

descriptive, summary judgment not appropriate in trademark

dilution claim).

### B.   Likelihood of Confusion

Even were Catamount able to establish that PocketMoney is

entitled to trademark protection, Microsoft would be entitled to

summary judgment if it could demonstrate that there is no

likelihood of confusion between its mark and Catamount's mark.

<u>See Banff</u>, 841 F.2d at 489.  For this second step in determining

trademark infringement the Court evaluates the marks in light of

the so-called <u>Polaroid</u> factors.  <u>See Polaroid Corp. v. Polarad</u>

---

[7]  Microsoft argues briefly in its reply memorandum that the
survey is inadmissible as inherently unreliable, and if
admissible should be accorded no weight.  Microsoft's concerns
over the methodology of RL Associates' survey will affect the
weight rather than the admissibility of the survey in this case.
<u>See Schering Corp. v. Pfizer Inc.</u>, 189 F.3d 218, 227-28 (2d Cir.
1999) (errors in methodology go to weight of evidence, subject to
exclusion of unduly prejudicial or confusing evidence under Rule
403).

Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961).  These factors include, but are not limited to: the strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap and enter the defendant's market, actual confusion, the defendant's good faith in adopting its own mark, the quality of the defendant's product, and the sophistication of the buyers. Id.; see also Banff, 841 F.2d at 489-90.  The Polaroid factors are not applied mechanically; no single factor is dispositive, and in certain cases a factor may be irrelevant.  Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 400 (2d Cir. 1995).  Summary judgment is appropriate if "'the undisputed evidence would lead only to one conclusion' under the Polaroid test." Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996) (quoting Cadbury Beverages, 73 F.3d at 478).

### 1.   Strength of the Mark[8]

The strength of a mark is determined by examining the mark's distinctiveness, its "'tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.'" Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,

---

[8]   Catamount argues that in a case of reverse confusion it is the strength of the junior user's mark that should be evaluated in order to gauge whether it has the ability to overpower the senior user's mark, citing McCarthy on Trademarks and Unfair Competition § 23:10 (4th ed. 2002); see also Cohn v. Petsmart, Inc., 281 F.3d 837, 841 (9th Cir. 2002) (in reverse confusion case, inquiry focuses on strength of junior mark); A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 231 (3d Cir. 2000) (court should analyze commercial strength of junior user as compared to senior user); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 959 (7th Cir. 1992) (logical to consider strength of mark in terms of association with junior user's goods).  The contention has some logical force, but, with one exception, courts in the Second Circuit have applied the Polaroid factors to cases of direct and reverse confusion alike, and evaluated the strength of the plaintiff's mark.  See Sterling, 14 F.3d at 743; W.W.W. Pharm., 984 F.2d at 572-73; Lang, 949 F.2d at 581; Banff, 841 F.2d at 491; M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha, 250 F. Supp. 2d 91, 101 (E.D.N.Y. 2003); Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 294 (S.D.N.Y. 2003); Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp., 964 F. Supp. 733, 744 (S.D.N.Y. 1997); Mejia & Assocs., Inc. v. IBM Corp., 920 F. Supp. 540, 546 (S.D.N.Y. 1996); DeClemente v. Columbia Pictures Indus., Inc., 860 F. Supp. 30, 47 (E.D.N.Y. 1994); but see Sunenblick v. Harrell, 895 F. Supp. 616, 626 (S.D.N.Y. 1995) (logical to examine strength of junior user's mark), aff'd, 101 F.3d 684 (2d Cir. 1996) (unpublished table decision).
What can be gleaned from the analyses of likelihood of confusion in this and other circuits is that at the very least a senior user's relative lack of commercial strength should be accorded less weight as a factor in a reverse confusion case, because the senior user's mark will typically be commercially weaker.  See Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 479 (3rd Cir. 1994) (district court erroneously put great emphasis on senior user's mark's lack of commercial strength and discounted its distinctiveness).

317 F.3d 209, 217 (2d Cir. 2003) (quoting <u>Arrow Fastener</u>, 59 F.3d at 391).  The same characteristics that determine a mark's eligibility for trademark protection determine its inherent distinctiveness:  whether the mark is generic, descriptive, suggestive, or arbitrary or fanciful.  <u>See</u> <u>Time, Inc. v. Petersen Publ'g Co.</u>, 173 F.3d 113, 117 (2d Cir. 1999).  That a mark is proven to be suggestive, and thus stronger than a generic or descriptive mark, does not end the inquiry into the strength of the mark, however.  <u>See</u> <u>Lang</u>, 949 F.2d at 581.

The mark's distinctiveness in the marketplace is also a feature of its strength.  <u>See</u> <u>Time</u>, 173 F.3d at 118.  The use of part or all of a mark by third parties weakens the mark.  <u>Id.</u>; <u>see also</u> <u>Lang</u>, 949 F.2d at 581.  In this regard, PocketMoney is relatively weak (as indeed is Money for Pocket PC minus Microsoft's house mark).  It is undisputed that the term "pocket" is widely used in the industry to identify software designed to run on Pocket PCs, and that many of these products also run on the Palm operating system.  The term "money" has been used by Microsoft and other companies as part of their trademarks for financial management software; for example Ultrasoft Limited produces Ultrasoft Money, oopdreams software, inc. produces MoneyMinder, and SplashData, Inc. produces SplashMoney.  <u>See</u> Discussion Board postings at http://www.pocketpcpassion.com (accessed Oct. 5, 2001) (Doc. 156, Ex. 61, App. I);

AO 72A
(Rev.8/82)

http://groups.google.com (accessed Nov. 12, 2001) (Doc. 157, Ex. C). Whether the market is defined as computer software in general or software for PDAs, the mark PocketMoney, even if shown to be suggestive, is not particularly strong.

In addition, Catamount's relatively modest sales of approximately 6,000 units and advertising expenditures averaging $3,300 annually in the years prior to Microsoft's launch of its product suggest that PocketMoney lacks commercial recognition, as Catamount's own survey attests. See Lang, 949 F.2d at 581 (total of $85,000 in domestic and foreign sales of book and tapes and extensive third party use of portions of mark weighed against finding that suggestive mark was strong).

### 2.   Degree of Similarity

For this factor, the Court considers "whether the similarity of the marks is likely to provoke confusion among potential customers," examining the general impression created by the marks, including the products' sizes, logos, typefaces and package designs. W.W.W. Pharm., 984 F.2d at 573. Microsoft points to several features of the marks that tend to reduce the likelihood of confusion in the marketplace, most notably the prominent display of its famous housemark. A trier of fact could conclude, however, that the close similarity of "PocketMoney" and "Money for Pocket PC," presented in similar typefaces, results in this factor favoring Catamount.

17

### 3.   Proximity of the Products

This factor considers how closely the two products compete with each other. Lang, 949 F.2d at 582. A court may assess "whether the products differ in content, geographic distribution, market position, and audience appeal." W.W.W. Pharm., 984 F.2d at 573. There can be no real dispute that these products serve the same purpose and directly compete with each other. This factor weighs in favor of Catamount.

### 4.   Bridging the Gap

Here there is no gap to be bridged. Catamount has already entered the market for software for Pocket PCs. This factor favors Catamount.

### 5.   Actual Confusion

Many of Catamount's submitted exhibits seek to demonstrate instances of actual confusion between its product and Microsoft's. Catamount has provided copies of numerous internet postings showing that users and potential users of Microsoft's product refer to it as Pocket Money, MS Pocket Money and PocketMoney. It has provided copies of online articles and press releases that refer to Microsoft's product as Pocket Money or PocketMoney. It has included one instance of a potential consumer in Italy who contacted Jarosoft in an attempt to obtain Microsoft's product, downloaded Catamount's product and professed himself satisfied with it. Another consumer bought "Pocket

18

Money", then discovered that "MS Money" was included with her PDA.  She requested that Catamount cancel her credit card charge, apparently believing that Catamount's product and "MS Money" were the same thing.  This consumer also wanted to acquire Microsoft's product.  A third consumer posted a question about acquiring "pocket money for the Ipaq 3630" to a Microsoft newsgroup.  Upon being asked to clarify which product he sought, he explained that he wanted Microsoft's product.  A fourth potential customer contacted Catamount to purchase "pocket money," but also inquired about purchasing "pocket word and other software."  It is not clear whether she wanted Catamount's or Microsoft's financial management software.

Although this evidence, if admissible, demonstrates a degree of confusion, "[a]t issue is whether this is the type of confusion against which the Lanham Act was designed to protect. . . . [;r]elevant confusion is that which affects 'the purchasing and selling of the goods or services in question.'" Lang, 949 F.2d at 582-3 (quoting Programmed Tax Sys., Inc. v. Raytheon Co., 439 F. Supp. 1128, 1132 (S.D.N.Y. 1977)).  The only evidence of affected purchasing decisions was the Italian customer (whose confusion benefitted Catamount), two individuals who wanted Microsoft's product but were calling it by the wrong name, and one instance that fails to identify the precise confusion.  This handful of anecdotes of consumer confusion could be considered

19

"de minimis evidence insufficient to raise triable issues." <u>Nora Beverages, Inc. v. Perrier Group of Am., Inc.</u>, 269 F.3d 114, 124 (2d Cir. 2001).

More importantly, even if the Court were to infer that Catamount's online discussion evidence demonstrates that purchasing decisions were somehow affected, it does not show confusion involving potential consumers of its product who mistakenly believed that it was produced by Microsoft.  Reverse confusion exists if the junior user (Microsoft) employs a trademark that is likely to cause consumers to mistake the senior user's (Catamount's) product as having been produced by the junior user.  <u>Lang</u>, 949 F.2d at 583.  Catamount's evidence tends to show that consumers have acquired or intend to acquire Microsoft's product, and that they refer to it incorrectly, frequently by the name of Catamount's product.  The Court has as yet seen no evidence of actual confusion that would support Catamount's reverse confusion claim; the errors demonstrated by the proffered evidence do not permit the inference that Catamount will suffer "commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation."  <u>Id.</u>  On the current state of the record, this factor favors Microsoft.

**6.   Good Faith**

Bad faith is established by proof that "'the defendant

adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his [sic] and the senior user's product.'" <u>Lang</u>, 949 F.2d at 583 (quoting <u>Edison Bros. Stores, Inc. v. Cosmair, Inc.</u>, 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987)).  Catamount has presented no evidence that would lead to the inference that Microsoft intended to capitalize on Catamount's reputation or good will.  One or two of the copied e-mail and internet exchanges could be read as a Microsoft agent seeking to benefit from a potential Catamount customer's lack of knowledge of how to obtain its product, but this scant evidence, if admissible, would hardly lead to a finding of bad faith on the part of the company.

Good faith can rest on a finding that a defendant has selected a mark that reflects the product's characteristics. <u>W.W.W. Pharm.</u>, 984 F.2d at 575.  Microsoft's selection of Microsoft® Money for Pocket PC is its fairly literal characterization of its product, a version of its Money software designed to run on Pocket PCs.  On this record, the factor favors Microsoft, but given that bad faith, like other questions of intent, is generally not appropriate for resolution on summary judgment, <u>see</u> <u>Lang</u>, 949 F.2d at 583, the Court concludes that this factor must be resolved at trial.

###     7.    Quality of the Product

Catamount has emphasized its belief, backed up by a host of

complaints posted to web news groups or chat rooms, that Microsoft's product is inferior. Microsoft has not demonstrated an absence of factual dispute concerning this factor.

### 8.    Sophistication of the Buyers

Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product. Bristol-Myers Squibb, 973 F.2d at 1046. Catamount does not argue that purchasers of financial management software for PDAs are unsophisticated consumers. See M & G Elecs., 250 F. Supp. 2d at 104 (finding electronic products consumers sophisticated); Marlarkey-Taylor Assocs., Inc. v. Cellular Telecomm. Indus. Ass'n, 929 F. Supp. 473, 477 (D.D.C. 1996) (online information service marketed to sophisticated consumers); Nat'l Info. Corp. v. Kiplinger Wash. Editors, Inc., 771 F. Supp. 460, 465 (D.D.C. 1991) (purchasers of financial publications likely to exercise care); Lambda Elecs. Corp. v. Lambda Tech., Inc., 515 F. Supp. 915, 928 (S.D.N.Y. 1981) (finding computer software package purchasers sophisticated). Based on the information made available to the Court at this stage of the litigation, this final factor favors Microsoft.

Summary judgment is accordingly not appropriate on the issue of likelihood of confusion; the Court cannot decide as a matter

of law that the evidence points to only one conclusion under the Polaroid test.[9]  Because Microsoft has not demonstrated that it is entitled to summary judgment on the issue of likelihood of confusion it is also not entitled to summary judgment on Catamount's state law claims of trademark infringement, trademark appropriation, trademark disparagement and unfair competition, because success on these claims will rest on likelihood of confusion as well.

### C.   Clean Hands Doctrine

Microsoft contends that Catamount is barred from any relief under the clean hands doctrine because of its improper use of the registration symbol.  Section 1117(a) of Title 15 U.S.C. provides that if a violation of § 1125(a) is established, any monetary recovery is subject to the principles of equity.  15 U.S.C.A. § 1117(a) (West Supp. 2002).  Resolution of this issue is premature.  If and when Catamount establishes a violation of § 1125(a), the Court will consider whether Catamount's admitted use of the registration symbol prior to federal registration will bar recovery.  In that regard, the Court notes that ordinarily a defense of unclean hands will not apply where a plaintiff has

---

[9]  Although the Court was required to evaluate the evidence in light of the Polaroid factors in order to determine whether Microsoft was entitled to judgment as a matter of law, i.e., that a finder of fact could reach only one conclusion concerning likelihood of confusion, at trial of course the Court, as the finder of fact, will re-weigh the evidence that is presented to it.

AO 72A
(Rev.8/82)

acted in good faith.  See GTFM, Inc. v. Solid Clothing, Inc., 215 F. Supp. 2d 273, 303 (S.D.N.Y. 2002) (unclean hands applies where party is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to matter at issue); Three Blind Mice Designs Co. v. Cyrk, Inc., 892 F. Supp. 303, 313 (D. Mass. 1995) (in application of clean hands doctrine, essential question is plaintiff's intent); see also Copelands' Enters., Inc. v. CNV, Inc., 945 F.2d 1563, 1566 (Fed. Cir. 1991) (improper use of registration symbol will defeat right to registration only where applicant intended to deceive purchasing public or others in the trade into believing mark was registered).

## II.  Catamount's Motion for Summary Judgment

Catamount seeks summary judgment on Microsoft's counterclaim, pled in the alternative, that if likelihood of confusion is found with respect to Catamount's claims against Microsoft, then it is a result of Catamount's infringement upon Microsoft's Money trademark.  Because the issues of whether Catamount has trademark rights in PocketMoney and whether Catamount can show likelihood of confusion cannot be resolved at summary judgment, Catamount's motion for summary judgment will be denied as well.  Microsoft's claim arises only if likelihood of confusion is found.

24

AO 72A
(Rev.8/82)

## Conclusion

For the reasons stated above, Microsoft's Motion for Summary Judgment (Doc. 144) and Catamount's Motion for Summary Judgment on Microsoft's Counterclaim (Doc. 140) are denied.

Dated at Burlington, Vermont this 3rd day of June, 2003.

William K. Sessions III
Chief Judge

AO 72A
(Rev.8/82)