U. S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
BY _C/S_   7/1/03
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

HARLAND A. MACIA, III, D/B/A )
CATAMOUNT SOFTWARE, Plaintiff )
                                          )
            v.                            )     Civil Action No.
                                          )     2:00-CV-299
MICROSOFT CORPORATION, INTUIT,INC.,)
and MECA SOFTWARE, LLC Defendants )
                                          )

## PLAINTIFF CATAMOUNT'S MEMORANDUM IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO MICROSOFT'S MOTION FOR RECONSIDERATION

Plaintiff Harland A. Macia, III, d/b/a Catamount Software (hereinafter "Catamount") herewith responds in opposition to Microsoft's Motion for Reconsideration pursuant to Local Rule of Civil Procedure 7.2(b).

**I. Introduction**

In its Opinion and Order dated June 3, 2003 (Doc. 172), the Court ruled that the term "'[p]ocket' when used in connection with computer hardware, is descriptive of its size, and in connection with computer software, by analogy, is descriptive of software designed to run on 'pocket-sized' computers." Doc. 172, Pg. 10.

Microsoft asks that the Court reconsider this ruling because it believes that the Court must have "overlooked" evidence that it now claims requires the conclusion that because one element is generic, there can be no likelihood of confusion between the trademarks POCKETMONEY and MONEY FOR POCKET PC.

Plaintiff has consistently maintained that the "composite trademark" POCKETMONEY is "suggestive" (and thus "inherently

176.

distinctive"), and that there is a "likelihood of confusion" between Catamount's use of POCKETMONEY and Microsoft's use of MONEY FOR POCKET PC, because: (1) both marks are comprised of the same two dominant elements, POCKET and MONEY, and (2) both marks are used to identify directly-competing products.

## II. Microsoft Has Already Conceded that POCKET May Be "Descriptive"

As grounds for its Motion to Reconsider, Microsoft asserts that the Court "overlooked" evidence that it claims is undisputed, but it does not even identify with any specificity exactly which evidence it believes was "overlooked."

Microsoft asserts that this unidentified evidence requires a finding that the term POCKET PC falls within the legal category of "generic" terms, and that it is impossible for a "generic" term to be infringed.

However, in its Motion for Summary Judgment, Microsoft did not argue that its evidence requires a conclusion that the term POCKET PC is "generic." Instead, Microsoft admitted as fact that the term could be considered descriptive when it asserted as undisputed that:

> 9. MONEY and the famous Microsoft housemark are accompanied by the generic *or descriptive* phrase "for Pocket PC" **to describe** the devices for which the software was written. (Shields Dec. ¶ 3; O'Brien Dec. ¶ 4, Exh. C; O'Brien Dec. ¶ 7-8, Exhs. E and F).

Microsoft's Statement of Undisputed Fact, ¶ 9 (emphasis supplied).

Plaintiff maintains that the report of its expert witness, Dr. Michael Rappeport of R L Associates, establishes the ***conceptual***

**suggestiveness** of the composite mark composed of the two elements POCKET and MONEY.  Because it is suggestive, it is inherently distinctive.  Plaintiff argues that Microsoft's bad faith[1] use of a mark employing the same two elements, POCKET and MONEY, for a directly competing product[2] is likely to cause confusion.[3]

In each case that Microsoft cites in support of its position, the courts all dismissed claims of infringement where the marks

---

[1]

Plaintiff notes that in its Opinion and Order, the Court incorrectly applies the standard from *Lang v. Retirement Living*, 949 F.2d 576, 21 U.S.P.Q.2D (BNA) 1041 (2nd Cir. 1991) regarding the standard for a finding of bad faith in reverse confusion cases.  That case used the forward confusion standard to hold that bad faith is found in cases where the junior user "defendant adopted its mark with the intention of capitalizing on [senior user] plaintiff's reputation and goodwill."  In reverse confusion cases, "[i]t is often likely that the defendant's misappropriation is occasioned more by lust for a mark which 'fits' with a proposed promotional campaign, than by a desire to trade on the usually meager and undeveloped good will of the plaintiff."  Long & Marks, *Reverse Confusion: Fundamentals and Limits*, 84 Trademark Reporter 1, 27-32 (1994). (Copy enclosed).

[2]

Plaintiff notes that in its Opinion and Order, the Court applied the standard from *Lang v. Retirement Living*, 949 F.2d 576, 21 U.S.P.Q.2D (BNA) 1041 (2nd Cir. 1991) regarding the weight accorded to evidence of actual confusion.  In *Lang*, the court found that "Lang has not shown that these misdirected callers were prospective purchasers of Lang's products."  Unlike in the Lang case, here the products compete directly.  Thus any misdirected inquiries are relevant because they involve people who were potential consumers of some kind of financial management software for PDAs who were looking for something named like "Pocket Money."  In *Lang*, by contrast, people looking for a magazine for people over fifty years old happened to find a publisher of self-help materials focusing on charisma development, which the court found to be irrelevant confusion.  Please also note that in the *Sunenblick* case concerning use of the UPTOWN RECORDS mark, the court found that the plaintiff's jazz record label did not compete with the defendant's Hip-Hop and R & B record label.  895 F. Supp. 629.  **In this case, the products compete directly and therefore confusion is substantially more likely as demonstrated by Catamount's evidence of instances of actual confusion.**

[3]

Plaintiff notes that instances of actual confusion of potential consumers exceeds the **likelihood** of confusion standard which Plaintiff must meet to establish his claim.  *See, generally*: McCarthy on Trademarks, §§ 23:12-13.  "It is well established that, in a claim under the Lanham Act, 'actual confusion need not be shown ... since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source.'"  *Sunenblick v. Harrell*, 895 F. Supp. 816, *quoting*: *Lois Sportswear v. Levi Strauss*, 799 F.2d 875 (2nd Cir. 1986).

only shared one element and the court found that the shared element was generic.

For instance, Microsoft cites the case of *American Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306 (2nd Cir. 1986), for the proposition that one generic element (in that case "HIB") requires summary judgment in its favor. But HIB was the only element that the marks HIBVAX and HIBMUNE shared. In this case, the marks at issue both use the same *two* dominant elements: POCKET and MONEY. Even if the Court found here that POCKET is generic, which it did not, there is still no authority for the result Microsoft seeks.[4]

Plaintiff also notes that in its case-in-chief it will present recent evidence that Microsoft treats the term POCKET PC as a trademark to identify only PDAs using its software. For instance, it recently released an upgrade to the WINDOWS CE operating system (OS) which it now calls WINDOWS MOBILE 2003 FOR POCKET PC. See:

---

[4] The passage that provides authority for Microsoft's position is itself based on questionable law. The *American Cyanamid* court wrote:

> A trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term such as "Hib." See, e.g. *Flintkote Co. v. Tizer*, 266 F.2d 849, 852 (3rd Cir. 1959); *Upjohn Co. v. Schwartz*, 246 F.2d 254, 262 (2nd Cir. 1957); *Eastern Wine Corp. v. Winslow-Barren, Ltd.*, 137 F.2d 955, 959 (2nd Cir.), *cert. denied*, 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452 (1943).

The Court's attention is drawn to the fact that the line of authorities cited by the *American Cyanamid* court all pre-date the seminal *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2nd Cir. 1976) decision in which Judge Friendly (also author of *Polaroid*) first set forth the now classic "spectrum of distinctiveness test" later approved by the U.S. Supreme Court in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 120 L.Ed.2d 615, 112 S.Ct. 2753 (1992). *See, generally*: *McCarthy on Trademarks* §§ 11:1-2.

attached Press Release dated June 23, 2003 announcing the availability of the WINDOWS MOBILE 2003 FOR POCKET PC OS:

> **About Windows Mobile-Based Pocket PCs**
>
> Windows Mobile-based Pocket PCs, the next generation of personal digital assistants (PDAs) *from Microsoft and industry partners* ...

Microsoft Press Release Dated June 23, 2003: Microsoft Unveils Windows Mobile 2003 Software for Pocket PCs at Pg. 4/5 (Copy attached). This passage distinguishes Pocket PCs (capitalized) from all other PDAs as those coming from Microsoft and its partners in the computer industry.

### III. POCKETMONEY is a Composite Mark Comprised of Two Suggestive Elements Which Combine to Create a Suggestive Trademark

In determining into which legal category within the spectrum of distinctiveness a given term belongs, and in turn how this affects the markholder's scope of protection, at least one court has distinguished between a mark's "conceptual" strength and its "commercial strength." See: *Sunenblick v. Harrell*, 895 F. Supp. 616, 625, 38 U.S.P.Q.2D (BNA) 1716, (S.D.N.Y. 1995).[5]

The report of Plaintiff's expert, R L Associates, demonstrates that the term POCKETMONEY is "conceptually" suggestive of PDA related products and therefore belongs in the category of inherently distinctive suggestive trademarks.

---

[5] Plaintiff also continues to urge the Court to adopt the *Sunenblick* court's lucid conclusion that in reverse confusion cases it is appropriate to consider the strength of the junior user's mark as the "Strength of the Mark" *Polaroid* factor. 895 F.Supp. at 626-628.

The R L Associates report does not test for the likelihood of confusion, nor does it purport to establish the strength of the mark in and of itself.

Instead, it is offered to show that the average person using common language cannot determine the function or purpose of the product without additional information or imagination, and therefore it is suggestive and not descriptive or generic of financial management software for PDAs.

Because the survey evidence collected and summarized by R L Associates establishes that the term POCKETMONEY, taken as a whole, is suggestive, Plaintiff maintains that this Court should, after proper admission and due consideration of such evidence, find that the composite mark POCKETMONEY belongs to the legal category of inherently distinctive "suggestive" trademarks.[6]

## IV. Conclusion

Because Microsoft has already conceded that the term POCKET may be descriptive, it is estopped from asserting that it must be generic. But this case is about two composite trademarks using the same two dominant elements, POCKET and MONEY, to identify directly competing products. Thus, even if one of two elements is deemed generic, such a finding would not require a finding of no

---

[6]
The Court also wrote that "Catamount at different times during this litigation appears to have taken the position that the term 'money' is suggestive when applied to computer programs [citations], and also that it is a descriptive term that has acquired secondary meaning" for Microsoft. Doc. 172, Pg. 10. Catamount has consistently maintained the former statement, that MONEY is suggestive, as its position with respect to its claims, and took the latter, that MONEY is descriptive and has acquired secondary meaning, only for purposes of responding to Microsoft's motion for summary judgment on Plaintiff's claims, to wit, taken in the light most favorable to Microsoft's defenses.

likelihood of confusion, because the marks must be compared and considered in their entire commercial impression and context.

WHEREFORE, Plaintiff Catamount respectfully requests that the Court deny Microsoft's Motion for Reconsideration.

DATED AT BURLINGTON, VERMONT THIS 1ˢᵗ DAY OF JULY , 2003.

BY: _____
MARKUS BRAKHAN, ESQ.
P.O. BOX 5851
44 CHURCH ST., SUITE 1
BURLINGTON, VT 05402
(802) 660-8210

Microsoft Press Release

Dated June 23, 2003

Microsoft Unveils
Windows Mobile 2003 Software for Pocket PCs

# Microsoft Unveils Windows Mobile 2003 Software for Pocket PCs

Put PressPass in your inbox
Microsoft's e-newsletter for journalists

**New Pocket PC Software Offers Easy Wi-Fi Access, Advanced Support for Digital Imaging**

**REDMOND, Wash. -- June 23, 2003** -- Microsoft Corp. today announced the availability of Windows Mobile (TM) 2003 software for Pocket PCs. Customers can choose among a variety of devices based on Windows Mobile software, available for purchase today. This new version of Microsoft® Windows Mobile software enhances the Pocket PC software experience by including support for easy access to wireless networks, a powerful digital media experience, and support for developers building Microsoft .NET services and applications. Industry partners around the world, including new and existing Windows Mobile-based Pocket PC manufacturers, mobile operators and independent software vendors (ISVs), joined Microsoft in the introduction of this offering. In related news, Microsoft today also announced the new Windows Mobile brand, a single brand that extends the familiarity of the Windows® brand, while reflecting the uniqueness of software for mobile devices.

"Windows Mobile 2003 software for Pocket PCs creates new opportunities for hardware, software and wireless companies to partner and deliver innovative solutions to help improve the way people work and live," said Juha Christensen, corporate vice president for the Mobile Devices Division at Microsoft. "By improving the core elements of Windows Mobile software, Microsoft has enabled customers to take advantage of software features that are wireless-ready and easy to use, and to connect with people and information with a broader range of new device hardware -- and at attractive prices."

**Related Links**

- Windows Mobile Software For Poc PCs Virtual Press on PressPass

## New Devices and Partners

Microsoft is pleased to announce two new manufacturers for the Windows Mobile platform, Gateway Inc. and JVC Company of America, which will introduce new Pocket PCs later this year. Customers can choose among a variety of devices from ASUSTeK Computer Inc., Dell, Fujitsu Siemens Computers, HP, Toshiba America Information Systems Inc. and ViewSonic based on Windows Mobile software, available for purchase today. In addition, Windows Mobile-based Pocket PC devices will be available soon from existing device manufacturers including Acer Incorporated, ASUSTeK Computer, Dell, Fujitsu Siemens Computers, HP, Intermec Technologies Corp., Legend Group Ltd., MiTAC, Panasonic Computer Solutions Co., Symbol Technologies Inc., Toshiba America Information Systems, Trimble and ViewSonic.

In conjunction with today's announcement, Microsoft and Wi-Fi industry leader T-Mobile HotSpot, along with Boingo Wireless Inc. and Wayport Inc., announced offers to provide free 30-day access with new qualifying subscriptions to their Wi-Fi services to U.S. customers who purchase a Windows Mobile-based Pocket PC.

"T-Mobile's Wi-Fi promise of wireless broadband solutions where you already go means our customers can check e-mail, download large files or access corporate intranets at T-1 speeds," said Joe Sims, vice president and general manager of T-Mobile HotSpot. "T-Mobile is excited to work with Microsoft to launch Windows Mobile 2003 software for Pocket PCs. We believe that this software will further enhance our customer's user experience."

**Pocket PC, Refined**

This latest version of Windows Mobile improves the core elements of the Pocket PC software through enhancements in wireless connectivity, easy navigation and rapid application development support as well as more entertainment options. Enhancements include these:

- **Enables easy connection to a variety of wireless networks.** Automatically detects and easily connects to Wi-Fi networks and personal area networks via native support for

Bluetooth®
- **Delivers a great messaging and e-mail experience.** Enables always-up-to-date e-mail synchronization through integration with the upcoming Microsoft Exchange Server 2003 and encourages further hardware innovation with native support for integrated keyboard devices
- **Expands the digital media experience.** Offers improved mobile experiences with users' photos, music and home movies through support of Windows Media® 9 Series audio and video technology:
- **Pictures.** Users can store, edit and display digital photos on their device.
- **Windows Media Player 9:**
- Provides access to a wider range of high-quality digital media content (no longer just content formatted for portable devices) over Wi-Fi networks at speeds of up to 300 Kbps.
- Enables playback of home movies and digital photo albums created with Windows Movie Maker 2 or Plus! Photo Story.
- Supports Plus! Sync & Go, allowing users to synchronize digital content from the Internet or their PC.
- **Encourages platform innovation.** Includes integrated support for the Microsoft .NET Compact Framework, providing an exciting opportunity for enterprise developers, ISVs and solution providers with a rapid application development platform for a wide variety of applications that can take full advantage of Web services and XML

**A Superior Platform for Developer Innovation**

Windows Mobile 2003 software for Pocket PCs is a rich, extensible platform for application development that takes full advantage of the new Windows CE .NET 4.2 operating system and the .NET Compact Framework in ROM. Utilizing Visual Studio® .NET 2003 development tools, millions of Visual Studio application developers can now use their existing skills to develop and deploy innovative applications and take advantage of Web services. The .NET Compact Framework brings the power and performance of the desktop to the handheld device.

Today, Microsoft officially released the Windows Mobile 2003 Software for Pocket PCs Software Development Kit (SDK) to new and existing Windows Mobile developers. To date, more than 8,000 developers have received the Windows Mobile 2003 Software for Pocket PCs SDK in advance, at the Microsoft Mobility Developer Conferences in the United States, Europe and Japan, at Tech•Ed in the United States, and through the Microsoft Mobile Solutions Partner Program. More information on the SDK is available at http://www.microsoft.com/mobile/developer/.

Interest from the community of Pocket PC developers continues to grow with new and existing ISVs and solution providers today announcing their support and commitment to create applications based on Windows Mobile 2003 Software for Pocket PCs.

"Windows Mobile-based Pocket PCs continue to generate increased interest from users and developers alike," said Laura Rippy, chief executive of Handango. "The community of Windows Mobile developers selling Pocket PC applications has nearly doubled and is up 95 percent in the first quarter of 2003 over the first quarter of 2002, and Pocket PC software sales are up over 67 percent from the first quarter of 2002."

**About Windows Mobile-Based Pocket PCs**

Windows Mobile-based Pocket PCs, the next generation of personal digital assistants (PDAs) from Microsoft and industry partners, offer customers the best way to connect to their most essential information while on the go yet are versatile enough to satisfy the personal needs of today's busy mobile consumer. This Windows Mobile software includes a broad range of native business, personal productivity and entertainment applications and can be expanded easily to adapt to each customer's changing needs through a continually growing number of industry-standard hardware designs, hardware peripherals and software applications. More information about the new lineup of Windows Mobile-based Pocket PCs is available at the Windows Mobile 2003 Software for Pocket PCs Virtual Pressroom.

**About Microsoft**

Founded in 1975, Microsoft (Nasdaq "MSFT") is the worldwide leader in software, services and Internet technologies for personal and business computing. The company offers a wide range of products and services designed to empower people through great software -- any time, any place and on any device.

Microsoft, Windows Mobile, Windows, Windows Media and Visual Studio are either registered trademarks or trademarks of Microsoft Corp. in the United States and/or other countries.

The Bluetooth trademarks are owned by its proprietors and used by Microsoft under license.

The names of actual companies and products mentioned herein may be the trademarks of their respective owners.

*Note to editors:* If you are interested in viewing additional information on Microsoft, please visit the Microsoft Web page at http://www.microsoft.com/presspass/ on Microsoft's corporate information pages. Web links, telephone numbers and titles were correct at time of publication, but may since have changed. For additional assistance, journalists and analysts may contact Microsoft's Rapid Response Team or other appropriate contacts listed at http://www.microsoft.com/presspass/contactpr.asp.

**Contact Us   Subscribe**

©2003 Microsoft Corporation. All rights reserved.   Terms of Use | Privacy Statement | Accessibility

**Law Review Article**

**Thad G. Long & Alfred M. Marks**

*Reverse Confusion: Fundamentals and Limits*

**84 Trademark Reporter 1 (1994)**

.-7796

sident
sident
sident
tional
ısurer
retary
rector

# The Trademark Reporter ®

(USPS 636-080)
Copyright © 1994, by the International Trademark Association
All Rights Reserved

| Vol. 84 | January-February, 1994 | No. 1 |
|---------|------------------------|-------|

## TABLE OF CONTENTS

ARTICLES AND REPORTS

Reverse Confusion: Fundamentals and Limits,
Thad G. Long and Alfred M. Marks . . . . . . . . . . . . . . .  1

Passing Off—Past, Present and Future,
Rembert Meyer-Rochow . . . . . . . . . . . . . . . . . . . . . . .  38

Consumer Literacy and Confusing Similarity of Pictorial
Trademarks in Nigeria, John Ohi Asein . . . . . . . . . . . .  64

Excerpts From the International Trademark Association's
Amicus Brief in L.A. Gear, Inc. v. Thom McAn Shoe
Company, Melville Corporation and Pagoda Trading
Company, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79

Tips From the United States Patent and Trademark Office:
A.  Office of Trademark Services, Margery A. Tierney . .  90
Divisional Processing

The Trademark Forum:
Defective Assignments in the Philippines,
Eugene A. Tan . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  99

Letters to the Editor . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

Reviews of Articles From Other Publications . . . . . . . . . .  107

Book Reviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  116

List of Other Articles, Legal Notes and Books . . . . . . . . .  120

The Trademark Reporter®/INTA Bulletins  . . . . . . . . . . .  124

This issue of THE TRADEMARK REPORTER® (TMR) should be cited as 84 TMR __
(1994).

# The Trademark Reporter®

## REVERSE CONFUSION:
## FUNDAMENTALS AND LIMITS

### By Thad G. Long* and
### Alfred M. Marks**

The law of trademarks is constructed on several fundamental assumptions which underlie the principles which have evolved. Those assumptions involve notions, among others, of priority of use, geographical expansion, good faith of the junior user, secondary meaning, likelihood of confusion, dilution and tarnishment, and the effect of federal (and, to a lesser extent, state) registration. When all these notions point in a single direction, trademark questions can be easily answered. For example, where a senior user (on a national basis) uses a mark intensively in a large and growing geographic area so that it acquires a secondary meaning which the public associates exclusively with the senior user and its products or services, the senior user can enjoin a junior user in that geographic area, and in other areas within a reasonable zone of expansion, from using the same mark or any other mark likely to cause confusion or to deceive, especially where the junior user has not adopted the mark in good faith and especially where the senior user has obtained a federal registration. It seems self-evident that a senior user should win in such circumstances, and indeed the precedents are in accord.

The essential element of a successful trademark infringement action is the existence of a likelihood of confusion. That remains the touchstone both for common law and statutory infringement, as well as for a claim of unfair competition.

> To succeed on a trademark infringement claim under the Lanham Act, plaintiff must show a likelihood of confusion as to the source of the goods at issue. . . . Likelihood of con-

* Partner in the firm of Bradley, Arant, Rose & White, Birmingham, Alabama, Associate Member of the International Trademark Association; Adjunct Professor of Law, University of Alabama; member of the Editorial Board of The Trademark Reporter®.

** Trademark Counsel, Kaplan, Thomashower & Landau, New York, New York, Associate Member of the International Trademark Association; member of the Editorial Board of The Trademark Reporter®; member of the Ladas Award Judging Committee; formerly Trademark Counsel, CBS Inc.; Former Member of the Trademark Review Commission of the International Trademark Association.

**Vol. 84 TMR**

fusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.[1]

More troublesome questions arise when the equities become a collection of vectors which point in differing directions. For example, suppose it is the junior user which has obtained the federal registration, perhaps one which has become incontestable, and suppose the junior user is expansion-minded while the senior user has stood pat in a discrete geographic area. The net equities are less clear, and so is the law.[2] The result will depend on the weighing of a number of factors, such as whether the junior user adopted the mark in good faith without knowledge of the senior user's rights and whether the expansion was undertaken with or without knowledge of the senior user's rights, among others.

Reverse confusion usually presents just such a mixed group of vectors. In the typical case, there is a first or senior user, usually a lesser player in the commercial world, who adopts and uses a mark. That mark is then adopted by a junior user, usually one with greater or considerable economic power, who uses and promotes the mark extensively, so as to create public recognition of its own (the junior user's) mark. Normally in such cases, the junior user does not intend to create confusion or to get a free ride on the good will of the senior user. However, in this situation, the purchaser or consumer mistakenly comes to believe that the source of the product or service of the senior is the infringement. Hence, the confusion is the "reverse" of what one encounters in the normal situation.[3] Indeed, one is tempted to say that it is often the senior user who possibly gets the free ride in a reverse confusion situation, although the senior is often unhappy about the submersion of its good will in a sea of junior user advertising. Obviously, it is possible that the senior's good will could be greatly

---

1. Sands, Taylor & Wood Co. v. Quaker Oats Co., 18 USPQ2d 1457, 1468 (ND Ill 1990), aff'd in part and revd in part 978 F2d 947, 24 USPQ2d 1001 (CA 7 1992) (footnotes and citations omitted).

2. Compare Weiner King, Inc. v. Wiener King Corp., 615 F2d 512, 204 USPQ 820 (CCPA 1980), modfg 201 USPQ 894 (TTAB 1979) (junior user with a federally registered mark won rights in most of the United States) with Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 408 F Supp 1219, 189 USPQ 17 (D Colo 1976), aff'd 561 F2d 1365, 195 USPQ 417 (CA 10 1977), cert dismissed 434 US 1052, 54 LEd2d 805 (1978) (in competition for sale of tires, junior user who had previously registered a federal mark for snowmobile tracks loses to senior user of same unregistered mark for tires).

3. See discussions in Banff, Ltd. v. Federated Department Stores, Inc., 841 F2d 486, 490, 6 USPQ2d 1187, 1190-91 (CA 2 1988), affg in part and revg in part 657 F Supp 336, 3 USPQ2d 1886 (SDNY 1987); Ameritech, Inc. v. American Information Technologies Corp., 811 F2d 960, 966, 1 USPQ2d 1861, 1865 (CA 6 1987), revg 609 F Supp 611, 226 USPQ 331 (ND Oh 1985); Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., see supra note 2.

diluted, so as to outweigh by far any beneficial aspects of a free ride on the coattails of the reverse confusion.

This article will attempt to isolate, consider and analyze those factors which most typify reverse confusion.

## I. THE NATURE AND CONCEPT OF REVERSE CONFUSION

Before considering the theory of the reverse kind of confusion, it should be helpful, at the outset, to identify and distinguish certain related concepts. Thus, "passing off" or "palming off" results from the classic fact pattern in which a junior user trades on the reputation of an earlier user to sell his own products or services by identifying them as, or suggesting they are those of, or are connected with the senior user. The result is confusion or likelihood of confusion as to source.

"Reverse passing off" occurs when a junior user acquires and sells a senior user's product, having removed or obliterated the original trademark. A reverse passing off transaction involves a resale of the senior user's goods, without attribution, whereas "straight" passing off involves the sale of the junior user's goods as the senior's.[4] Either type of passing off may lead to confusion or likelihood of confusion.[5]

This article does not deal with any of the above forms of passing off. Rather, it deals with trademark issues raised when a junior user of a mark overwhelms and threatens to destroy the good will associated with the senior's use of the mark. In any analysis of reverse confusion, it is imperative to remember, however, that there has to be likelihood of confusion of some kind before one reaches the question of whether it is direct or reverse confusion. When the term "likelihood of confusion" is used, one normally thinks of traditional likelihood of direct confusion, but there is no necessary equivalency. The law simply permits no remedy unless it can be proved that in some manner the public was likely to be confused by the defendant's conduct; it is only

---

4. See William M. Borchard, Reverse Passing Off—Commercial Robbery or Permissible Competition?, 67 TMR 1 (1977).

5. In turn, the finding of confusion or the likelihood of confusion relies on an analysis of various factors utilized by the courts to declare its presence or absence, as exemplified in Polaroid Corp. v. Polarad Electronics Corp., 287 F2d 492, 495, 128 USPQ 411, 413 (CA 2 1961), cert denied 368 US 820, 7 LEd2d 25, 131 USPQ 499 (1961). The factors cited in that case are: (1) the strength of the mark, (2) the degree of similarity between the marks, (3) the proximity of the products (in the market), (4) the likelihood that the senior user will bridge the gap, (5) the junior user's good faith in adopting the mark, (6) the quality of the junior user's product, (7) evidence of actual confusion, and (8) the sophistication of the relevant consumer group, and other variables, if appropriate. Each circuit will utilize its own list of factors.

incidental whether the confusion reflects a belief that defendant's products or services are those of the plaintiff (likelihood of direct confusion) or a belief that plaintiff's products or services are those of the defendant (likelihood of reverse confusion).

The existence of reverse confusion might, in fact, aid the junior user where the mark is inherently descriptive and can be afforded trademark protection only if it has acquired a secondary meaning. In that context, the existence of reverse confusion may indicate an absence of secondary meaning associated with the senior user,[6] which would be fatal to the senior user's claim for relief.

On the other hand, where a mark is suggestive, arbitrary or coined, and can be protected without proof of secondary meaning, the finding of reverse confusion will often clinch the senior user's infringement case, since the trend in the law is to allow a plaintiff to satisfy the requisite of likelihood of confusion by establishing likelihood of direct confusion or reverse confusion.[7] The law has a strong and fundamental bias in favor of senior users, and reverse confusion gives a senior user an additional option for satisfying one of the essential elements of its case—likelihood of reverse confusion, as well as likelihood of normal direct or "forward" confusion.

There are other cases in which the courts have found no likelihood of confusion of any kind—direct or reverse.[8] These

---

6. Eg, Jefferson Home Furniture Co. Inc. v. Jefferson Furniture Co. Inc., 349 So2d 5, 197 USPQ 334 (Ala Sup Ct 1977).

7. All Courts of Appeals which have considered the reverse confusion doctrine, i.e., that the likelihood of reverse confusion can satisfy the likelihood of confusion requirement in trademark and unfair competition cases, have now accepted it. The Seventh Circuit has been the last to do so, in Sands, Taylor & Wood Co. v. Quaker Oats Co., supra note 1. See also Banff, Ltd. v. Federated Department Stores, Inc., supra note 3; Ameritech, Inc. v. American Information Technologies Corp., supra note 3; Capital Film Corp. v. Charles Fries Productions, Inc., 628 F2d 387, 208 USPQ 249 (CA 5 1980) (represents precedent in the Eleventh Circuit and the new Fifth Circuit); Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., supra note 2. The First Circuit also recently accepted the doctrine of reverse confusion to the extent it provides a remedy based on confusion as to sponsorship. DeCosta v. Viacom International, Inc., 981 F2d 602, 25 USPQ2d 1187 (CA 1 1992), revg 757 F Supp 807, 18 USPQ2d 1835 (D RI 1991). Caveat: Most decisions on reverse confusion have involved at least a nominal acknowledgment that state law was controlling in cases largely premised on the diversity jurisdiction of the federal courts. However, the courts rarely find any divergence of state law from the general common law rules which are evolving on a national basis, with merely a ceremonial nod toward state law.

8. Eg, W.W.W. Pharmaceutical Co. Inc. v. Gillette Co., 808 F Supp 1013, 1024, 23 USPQ2d 1609, 1620 (SDNY 1992), affd 984 F2d 567, 25 USPQ2d 1593 (CA 2 1993) (plaintiff "failed to establish likelihood of confusion"; reverse confusion theory did not change the analysis); Lang v. Retirement Living Publishing Co. Inc., 949 F2d 576, 21 USPQ2d 1041 (CA 2 1991) (plaintiff "failed to proffer . . . evidence [of reverse confusion]"); Murphy v. Provident Mutual Life Insurance Co. of Philadelphia, 923 F2d 923, 17 USPQ2d 1299 (CA 2 1990), affg 14 USPQ2d 1825 (D Conn 1990), cert denied 112 US 65, 116 LEd2d 40 (1991) (plaintiff's advertising theme did not qualify as a trademark and had not acquired a secondary meaning; also, there was no likelihood of confusion); Lobo Enterprises, Inc. v.

abortive cases often involve a small senior user of a mark who is confronted with a later and more intensive use by a larger company of a mark which the senior user feels is too similar. The courts may find there is no likelihood of confusion, either because the marks are not sufficiently similar, or because they are weak marks used in connection with dissimilar products or services, or other factors exist to make confusion unlikely. Once a court finds there is no likelihood of confusion, the case ceases to be instructive or even interesting insofar as reverse confusion is concerned.

In some of those cases, the courts incidentally refer to "reverse confusion" merely because of the possibility that isolated customers, but not the public as a whole, may have become familiar with the junior user's products or services prior to becoming familiar with those of the senior user, even though such individual confusion is an aberration, and even though the junior user may more likely be guilty of classic "passing off."[9]  Such cases do not involve true reverse confusion. Most of the confusion in such cases would be direct confusion and any reverse confusion would be minor and incidental. To some extent small pockets of reverse confusion have probably always been present here and there in otherwise direct confusion cases. Although such decisions may contain instructive dicta, they really should be viewed as direct confusion cases, not reverse confusion.

Finally, there are some decisions in which "reverse confusion" has been mentioned merely in a passing reference or an incidental

---

Tunnel Inc., 822 F2d 331, 3 USPQ2d 1446 (CA 2 1987), vactg 652 F Supp 1037, 2 USPQ2d 1627 (SDNY 1987), on rem 693 F Supp 71, 8 USPQ2d 1764 (SDNY 1988) (no likelihood of confusion); M-F-G Corp. v. Emra Corp., 817 F2d 410, 412, 2 USPQ2d 1538, 1540 (CA 7 1987), affg 626 F Supp 699, 228 USPQ 568 (ND Ill 1985) ("the record does not permit an inference that there has been confusion of any stripe"); Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F2d 482, 212 USPQ 246 (CA 1 1981), affg 498 F Supp 805, 210 USPQ 10 (D Mass 1980); Bridges in Organizations Inc. v. Bureau of National Affairs, Inc., 19 USPQ2d 1827 (D Md 1991) (likelihood of confusion not established); Galaxy Chemical Co. v. BASF Corp., 11 USPQ2d 1279 (ND Ill 1989), later proceeding 20 USPQ2d 1555 (ND Ill 1991) (court considered likelihood of reverse confusion to be remote at best); Pump Inc. v. Collins Management Inc., 746 F Supp 1159, 15 USPQ2d 1716 (D Mass 1990); Andy Warhol Enterprises Inc. v. Time Inc., 700 F Supp 760, 9 USPQ2d 1454 (SDNY 1988) ("no proof" of reverse confusion had been presented); Source Services Corp. v. Source Telecomputing Corp., 635 F Supp 600, 230 USPQ 290 (ND Ill 1986); Jeffrey v. Cannon Films Inc., 3 USPQ2d 1373 (CD Calif 1987) (§43(a) theories were not extended to cover reverse confusion); McFly Inc. v. Universal City Studios, Inc., 228 USPQ 153 (CD Calif 1985) (failure of proof on reverse confusion); Victory Pipe Craftsmen, Inc. v. Faberge, Inc., 582 F Supp 551, 223 USPQ 258 (ND Ill 1984); Scott v. Mego International, Inc., 519 F Supp 1118, 213 USPQ 824 (D Minn 1981) (no likelihood of confusion).

9. Eg, Americana Trading Inc. v. Russ Berrie & Co., 966 F2d 1284, 23 USPQ2d 1031 (CA 9 1992), revg and remdg 8 USPQ2d 1950 (ND Calif 1988); PAF S.r.l. v. Lisa Lighting Co., 712 F Supp 394, 12 USPQ2d 1161 (SDNY 1989).

**Vol. 84 TMR**

context, but which do not suggest that the case in question embodies a reverse confusion nexus.[10]

On the whole, reverse confusion is troublesome, because even when present, it can be unfair to force a junior to revamp its entire program when the relevant mark is being aggressively promoted by the innovative junior with more imagination and initiative than a stand-pat senior whose only virtue is seniority itself. Courts sometimes have relied on other equities to prevent such a result.[11]

In dealing with reverse confusion or any other areas of the law where equities may be conflicting, the courts have three basic tools with which they can work to achieve a just result. First, there is the substantive law of liability, which determines the "winner"; in trademark law, it is a determination which depends heavily on priority of use and likelihood of confusion. Second, the courts can look for equities to help them avoid results which seem wrong. Third, there is the matter of fashioning the proper remedy. Where the senior would otherwise "win" under established principles of law, the courts can rely on the equities of the case to change that result.[12] Beyond the law and the equities, there often remain opportunities for softening harsh consequences by closely examining the remedy ordered.

## II. THE SEMINAL CASES

The difficulty which the courts have had in dealing with reverse confusion is well illustrated by one of the early cases, Westward Coach Mfg. Co. Inc. v. Ford Motor Co.,[13] the earliest

---

10. For the sake of completeness in covering "reverse confusion" cases, the citations are the following: Barnes Group Inc. v. Connell Limited Partnership, 15 USPQ2d 1100 (D Del 1990); Parenting Unlimited Inc. v. Columbia Pictures Television Inc., 743 F Supp 221, 16 USPQ2d 1171 (SDNY 1990); McGraw-Edison Co. v. Walt Disney Productions, 787 F2d 1163, 229 USPQ 355 (CA 7 1986), revg 225 USPQ 512 (ND Ill 1985); Beer Nuts, Inc. v. Clover Club Foods Co., 605 F Supp 855, 227 USPQ 454 (D Ut 1985), revd 805 F2d 920, 231 USPQ 913 (CA 10 1986); Yarmuth-Dion Inc. v. D'ion Furs, Inc., 835 F2d 990, 5 USPQ2d 1262 (CA 2 1987), revg 3 USPQ2d 1028 (SDNY 1987); GTE Corp. v. Williams, 649 F Supp 164 (D Ut 1986); Wallpaper Mfgrs., Ltd. v. Crown Wallcovering Corp., 680 F2d 755, 214 USPQ 327 (CCPA 1982), revg 208 USPQ 686 (TTAB 1980).

11. Eg, Weiner King, Inc. v. Wiener King Corp., supra note 2; Worthington Foods, Inc. v. Kellogg Co., 732 F Supp 1417, 14 USPQ2d 1577 (SD Oh 1990); H. Lubovsky, Inc. v. Esprit de Corp, 627 F Supp 483, 228 USPQ 814 (SDNY 1986) (pondering but not deciding appropriate relief); Pizitz, Inc. v. Pizitz Mercantile Co. of Tuscaloosa Inc., 467 F Supp 1089, 204 USPQ 707 (ND Ala 1979).

12. See for example H. Lubovsky, Inc. v. Esprit de Corp, supra note 11, in which only a modest injunction was granted to plaintiff because the court feared the extortionary power to plaintiff of a broader one, even though defendant had overpowered the market with its sales and promotion and deserved to lose, in the court's opinion.

13. 388 F2d 627, 156 USPQ 437 (CA 7 1968), affg 258 F Supp 67, 150 USPQ 495 (SD Ind 1966), cert denied 392 US 927, 157 USPQ 720 (1968).

Case 2:00-cv-00299-wks   Document 176   Filed 07/01/03   Page 22 of 53

reference in the cases, incidentally, to "reverse confusion." In Westward Coach, the Seventh Circuit was faced with a situation in which a relatively small and insolvent company began using the mark MUSTANG and the representation of a charging horse on its travel trailers and campers some two years before Ford Motor Company began using the same mark, with the representation of a running horse, on a new and then experimental sports automobile. Westward had secured an Indiana state registration for the mark, apparently before Ford selected the mark. Westward applied for a federal registration for travel trailers in October 1962, which finally issued in 1967.

It was not until April, 1964 that Ford actually began marketing its MUSTANG sports car, by which time Westward had already commenced use of the mark on its travel trailers, secured a state registration, applied for a federal registration, and given notice to Ford not to use the mark. Other than its priority based on such actions, Westward had few other equities. Westward had sold 865 travel trailers while Ford, in the first eighteen months sold 645,416 MUSTANG automobiles. Westward had spent less than $100,000 in advertising while Ford spent $16,000,000. Westward had no plans to expand into the production of automobiles.

Ford apparently conceded "the likelihood that Westward's MUSTANG-marked products [would] be mistaken for products of Ford."[14] However, despite Westward's priority of use and despite Ford's concession that the public was likely to mistake Westward's products for those of Ford, both the trial court and the Seventh Circuit decided that Ford had not infringed any rights of Westward.

The Seventh Circuit's opinion in Westward Coach sheds little light, except as a study in the psychology of judges who know what conclusion they want to reach and are groping for a way to get there over obstacles set up by established legal principles. First, in order to justify the trial court's summary judgment in favor of Ford, the court pronounced that a pure question of law was presented.[15] Then, inconsistently, the court quoted with approval statements from an Indiana state court decision that "unfair competition is always a question of fact."[16] The court labored to find that MUSTANG "is not a distinctive word" and that it could not be protected "beyond the narrow limits of its

---

14. Id at 633, 156 USPQ at 441.
15. Id at 632, 156 USPQ at 440.
16. Id at 633, 156 USPQ at 441, quoting from Hartzler v. Goshen Churn & Ladder Co., 55 Ind App 455, 465-66 (1914).

**Vol. 84 TMR**

secondary meaning in the trailer industry."[17]  Yet MUSTANG, as applied to a travel trailer, is clearly suggestive at least, and possibly arbitrary.  (Consider, for example, the suggestiveness of GREYHOUND for buses and travel services.)  In the case of either suggestive or arbitrary marks, secondary meaning does not have to be shown in order to obtain relief.[18]   The Seventh Circuit stressed the existence of thirty-four existing or previous federal registrations for MUSTANG,[19]  and at least two-hundred sixty-six registrations of a horse design, in finding that the mark was weak, and noted that Ford "clearly communicated to the public beyond any doubt that Ford was the manufacturer, seller and warrantor of the MUSTANG automobile."[20]

The Seventh Circuit, looking nominally to Indiana law in this diversity case, found that the tests for infringement theretofore articulated by the Indiana courts did not embrace confusion relating to the first user's products.[21]   In fact, the court went further and declared essentially that "reverse confusion" was all nonsense.[22]

The court, after cataloging the equities, affirmed the summary judgment in favor of Ford, without identifying any particular theory for so deciding.  It would appear that the court was trying to say there was no likelihood of confusion for which Westward had standing to complain.  The key factors in the decision appear to be that the famous FORD mark was prominently promoted along with the relatively weak MUSTANG mark, that the senior user's travel trailers were a different product from Ford's automobiles, and that there was no intent to deceive.  However, one

---

17.  Id at 632, 156 USPQ at 440.

18.  Eg, Banff, Ltd. v. Federated Department Stores, Inc., supra note 3 at 489, 6 USPQ2d at 1190; Keebler Co. v. Rovira Biscuit Corp., 624 F2d 366, 374 fn 8, 207 USPQ 465, 472 (CA 1 1980); Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., supra note 2, 561 F2d at 1370, 195 USPQ at 421; Worthington Foods, Inc. v. Kellogg Co., supra note 11 at 1433, 14 USPQ2d at 1588.

19.  Westward Coach Mfg. Co. v. Ford Motor Co., supra note 13 at 631, 156 USPQ at 441.

20.  Id at 631, 156 USPQ at 439.  Several other cases have noted that a defendant's prominent display of a famous mark in conjunction with the challenged new mark reduces the likelihood of confusion.  Eg, Frisch's Restaurant, Inc. v. Shoney's Inc., 759 F2d 1261, 1265, 225 USPQ 1169, 1172 (CA 6 1985); Vitarroz Corp. v. Borden, Inc., 644 F2d 960, 969, 209 USPQ 969, 977 (CA 2 1981); Pump, Inc. v. Collins Management Inc., supra note 8 at 1167, 15 USPQ2d at 1724; Worthington Foods, Inc. v. Kellogg Co., supra note 11 at 1441, 14 USPQ2d at 1601; Decatur Federal Savings & Loan Assn. v. Peach State Federal Savings & Loan Assn., 203 USPQ 406, 412 (ND Ga 1978).  But see Banff, Ltd. v. Federated Department Stores, Inc., supra note 3 at 492, 6 USPQ at 1192 (the famous mark was displayed in very small letters).

21.  Id at 634, 156 USPQ at 441.

22.  Id at 633-34, 156 USPQ at 441 ("Appellants apparently put forth a suggested doctrine of 'reverse confusion' concerning which we find no rational basis for support.").

has the feeling that, if Ford had been the senior user and all other facts had remained unchanged, relief would have been granted to the senior user.

Both prior to the Westward Coach decision in 1968 and thereafter, there have been other decisions which demonstrated the classic reverse confusion pattern and should be considered reverse confusion cases, although the courts never used those words.

For example, in W.E. Bassett Company v. Revlon, Inc.,[23] Revlon adopted the mark CUTI-TRIM for its cuticle cutter in 1964, although Bassett had used the mark TRIM for manicuring implements since 1947. The court found that Revlon had selected a name which was too close and would be likely to cause confusion, acting with an "aura of indifference" to Bassett's rights and a "smug willingness" to treat plaintiff's good will as a nullity.[24]

---

23. 305 F Supp 581, 163 USPQ 466 (SDNY 1969), affd in pertinent part 435 F2d 656, 168 USPQ 1 (CA 2 1970).

24. The court might have been talking about reverse confusion, in saying:

> The power of the name "Revlon" could not insure against—but might indeed promote—confusion as to the source indicated by TRIM or variants of TRIM. While the kinds of confusion may not be determinable with sure precision, the uncertainty and the ambiguous possibilities are among the evils against which the trademark owner is to be safeguarded.

Id at 587-88, 163 USPQ at 470.

To be noted also is International News Service v. Associated Press, 248 US 215, 63 LE2d 211 (1918), in which Justice Holmes in a concurring opinion clearly foreshadowed the later emergence of the concept of reverse confusion:

> The ordinary case, I say, is palming off the defendant's product as the plaintiff's; but the same evil may follow from the opposite falsehood,—from saying, whether in words or by implication, that the plaintiff's product is the defendant's; and that, it seems to me is what happened here.
>
>                                    • • •
>
> The falsehood is a little more subtle, the injury a little more indirect, than in ordinary cases of unfair trade, but I think the principle that condemns the one condemns the other.

Id at 247, 63 LE2d at 224.

See also In re General Motors Corp., 196 USPQ 574 (TTAB 1977) in which an application to register STARFIRE for motor vehicles was refused on the basis of a prior registration for STARFIRE for automobile shock absorbers. Upholding the Examiner, the Board found that prospective purchasers who see STARFIRE on an automobile (of the junior user) may assume that a STARFIRE replacement part (of the senior user) was manufactured or approved by the applicant auto maker.

Finally, mention should be made of the rule stated in 148 ALR 56 (1944), which the Fifth Circuit in Capital Films calls "a subtle precursor of the Doctrine of Reverse Confusion":

> The doctrine [of unfair competition] is applicable not only whereby the acts of the infringer customers are mislead [sic] to believe that the infringer's goods, services or business are the complaining party's, but also where the impression is created that the complaining party has sponsored, or approved or is in any way connected with the activities of the infringer, or that the latter is affiliated with, or a part or a

Case 2:00-cv-00299-wks   Document 176   Filed 07/01/03   Page 25 of 53

## III.  THE BIG O CASE

Despite the Seventh Circuit's rejection of reverse confusion as a viable means of establishing likelihood of confusion, reverse confusion tenaciously persisted.  Undoubtedly, its persistence was due to the law's need of some means for dealing with the bully newcomer who swamps a smaller senior user and its products or services with massive advertising so as to destroy whatever good will once existed and to seize the mark for itself.  It was this consideration which weighed heavily in the thinking of the Tenth Circuit when it rendered its influential 1977 decision in Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co,[25] a veritable mixed bag of equities.

Big O Tire Dealers, Inc., after its formation in 1962, acted as a central marketing, advertising, purchasing and business office for some two hundred independent automobile tire dealers in fourteen states, selling under a "Big O" label.  In 1973, Big O arranged to manufacture and to sell bias belted tires under the mark BIG O BIG FOOT 60 or BIG O BIG FOOT 70, which marks were visible in raised white letters on the sidewalls.  Sales began in April, 1974.  Big O did not succeed in registering BIG FOOT.[26]

Goodyear had actually preceded Big O in adopting the trademark BIGFOOT for snowmobile replacement tracks.[27]  The product was unsuccessful.  A few months later, Big O adopted its mark for private brand tires, as described.  Then, three months after that, early in 1974, Goodyear, the world's largest tire manufacturer, decided to extend the use of its mark to the manufacture of a new custom polysteel radial tire, which after consultation with its advertising agency, was also named BIG-FOOT (to emphasize its width and traction).  At that time, Goodyear had no knowledge of the interim adoption of the mark by Big O.  A national advertising campaign was prepared, including television commercials, and on September 16, 1974, the campaign was launched at the Superbowl game.

It was on August 24, 1974, three weeks before the Goodyear ad campaign was to begin, that Goodyear first learned of Big O's use of BIG FOOT for its tires.  Telephone conversations and

---

branch and subsidiary of the former.

Capital Films Corp. v. Charles Fries Productions, Inc., supra note 7 at 394, 208 USPQ at 254, citing in turn Burge v. Dallas Retail Merchants Assn., 257 SW2d 733, 736 (Tex Civ App 1953), which quoted 148 ALR 56 with approval.

25. Supra note 2.

26. Id 561 F2d at 1368, 195 USPQ at 419.

27. Ibid (Goodyear started in October 1973, and Big O made its first interstate shipment in February 1974).

se confusion as
fusion, reverse
persistence was
with the bully
its products or
whatever good
f.  It was this
ng of the Tenth
ision in Big O
o,[25] a veritable

1962, acted as
business office
tire dealers in
n 1973, Big O
tires under the
), which marks
s.  Sales began
g BIG FOOT.[26]
adopting the
tracks.[27]  The
g O adopted its
three months
's largest tire
mark to the
e, which after
o named BIG-
At that time,
on of the mark
was prepared,
r 16, 1974, the

e the Goodyear
rned of Big O's
versations and

----

t 394, 208 USPQ at
d 733, 736 (Tex Civ

its first interstate

meetings were held to resolve the conflict.  Goodyear asked for a "no objection" letter from Big O; Goodyear showed Big O rough versions of its contemplated commercials and promotional materials; and the payment of money by Goodyear was discussed. Apparently, Big O made a definite demand of Goodyear to stop its proposed promotional campaign only six calendar days before the campaign was due to begin.  There was testimony that it would have been "technically" possible for Goodyear to have halted its promotion of BIGFOOT tires even at that late date.[28]  However, one can imagine that it would have been enormously disruptive and difficult to do so.

Ultimately, Goodyear decided it would go forward with its BIGFOOT campaign, having invested $5,000,000 in advertising up to that point ($10,000,000 by the time of trial).  Evidence existed that actual confusion had resulted among consumers,[29] and the belief arose among the public that the use of BIG FOOT by Big O was wrongful and dishonest.[30]

The Tenth Circuit limited the trademark benefit of Goodyear's early use of BIGFOOT on snowmobile tracks strictly to that product and declined to extend the trademark benefit to tires.[31] The elimination of credit for Goodyear's prior use thus resulted in Big O's being considered the senior user by a few months. Looking to Colorado law, the court observed that Colorado had been widening the scope of protection for trademarks and trade names and that the state had a policy of preventing public confusion.[32]  Goodyear argued that it had had no intent to trade on the good will of Big O nor to represent Goodyear products as being those of Big O.  The Tenth Circuit, holding that likelihood of reverse confusion formed a predicate for an actionable case against Goodyear, answered Goodyear with the words of District Judge Matsch who had written the opinion in the trial court:

> The logical consequence of accepting Goodyear's position
> would be the immunization from unfair competition liability
> of a company with a well established trade name and with the

----

28.  Ibid.

29.  Id 408 F Supp at 1229, 189 USPQ at 32.  Such evidence of confusion took several forms:

   (i)  Big O customers thought Goodyear was producing the BIG O BIG FOOT tires;

   (ii)  Questions were asked about the association of BIG O with Goodyear;

   (iii)  Some people wondered how two companies could use the same trademark for tires; and

   (iv)  Confusion existed about who owned the mark and who had adopted it first.

30.  Id at 1229, 189 USPQ at 32.

31.  Id 561 F2d at 1371, 195 USPQ at 422.

32.  Id at 1371-72, 195 USPQ at 422.

> economic power to advertise extensively for a product name
> taken from a competitor. If the law is to limit recovery to
> passing off, anyone with adequate size and resources can
> adopt any trademark and develop a new meaning for that
> trademark as identification of the second user's products. The
> activities of Goodyear in this case are unquestionably unfair
> competition through an improper use of a trademark and that
> must be actionable.[33]

The court also found that the jury could reasonably have inferred
a likelihood of confusion based upon the testimony of actual
confusion.

It is surprising how strongly Goodyear was condemned by the
court, considering that Goodyear adopted the mark in good faith
after having previously used the same mark on a related line of
products and having learned of Big O's use only on the eve of a
nationwide campaign to promote BIGFOOT. At best, Big O's
seniority was of only a few months duration. One suspects that
the judge and jury in the district court, and the Tenth Circuit on
appeal, were offended and influenced by some apparently high-
handed remarks made by a Goodyear official to Big O to the effect
that: "Goodyear wished to avoid litigation but . . . if Big O did
sue, the case would be in litigation long enough that Goodyear
might obtain all the benefits it desired from the term 'Bigfoot.'"[34]

Whatever might have been the critical factors influencing the
Tenth Circuit's decision, Big O stands for the proposition that
reverse confusion can be actionable. However, Big O does not give
much guidance as to the extent of or limitations on the so-called
reverse confusion doctrine. We will consider below certain
situations and the manner in which the courts have developed the
reverse confusion doctrine.

## IV. REPRESENTATIVE CASES AFTER BIG O

In Love v. New York Times Company,[35] plaintiff was the first
to use the title US QUARTERLY or US for a magazine. Only
three issues were published, and few copies were sold. Defendant
had searched and found no record of plaintiff's unregistered mark,
but although later put on notice of such use, it continued to use its
mark for a photo journal. While plaintiff was found to have a
protectible trademark right and was the first to use the mark, the

---

33. Id at 1372, 195 USPQ at 423 (quoting from the trial court decision, 408 F Supp
at 1236, 189 USPQ at 32).

34. Id at 1368, 195 USPQ at 420.

35. 691 F2d 261, 217 USPQ 313 (CA 6 1982).

roduct name
t recovery to
esources can
ting for that
roducts. The
nably unfair
ark and that

tave inferred
ty of actual

mned by the
n good faith
lated line of
the eve of a
est, Big O's
aspects that
n Circuit on
rently high-
to the effect
f Big O did
it Goodyear
'Bigfoot.'"[34]
uencing the
sition that
ies not give
ne so-called
ow certain
veloped the

G O

as the first
tine. Only
Defendant
ered mark,
d to use its
to have a
mark, the

lower court determined that there was no likelihood of confusion
and held in favor of defendant.

On appeal, plaintiff claimed that he was frustrated by
defendant's bi-weekly flooding of the market with thousands of
copies of its magazine, having a similar format and a highly
similar name. This could well have prevented plaintiff from
obtaining financing and distribution outlets, and if proved, might
have established reverse confusion, in that Love would incorrectly
appear to be trading on defendant's name. Nevertheless, the
record did not warrant overturning the lower court's judgment.
Aside from the fact that there were apparent differences in the
magazines and that the markets and the contents were also
different, plaintiff already faced financial disaster before defendant
decided to publish. The Sixth Circuit stated:

> We find no way by which, on this record, the District Judge
> could have separated from the reverse confusion issue the
> financial impact of such factors as unsatisfactory sales of his
> first issue (which was published before defendant's magazine
> was on the market) and inadequate financing.[36]

Injunctive relief to plaintiff was considered inequitable,
largely because of The New York Times' investment of over $7
million, which was many times greater than plaintiff's and
because of plaintiff's untenable financial condition. No deception
had been intended and there was no "passing off," nor any
attempt to trade on plaintiff's good will. There appeared to be
some feeling that suit had been brought as a maneuver or gamble
to obtain a financial settlement from the stronger company. What
is demonstrated by this case is that a factual pattern showing
reverse confusion does not always ensure success.

Plus Products v. Plus Discount Foods, Inc.,[37] is one of the
frequently cited reverse confusion cases arising after Big O. In
1939, Plus Products started to produce and sell health products
under the PLUS and design mark, which was registered for
vitamin products, food supplements, cosmetic lotions, creams and
related toilet articles. The company also used the mark for spices
and cooking oils, after 1963, and for pet food supplements, after
1972, as well as for a line of food products. From 1970 to 1979,
the company spent over $6 million in advertising and took in $75
million in sales from PLUS products, primarily through health
food magazine mail orders, and later, through direct sales to
jobbers and health stores. In 1980, it expanded into supermarket

n, 408 F Supp

36.  Id at 264, 217 USPQ at 315.

37.  564 F Supp 984, 218 USPQ 726 (SDNY 1983), affd in part and revd in part 722
F2d 999, 222 USPQ 373 (CA 2 1983)

Case 2:00-cv-00299-wks   Document 176   Filed 07/01/03   Page 29 of 53

nutrition centers and by late 1981, had 35 supermarket accounts with 923 outlets. PLUS products were known for high quality and high cost.

Starting in 1979, defendant, Plus Discount Foods used its PLUS logo on discount food stores, selling private label items, identified with a generic product name and store logo, as well as national brands. It later opened a number of bargain basement, no frills, discount food stores in the United States under a PLUS store trademark, selling PLUS branded products. There were 61 stores by September 1980 (later rising to 81 and then dropping to 38). Defendant spent over $5 million in advertising and had over $400 million in sales.

When the potential conflict was noted, defendant's counsel advised against the use of the PLUS logo on vitamins, shampoos, beauty preparations and beauty soaps, because those were the items Plus Products was selling under its PLUS mark. That advice was ignored.

The district court, citing the evidence as a type of "so-called reverse confusion," found that the equities weighed in favor of injunctive relief for plaintiff, "but just barely," and allowed only limited relief to avoid granting plaintiff a monopoly on the use of PLUS. Defendant was enjoined from using its logo until "Foods" was added prominently thereto and unless a prominent disclaimer was posted as a sign in the stores and included in advertising. Shelf talkers using PLUS were enjoined for vitamins, health foods and pet foods, unless the manufacturer's name was also specified. Disclaimers to the effect that private label products were not those of plaintiff were also to be posted at store entrances.

On appeal, the Second Circuit treated reverse confusion as a more prominent element of the case than did the court below. If consumers concluded, said the appellate court, that defendant is the source of plaintiff's goods, plaintiff's "reputation for high quality merchandise may well become tarnished because of Foods' bargain basement, no-frills image."[38]

The court concluded that the district court's analysis of the relevant factors for determining likelihood of confusion, while factually accurate, had incorrectly assessed the weight given to certain of them. The court determined that the injunction should be limited to the three overlapping products, i.e., pet foods, spices and food oils. It also held the disclaimers to be unnecessary.

Defendants in this case had been guilty of the intentional adoption of a prior user's mark, to secure its previous investment in its own mark. Yet, despite an injunction against their acts,

---

38. Id 722 F2d at 1003, 222 USPQ at 376.

cet accounts
quality and

ds used its
label items,
), as well as
1 basement,
der a PLUS
ere were 61
dropping to
nd had over

nt's counsel
s, shampoos,
se were the
1ark.  That

of "so-called
in favor of
1llowed only
n the use of
ntil "Foods"
t disclaimer
advertising.
health foods
so specified.
re not those

nfusion as a
1rt below.  If
lefendant is
on for high
use of Foods'

alysis of the
1sion, while
jht given to
ction should
foods, spices
)cessary.
intentional
investment
their acts,

---

despite their intent and despite a recognition that likelihood of confusion existed, defendants were essentially successful in fighting off any strong limitations on their actions.

In Fuji Photo Film Company, Inc. v. Shinohara Shoji Kabushiki Kaisha,[39] two Japanese companies claimed the right to use FUJI on graphic arts equipment and supplies in the United States, and each alleged trademark infringement and unfair competition by the other.  The only reference to reverse confusion was parenthetical,[40] in a citation to Plus Products.[41]  Yet, this is a reverse confusion case, and the court spoke in reverse confusion terms.

Fuji had sold photographic products and graphic arts products in the United States, since 1954 and 1965, respectively. Shinohara first sold its FUJI printing presses in the United States in 1978, resulting in actual confusion, and there was continuing litigation between them, either directly or through their United States representatives.

The trial court, reviewing the factors evidencing likelihood of confusion, found for defendant.  On appeal, the Fifth Circuit held that the lower court had used the wrong standard and did not focus on the correct factors.  The decision was reversed on that issue and remanded.

The trial court had understood likelihood of confusion to mean "only confusion by the purchasers of Shinohara's presses" as to the source of those presses.[42]  Referring to a number of reverse confusion cases without categorizing them as such, the court recognized that an action would lie when confusion arises as to either or both parties' products.  Further, likelihood of confusion might be found absent confusion as to source.  "[T]rademark infringement occurs also 'when the use sought to be enjoined is likely to confuse purchasers with respect to . . . [the products'] endorsement by the plaintiff, or its connection with the plaintiff.'"[43]

In this somewhat confusing case, defendant's sales of printing presses under the same name as plaintiff's famous photographic and graphic arts products was considered to have created actual confusion, through the belief that plaintiffs had endorsed defendant's products or had some connection with them.  This undoubtedly suggests reverse confusion, but the court did not clearly

---

39.  754 F2d 591, 225 USPQ 540 (CA 5 1985)
40.  Id at 596, 225 USPQ at 543.
41.  Supra note 37.
42.  Supra note 39 at 596, 225 USPQ at 543 (emphasis omitted).
43.  Ibid.

identify or discuss the factual elements which constituted the reverse confusion.

In the recent case of Americana Trading Inc. d/b/a Amtra v. Russ Berrie & Co.[44]  Amtra had begun selling pairs of velcro-joined stuffed bears called "Wedding Bears," dressed as bride-groom and bride.  The mark was licensed to a toy company and had become very successful by 1986.

In 1985, Russ Berrie & Co. ("Russ") which had become aware of the Amtra line, developed similar stuffed bears which were called "Bride Bear" and "Groom Bear," first sold in 1986.  Those names were used on all sales and promotional materials, except that a cloth tag sewn into the rump of each bear bore the promi-nent notation "Wedding Bear," with Russ' name.

In 1987, suit was brought and a preliminary injunction was granted.  Russ then filed a motion for summary judgment which was granted by the district court.

On appeal, the Ninth Circuit reviewed the lower court findings as to the tests for likelihood of confusion and disagreed with several.  Particularly, it had been held below that the "Wedding Bear" marks were not similar, in part because the prominent use of Russ' house mark on the tag would negate any likelihood of confusion.  However, the appellate court believed that was a factual assumption not warranted at the summary judgment stage of the proceedings.  Also, said the court, "the prominence of Russ's housemark may serve to create reverse confusion that Russ, and not Amtra, is the source of Amtra's 'Wedding Bears.'  Russ's housemark therefore does not, as a matter of law, render its use of 'Wedding Bear' nonsimilar to Amtra's trademark."[45]

In short, it could not be said, as a matter of law, that Russ had not infringed the Amtra mark.  Amtra had presented sufficient evidence to survive the motion for summary judgment. The district court judgment was, accordingly, reversed and the case remanded for trial.  One appellate judge dissented, without opinion.

An important step forward in the development of the doctrine of reverse confusion was marked by the case of Banff, Ltd. v. Federated Department Stores, Inc.,[46] which was one of the first successful applications of the doctrine of reverse confusion in the context of actions brought under Section 43(a) of the Lanham Act, as contrasted with those brought pursuant to Section 32.

---

44.  Supra note 9.

45.  Id at 1288, 23 USPQ2d at 1035.

46.  Supra note 3.

I. 84 TMR

ituted the

ı Amtra v.
of velcro-
as bride-
ıpany and

ɔme aware
hich were
36. Those
ıls, except
:he promi-

ıction was
ent which

ver court
disagreed
that the
cause the
egate any
ieved that
judgment
ıinence of
:hat Russ,
s.' Russ's
er its use

:hat Russ
presented
udgment.
. and the
, without

ɛ doctrine
f, Ltd. v.
the first
on in the
ıham Act,
ĭ.

In 1971, plaintiff adopted and used the unregistered mark BEE WEAR for retail women's clothing.  Since 1930, defendant Bloomingdale's, had been using the letter "B," by itself and with other words (e.g., B-WAY), to promote its goods and business.  It used "B" in three ways, with a ribbon-style logo, in a standard typeface and as a modern styled lower case letter.  In 1986, Bloomingdale's commenced to use "B Wear" in standard type, and plaintiff objected.

The lower court found for plaintiff, but enjoined defendant from the use only of the standard type style "B."  However, on appeal, the injunction was  modified and broadened to enjoin the use of the mark "B Wear" in any form, but without restricting the use of "B" alone or in any other combination.

The court pointed out that the disputed marks might create both ordinary confusion and reverse confusion.  Under the Lanham Act, it was said, confusion is ordinarily the misimpression that the senior user (Banff) was the source of the junior user's goods.  Reverse confusion is the misimpression that the junior user is the source of the senior user's goods.  Consumers of any of the "B Wear" goods might come to believe either that Bloomingdale's goods originated with Banff or that Banff's goods originated with Bloomingdale's, depending on which mark they first came to know.  In either event, Banff's reputation might be injured and its good will impaired.  "Thus, reverse confusion also inhibits fair competition and deprives Banff of its reputation and good will."[47]

This is one of the more cited decisions on reverse confusion.  Although the facts could have supported either type of confusion, the court's discussion focused on the reverse variety.  The subject was fully considered and clearly expounded.  Furthermore, the opinion furnishes an excellent example of a court's tailoring its relief to the facts.

One of the more interesting efforts to extend the reach of reverse confusion is described in DeCosta v. Viacom International, Inc.,[48] a decision of the First Circuit decided in December 1992.  Plaintiff DeCosta's appearance and costume at rodeos and other public events was the alleged inspiration of the hero "Paladin" in the television series "Have Gun, Will Travel" which was originally broadcast over the CBS Television Network in the late 1950s and early 1960s.  He had sued in 1963, claiming CBS unlawfully copied his idea and the elements of his persona.  Although the court at that time acknowledged that CBS might have copied, it found that the law did not afford him a remedy, since he had

---

47.  Id at 490, 6 USPQ2d at 1191.
48.  Supra note 7.

failed to prove a violation of the trademark and other relevant laws. When CBS later licensed re-run and syndication rights to its related company, Viacom (plaintiff), DeCosta sued again. The second case proceeded to trial, and DeCosta won a jury verdict, from which Viacom appealed.[49]

One of DeCosta's principal theories in his resurrected claim was based on the doctrine of reverse confusion. His position was that the development of reverse confusion law after the Big O decision (itself decided two years after the prior DeCosta decision) constituted a significant change in the law of trademarks so as to remove him from the bar of collateral estoppel and to create a new, level playing field on which to relitigate the formerly decided issues. However, said the court, the trademark law does not divide confusion into ordinary and reverse varieties. Nor did the court in Big O suggest that reverse confusion represented a totally new or novel principle.

> DeCosta cannot therefore claim that the principle (that trademark law protects against a buyer's being led to believe, wrongly and harmfully, that the copier is the source of the holder's product) was unavailable to him or that he was not aware of it in his initial case.[50]

It would have been more plausible, according to the court, for DeCosta to argue that he could have recovered for harm suffered from reverse confusion, not because the public might have believed Viacom made or sponsored plaintiff's goods or services, but because it was wrongly believed that DeCosta had copied or pirated the Paladin concept and persona. Pointing out that there are dicta in certain cases to support such a theory, nevertheless the First Circuit rejected it as unsound law. The court held that piracy alone was insufficient to establish reverse confusion, unless accompanied by likelihood of confusion of the public as to source or sponsorship.

It must be conceded that adopting mere piracy as a basis of decision and abandoning the concept of confusion, reverse or otherwise, as urged by plaintiff, would constitute a major development in the law of trademarks and unfair competition (although we may not be so far away as might be supposed, given the presumption of likelihood of confusion entertained by a number of courts today in cases where deliberate copying has occurred).

---

49. For prior decisions see Columbia Broadcasting System, Inc. v. DeCosta, 377 F2d 315, 153 USPQ 649 (CA 1 1967), cert denied 389 US 1007, 156 USPQ 719 (1967) and DeCosta v. Columbia Broadcasting System, Inc., 520 F2d 499, 186 USPQ 305 (CA 1 1975), cert denied 423 US 1073, 189 USPQ 64 (1976).

50. Supra note 7 at 608-09, 25 USPQ2d at 1192 (emphasis omitted).

Case 2:00-cv-00299-wks   Document 176   Filed 07/01/03   Page 34 of 53

ier relevant
on rights to
again. The
ury verdict,

rected claim
position was
: the Big O
sta decision)
arks so as to
to create a
erly decided
iw does not
Nor did the
ited a totally

nciple (that
ed to believe,
source of the
t he was not

the court, for
arm suffered
nave believed
services, but
ad copied or
ut that there
nevertheless
urt held that
fusion, unless
: as to source

as a basis of
n, reverse or
najor develop-
ion (although
ed, given the
y a number of
ias occurred).

However, the First Circuit preferred to steer a conservative course in requiring proof of likelihood of confusion as to sponsorship.

Depending on one's predilections, this determination might seem free of criticism or leave much to be desired. The court reasoned that the law often permits different users in widely separated geographic areas or in different businesses to use the same mark, implying that deliberate copying is sometimes permitted "on a different product in a different market."[51] DeCosta would presumably claim in such event that the senior user was open to a charge of piracy of the junior's mark which had become the more popular. While recognizing that if such piracy were actionable, no one could again safely adopt any mark previously used by another, the First Circuit did not seem to appreciate that, traditionally, even in such circumstances, the junior user must adopt a mark in good faith in order to acquire rights even in a disparate geographical area or line of goods.

In addition, the First Circuit also noted that there are other appropriate remedies for piracy, such as copyright infringement and commercial disparagement. However, copyright infringement would at best be an awkward means to protect the character and persona of DeCosta, although concrete elements such as the business card could have been protected. In turn, commercial disparagement would similarly arise out of the implicit misrepresentation that the senior was a pirate because he would be perceived wrongly to have adopted or stolen the junior user's more popular mark. Yet, the court did not consider that if the public believed that the senior was indeed a pirate, it would surely do so only in a context of confusion, in which event traditional trademark law would apply anyway.

Finally, the First Circuit did not find in Big O, the leading case on reverse confusion, anything suggesting that commercial disparagement law, as contrasted with traditional trademark law, "provides proper legal relief for the harm of 'falsely being thought a pirate.'"[52] Accordingly, as indicated above, the court rejected DeCosta's argument and held that a successful plaintiff must still prove reverse confusion by proving a likelihood of confusion as to sponsorship.

It would seem that the court in DeCosta did not need to labor over plaintiff's claim of piracy to the extent it did. The court could have held that piracy under the facts of that case was an intentional tort, excusing the plaintiff from proving secondary

---

eCosta, 377 F2d
.719 (1967) and
006 (CA 1 1975),

51.  Id at 609, 25 USPQ2d at 1193.

52.  Id at 610, 25 USPQ2d at 1194, referring to Big O, supra note 2, 561 F2d at 1373-74, 195 USPQ at 423-24.

**Vol. 84 TMR**

meaning and likelihood of confusion when the idea sought to be protected falls within the ambit of a traditional trademark (not just the "look and feel" of the idea). This would possibly have provided an acceptable remedy without a dramatic departure from present trademark law, although this particular plaintiff would still have had problems with collateral estoppel and laches.

However, the court did not hold that piracy without likelihood of confusion is actionable under trademark law, thus apparently confining piracy remedies to such niches as commercial disparagement, copyright, dilution or some other jurisprudential field, when appropriate. Nevertheless, one doubts whether the court realized that it was possibly thereby rejecting the broadly accepted proposition under present law that intentional infringement eliminates the need to prove likelihood of confusion and secondary meaning, or at least such intentional infringement creates important presumptions favorable to plaintiff. While perhaps unsatisfactory as written, the decision simply states, as summarized by the court:

> For these reasons, insofar as the doctrine of "reverse confusion" may be thought significantly "new" (reverse confusion about "piracy"), we do not accept it. Insofar as we accept it (reverse confusion involving source or sponsorship), we do not believe it is significantly new. Hence, we do not believe that there are changes in the law here that can overcome the effects of "collateral estoppel."[53]

## V. REVERSE CONFUSION AND GENERIC, DESCRIPTIVE, GEOGRAPHICAL AND SURNAME MARKS

It is interesting to consider the application of reverse confusion in the context of marks which are only marginally protectible, if at all. Generic marks, properly understood, are not protectible,[54] and thus the reverse confusion doctrine has no application to such marks. A junior user can adopt a generic mark with impunity, albeit distinguishing a generic mark from other types of more protectible marks is not always easy.

Descriptive marks, geographical marks, and marks based on surnames can be protected only if they have acquired a secondary meaning.[55] In addition, special considerations apply to surnames.

---

53. Ibid.

54. See 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §12.01[2] at 12-5 (3d ed 1992).

55. See McCarthy, id §15.01[2] at 15-16.

The existence of reverse confusion can be a relevant factor in the determination of whether secondary meaning exists, as well as in the determination of likelihood of confusion. Thus, reverse confusion may come into play in the threshold determination of whether there is a protectible mark. For example, in Jefferson Home Furniture Co. Inc. v. Jefferson Furniture Co. Inc.,[56] the Alabama Supreme Court, without using the words, considered reverse confusion in the context of two furniture retailers named JEFFERSON and JEFFERSON HOME, located in different areas of Jefferson County, the largest county in the state. One of the stores, junior in age but larger in sales volume, attempted to expand with a branch store into an area somewhat closer to the other, senior retailer, an area which the senior user considered to be within its normal sales territory. The court noted that JEFFERSON, the dominant part of each retailer's name, was a protectible trademark or trade name only if the senior user could prove secondary meaning.[57] Noting that there was reverse confusion (without however using those words) in that consumers had greater familiarity with the junior expansion-minded retailer, nevertheless, the court found that the senior user had failed to prove secondary meaning critical to its case:

> In this case, the evidence shows that when some customers have come into plaintiff's [senior user's] place of business (in response to defendant's ads), they have stated they thought they were in one of defendant's stores. The converse, however, was not shown to have occurred. We think this tends to negate the conclusion that plaintiff's name has acquired a secondary meaning. If anything, it appears to show that defendant's name has acquired a secondary meaning.[58]

With respect to surnames, one court resolved what may be considered a reverse confusion case involving two retailers with a common surname by requiring the junior user in the locality (but the senior user in the state) to add an addendum to its name to distinguish it from the other, and by requiring the junior user to take other steps to minimize confusion.[59] There was no issue of good faith, since both parties had been using their common surname in their respective businesses for many years. The court

---

56. Supra note 6.

57. Id at 8, 197 USPQ 334.

58. Id at 8, 197 USPQ at 336.

59. Pizitz, Inc. v. Pizitz Mercantile Co., supra note 11. The testimony of the defendant's employees showed that "the defendant had in the past sold to those customers who mistook defendant's operations for those of the plaintiff." Id at 1095, 204 USPQ at 712.

found that both parties' names had acquired a secondary meaning,[60] but the court was obviously reluctant to prohibit either of the parties from using its surname. Hence, the court resolved the litigation by allowing the senior user to continue to be called "Pizitz" while requiring the junior user to use only the designation "Pizitz of Birmingham" in its advertisements, together with an appropriate disclaimer.[61]

As noted, descriptive, geographical and surname marks are often hard to protect at the outset because the senior user must prove secondary meaning, a task made especially difficult when reverse confusion is present. Once secondary meaning is demonstrated, however, the issue of likelihood of confusion, whether forward or reverse, is next to be determined, through an analysis of the so-called Polaroid factors. We turn next to a consideration of some of them, as they relate to reverse confusion.

## VI.  EFFECT OF THE STRENGTH OF THE MARK

The decided cases do not articulate the theory very well, but apparently the judiciary feels that a broader band of reverse confusion is tolerable when a mark is weak, partly because a junior user will have a harder time achieving its exclusive association with a weak mark than with an inherently strong mark which has theretofore been minimally promoted by a senior user.[62]

Thus, senior users of weak marks are generally less likely to be accorded protection than senior users of stronger marks. At least one court, in a remarkably lucid opinion, has remarked on the special significance of the strength of the mark in the context of reverse confusion.[63]

With one possible exception,[64] there seems to be no reverse confusion case where meaningful relief has been granted to a senior user when the court has found the mark to be weak.[65]

---

60.  Id at 1095, 204 USPQ at 714.

61.  Id at 1099-1100, 204 USPQ at 715-16.

62.  See H. Lubovsky, Inc. v. Esprit de Corp, supra note 11.

63.  Worthington Foods, Inc. v. Kellogg Co., supra note 11 at 1456, 14 USPQ2d at 1607.

64.  Banff, Ltd. v. Federated Department Stores, Inc., supra note 3 at 491, 6 USPQ2d at 1191 (expressing doubt as to district court's finding that the mark was weak, the appellate court did not disturb, and even strengthened the injunction).

65.  Compare Westward Coach Mfg. Co. Inc. v. Ford Motor Co., supra note 13 at 632, 156 USPQ at 442 (mark was "weak"; senior user lost); Pump Inc. v. Collins Management, Inc., supra note 8 at 1171, 15 USPQ2d at 1866 (mark was "extremely weak"; senior user lost); and Worthington Foods, Inc. v. Kellogg Co., supra note 11 at 1456, 14 USPQ2d at 1607 (SD Oh 1990) ("not . . . a 'strong' mark"; senior user denied preliminary injunction) with Ameritech, Inc. v. American Information Technologies Corp., supra note 3 at 967, 1 USPQ2d at 1866 (mark locally strong; reversed lower court's summary judgment against

condary mean-
>hibit either of
rt resolved the
e to be called
y the designa-
together with

me marks are
iior user must
difficult when
ung is demon-
ision, whether
gh an analysis
. consideration
i.

E MARK

very well, but
ind of reverse
·tly because a
its exclusive
erently strong
:ed by a senior

y less likely to
er marks. At
s remarked on
in the context

be no reverse
granted to a
be weak.[65]

---

In an interesting twist, the Seventh Circuit has held that, in a reverse confusion case, the strength or weakness of a mark must be judged "in terms of its association with the junior user's goods."[66] In that case, the mark THIRST-AID was owned and registered but was not currently being used by the plaintiff for beverages, although it was being used on ice cream toppings by an assignee of its non-beverage product line, and active efforts were being made to license it for beverages.

Quaker Oats, owner of GATORADE, had promoted THIRST AID heavily in an advertising campaign based on the slogan GATORADE IS THIRST AID, with knowledge of the mark's history and prior usage, acquired during the development of the campaign. The slogan and mark became strongly associated with the junior user (Quaker Oats), and "the vast majority of [survey] respondents identified GATORADE with the mark THIRST-AID."[67]

While the Seventh Circuit thus regarded the mark as strong because it had become strongly associated with the junior user, this approach seems analytically untenable. Surely the liability of a junior user on the merits, insofar as likelihood of confusion is concerned, ought to be judged based on the strength of the mark (considered with other pertinent factors) as of the time of the initial misappropriation, and not on the basis of enhanced strength resulting from the arguably infringing use.[68]

The Seventh Circuit finally adopted the reverse confusion doctrine in this case, reversing its original antipathy for the concept evidenced in the Westward Coach case in 1966.

> Although this court has not previously recognized reverse confusion as the basis for a claim under the Lanham Act, several other circuits have endorsed the concept. We agree with those courts that "the objectives of the Lanham Act—to protect an owner's interest in its trademark by keeping the public free from confusion as to the source of goods and

---

senior user); and Tanel Corp. v. Reebok International, Ltd., 774 F Supp 49, 55-56, 16 USPQ2d 2034, 2040 (D Mass 1990) (mark was "strong"; preliminary injunction granted in favor of senior user).

66. Sands, Taylor & Wood Co. v. Quaker Oats Co., supra note 1, 978 F2d at 959, 24 USPQ2d at 1012.

67. Id 18 USPQ2d at 1471.

68. However, even though the impact of the THIRST-AID mark may have been weakened because it was not in use for beverages at the time of infringement, it had been registered, and was still in use under the aegis of the plaintiff. Such use dated back to 1921, and despite business ups and downs, there had never been an intention to abandon the mark, and there were active efforts to license its use. The lower court was obviously impressed also by the lack of good faith shown by Quaker Oats. Thus, it is neither inconsistent nor inaccurate to consider the mark a "strong" one, entitling plaintiff to a judgment based on a finding of reverse confusion, among other grounds.

---

14 USPQ2d at 1607.
3 at 491, 6 USPQ2d
irk was weak, the

ra note 13 at 632,
lline Management.
eak"; senior user
14 USPQ2d at
ary injunction)
e 3 at 967, 1
ment against

Case 2:00-cv-00299-wks   Document 176   Filed 07/01/03   Page 39 of 53

ensuring fair competition—are as important in a case of reverse confusion as in typical trademark infringement." Banff, Ltd., 841 F2d at 490 [6 USPQ2d at 1191]. We therefore hold that reverse confusion is a redressable injury under the Lanham Act.[69]

The appellate court went on to consider defendant's argument that there was no likelihood of confusion of any sort, but rejected it. It held that the district court's analysis of the various factors was sufficient to support its finding that there was a likelihood of confusion and, therefore, infringement. It did, however, weaken the finding of bad faith on the part of Quaker Oats.

## VII. EFFECT OF EXPANSION HISTORY AND FEDERAL REGISTRATION

Reverse confusion will ordinarily occur when the junior user is relatively large and the senior user is relatively small.[70] A frequent corollary is that the junior user has acted aggressively and has expanded rapidly while the senior user has had little growth.[71] It can be argued that the courts ought not to attach great significance to the expansion history, because the senior user might well have expanded also but for the lack of adequate financial resources.[72] Nevertheless, the judiciary has considered the expansion history to be important in traditional trademark litigation, and it likewise weighs the expansion history heavily when it evaluates reverse confusion.

Similarly, a larger and more sophisticated junior user may be more likely to pursue a federal registration than a mom-and-pop senior user whose situation has remained small and static. It could be argued that such failure to register should not be held against the junior user. Nevertheless, the courts do take such registrations into account, perhaps decisively in some instances.

One of the best examples of the impact of the parties' respective expansion histories, and of the registration argument is found in Weiner King, Inc. v. Wiener King Corp.[73] There, the former Court of Customs and Patent Appeals reviewed a decision of the Trademark Trial and Appeal Board in a cancellation

---

69. Id 978 F2d at 958, 24 USPQ2d at 1010 (footnote omitted).

70. See Sands, Taylor & Wood, supra note 1; Banff, Ltd., supra note 3; Big O, supra note 2.

71. See H. Lubovsky, Inc. v Esprit de Corp, supra note 11; MasterCard International Inc. v. Arbel Corp., 13 USPQ2d 1958 (SDNY 1986); Elizabeth Taylor Cosmetics Co. v. Annick Goutal S.a.r.l., 673 F Supp 1238, 5 USPQ2d 1305 (SDNY 1987), later opinion 677 F Supp 144, 6 USPQ2d 1571 (SDNY 1987).

72. See Love v. New York Times Co., supra note 35.

73. Supra note 2.

a case of
ingement.''
/e therefore
r under the

; argument
ɔut rejected
ious factors
ı likelihood
ver, weaken

\ND

junior user
small.[70]   A
ıggressively
; had little
ıt to attach
the senior
of adequate
ı considered
trademark
ory heavily

user may be
ıom-and-pop
d static. It
not be held
o take such
: instances.
the parties'
n argument
There, the
ıd a decision
cancellation

Big O, supra

ʌternational
ʌtics Co. v.
ʌ inlon 677

proceeding.  The senior user had remained small and local in a portion of New Jersey using the name WEINER KING.  The junior user had adopted the mark WIENER KING, starting in North Carolina and expanding into twenty states with more than one-hundred facilities over a period of five years.  Furthermore, the junior user had obtained federal registrations for three variations of WIENER KING, which registrations were subject to the cancellation proceeding.  While the junior user had adopted its marks in good faith, most of its expansion had occurred after it learned of the existence and rights of the senior user.  Here again, is a reverse confusion case without the words.

In resolving this cancellation proceeding, the court relied heavily on a balancing of the equities.[74]  On the one hand, the senior user had done little to develop his mark, and a favorable ruling would put it in a position of being able to hold hostage a large organization whose options would essentially be either to change the name of more than one-hundred stores or to buy its way out of the problem with a generous payout to the senior.  On the other hand, most of the expansion had occurred after the junior user knew of the existence of the senior.

The court in Weiner King struggled with the equities but concluded that the junior user should retain its exclusive rights in practically all of the United States except in those areas of New Jersey where the senior user had been operating.  In reaching this conclusion, the court stressed: (1) the initial good faith adoption of the mark by the junior user; (2) the diligence of the junior user in expanding, which the senior had not done; and (3) the junior user's diligence in securing federal registration, which the senior had not done.[75]  It is questionable whether the outcome would have been the same in the absence of the federal registrations, even considering the other two factors.  The court was careful to point out that "we also find it significant that . . . [the junior user] was the first to register its mark," referring also to the "policy of encouraging prompt registration of marks by rewarding those who first seek registration. . . ."[76]

Thus, the most significant factor distinguishing Weiner King from those cases which have tilted toward greater protection of the senior user may have been the junior user's diligence in obtaining federal registration.

---

74.  Id at 522, 204 USPQ at 829 ("application of equitable principles"; "balancing the equities").

75.  Id at 522-23, 204 USPQ at 829-31.

76.  Id at 523, 204 USPQ at 830.

## VIII. SUDDENNESS OF SATURATION ADVERTISING AND PROMOTION

Although the extent of advertising and promotion of a contested mark is certainly one of the factors to be considered, the cases scarcely assign any explicit relevance to the sudden saturation of the market by a junior's advertising campaign as compared with a junior's gradual expansion from one geographic area to another. However, "suddenness" versus "gradualism" implicitly appears to be relevant.

It has already been noted that the Tenth Circuit condemned the sudden nation-wide saturation by the junior user (Goodyear) in the Big O case, while a different court allowed the junior user in Weiner King to expand gradually from one state to another. It seems more than coincidental that other courts have consistently protected senior users against the onslaught of massive advertising campaigns.

The logic appears to be twofold: on one hand, there is the feeling that a senior user is helpless to defend itself against a larger and better financed junior user which suddenly saturates the advertising media with a massive campaign; on the other hand, in the case of more gradual encroachment, there is the feeling that it is a shame to turn back the clock and make a junior user change its marks which have been spread gradually over regional or national areas without objection by the senior user. At least, in the latter case the senior has had a better opportunity to object to and oppose the expansion than in the case of a sudden onslaught.

The courts tend to speak in terms of the senior user being "overwhelm[ed],"[77] or "swamp[ed],"[78] or "suffocated,"[79] or "flood[ed],"[80] or "saturat[ed],"[81] all words which imply the sudden application of paralyzing force against the smaller senior user and its mark. It would appear, therefore, that the equities and the results do change, depending on the nature, extent and forcefulness of the junior user's activities vis-a-vis a senior user's complacency or vigorous reaction.

---

77. Worthington Foods, Inc. v. Kellogg Co., supra note 11 at 1456, 14 USPQ2d 1577.

78. Source Services Corp. v. Source Telecomputing Corp., supra note 8 at 614, 230 USPQ at 298 (quoting McCarthy).

79. Ameritech, Inc. v. American Information Technologies Corp., supra note 3 at 966, 1 USPQ2d at 1866.

80. Weiner King, Inc. v. Wiener King Corp., supra note 2 at 524 fn 9, 204 USPQ at 831; Pump, Inc. v. Collins Management, Inc., supra note 8 at 1166, 15 USPQ2d at 1722.

81. Sands, Taylor & Wood Co. v. Quaker Oats Co., supra note 1, 978 F2d at 957, 24 USPQ at 1010; Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., supra note 2.

Case 2:00-cv-00299-wks Document 176 Filed 07/01/03 Page 42 of 53

## IX. INTENT TO MISAPPROPRIATE

Clearly there appears to be a feeling on the part of most courts that the junior user's good faith and intent is important in reverse confusion cases,[82] although, in such a case, at least one court has said that such intent is "essentially irrelevant."[83] Certainly, the standard rules that a defendant's bad faith relieves a plaintiff of the necessity of proving secondary meaning[84] or likelihood of confusion[85] are less intellectually defensible in the context of reverse confusion, because the senior's mark is commonly not well known nor widely used. It is often likely that the defendant's misappropriation is occasioned more by lust for a mark which "fits" with a proposed promotional campaign, than by a desire to trade on the usually meager and undeveloped good will of the plaintiff.

Yet, where a junior user learns of another's existing mark or seeks unsuccessfully to remove the other mark from its path, the balance changes. Bad faith, especially where sufficiently egregious, has been held to affect relief in the context of reverse confusion. Thus, in one case, the defendant's "callous" conduct warranted an award of defendant's profits,[86] a result which would also be expected in cases involving direct confusion. Even in those instances where a court might consider good or bad faith irrele-

---

82. Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., supra note 2 ("malice" found); Weiner King, Inc. v. Wiener King Corp., supra note 2 (good faith found); Worthington Foods, Inc. v. Kellogg Co., supra note 11 at 1449, 14 USPQ2d at 1601 (good faith found); PAF S.r.l. v. Lisa Lighting Co., supra note 9 at 408, 12 USPQ2d at 1173 (bad faith gives rise to a presumption of likelihood of confusion); Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.a.r.l., supra note 11 at 1246-47, 5 USPQ2d at 1311-12. Compare Westward Coach, supra note 13.

83. Sands, Taylor & Wood Co. v. Quaker Oats Co., supra note 1, 978 F2d at 961, 24 USPQ2d at 1013. Yet another court has stated that intent "loses importance" where other factors show little likelihood of confusion. H. Lubovsky, Inc. v. Esprit de Corp, supra note 11 at 490, 228 USPQ at 819.

84. In the direct confusion context, see M. Kramer Mfg. Co. Inc. v. Andrews, 783 F2d 421, 447-48, 228 USPQ 705, 725 (CA 4 1986); Pic Design Corp. v. Bearings Specialty Co. Inc., 436 F2d 804, 807, 168 USPQ 321 (CA 1 1971); Audio Fidelity, Inc. v. High Fidelity Recordings, Inc., 283 F2d 551, 558, 127 USPQ 306, 311 (CA 9 1960); National Lampoon, Inc. v. American Broadcasting Cos. Inc., 376 F Supp 733, 747, 182 USPQ 24 (SDNY 1974), affd 497 F2d 1343, 182 USPQ 6 (CA 2 1974); Travelodge Corp. v. Siragusa, 228 F Supp 238, 241, 141 USPQ 719, 721 (ND Ala 1964), affd per curiam 352 F2d 516, 147 USPQ 379 (CA 5 1965); Knorr-Nahrmittel, A.G. v. Reese Finer Foods, Inc., 695 F Supp 787, 792-93, 9 USPQ2d 1309 (D NJ 1988); Midway Mfg. Co. v. Dirkschneider, 543 F Supp 466, 486, 214 USPQ 417 (D Neb 1981).

85. In the direct confusion context, see Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F2d 254, 2 USPQ2d 1677 (CA 2 1987); Freedom Savings & Loan Assn. v. Way, 757 F2d 1176, 1185, 226 USPQ 123, 129 (CA 11 1985); WSM, Inc. v. Tennessee Sales Co., 709 F2d 1084, 220 USPQ 17 (CA 6 1983); Quabaug Rubber Co. v. Fabiano Shoe Co. Inc., 567 F2d 154, 161, 195 USPQ 689, 694 (CA 1 1977); HMH Publishing Co. Inc. v. Brincat, 504 F2d 713, 729, 183 USPQ 141, 146-47 (CA 9 1974); Travelodge Corp. v. Siragusa, supra note 84.

86. Stuart v. Collins, 489 F Supp 827, 831, 208 USPQ 657, 661 (SDNY 1980).

**Vol. 84 TMR**

vant to a determination of likelihood of confusion, it will give prominent consideration to such factor in assessing or reviewing an award of damages.[87]

## X. A PROPOSED SYSTEM OF ANALYSIS OF REVERSE CONFUSION CASES

As previously noted, a trademark infringement or unfair competition action requires a plaintiff to show that his mark is protectible and, when necessary, that it has developed a secondary meaning. Then, to succeed in the action, a plaintiff must, preliminarily, show that there is a likelihood of confusion, through an analysis of the appropriate factors used in the particular circuit. Such Polaroid or other factors would be equally applicable in analyzing both forward and reverse confusion, but it must be remembered that there can be no finding of reverse confusion without the existence of a likelihood of confusion.

It is the purpose of this article to suggest those key factors particularly useful in analyzing reverse confusion cases. The principles outlined below may seem too rigid and dogmatic, but they are submitted with the thought that bright-line tests are possible and desirable in this area of the law, at least in those situations which seem to arise with some frequency.

It is suggested, therefore, that in cases of reverse confusion:

1.  The senior user of a protectible mark always wins against a junior user who adopts a confusingly similar mark with knowledge of the senior's prior usage.

2.  A senior user who federally registers its mark prior to the junior user's first use always wins.

3.  A senior user of a strong (especially an inherently strong) mark always wins against a junior who prior to the junior's first use: (a) fails to register its mark or file an intent-to-use application with the USPTO which thereafter matures into a federal registration in due course; or (b) fails to conduct a reasonably comprehensive trademark search which does not reveal the senior's usage.

4.  A senior user with a strong mark always wins against a junior user who commences first use of a mark by suddenly (a) saturating the market; or (b) massively advertising; or (c) massively promoting products or services, in a geographic area where the senior user operates or to which it might reasonably expand, and which are of a type which would be competitive with those of the senior user.

---

87. Sands, Taylor & Wood Co. v. Quaker Oats Co., supra note 1, 978 F2d at 961-62, 24 USPQ2d at 1013-14; Big O, supra note 2.

Case 2:00-cv-00299-wks   Document 176   Filed 07/01/03   Page 44 of 53

will give
eviewing

r unfair
mark is
a secon-
iff must,
through
articular
plicable
must be
onfusion

y factors
es. The
atic, but
ests are
in those

nfusion:

against
rk with

or to the

y strong)
or's first
plication
registra-
nprehen-
usage.
gainst a
lenly (a)
(c) mas-
a where
expand,
those of

at 961-62,

---

5. A senior user of a strong mark who has diligently expanded the geographic operating area or geographic coverage of the mark always wins against a junior user, except in those areas where the junior user has adopted the mark in good faith without knowledge of the senior user's prior usage and before the senior user federally registers the mark or files an intent-to-use application.

6. A junior user of a protectible mark always wins when the junior user has filed an intent-to-use application, prior to the junior's first use, which eventually matures into a federal registration or, prior to its first use, conducts a reasonably comprehensive trademark search which does not reveal the senior's usage and then files for a federal registration without such knowledge of the senior's prior usage if: (a) the junior user thereafter diligently and progressively (but gradually) expands its geographic operating area or geographic coverage of the mark; and (b) the senior user has neither federally registered its mark nor diligently expanded its geographic operating area.

7. A famous junior user of a weak but protectible mark always wins if it adopts the mark in good faith without knowledge of the senior's prior usage and clearly and conspicuously features and promotes its own famous name together with the weak but protectible mark, provided the senior user has not federally registered the mark nor filed an intent-to-use application prior to the junior user's first use of the mark.[88]

A few explanatory comments are in order. The words "protectible mark" mean a mark which has acquired a secondary meaning in the geographic area of the senior's usage or one which is suggestive, arbitrary or coined, and therefore does not have to acquire a secondary meaning in order to enable the owner to sue for infringement. "Senior user" means the first person to use the mark anywhere in the United States without abandoning it. To "win," in the case of senior users, means to be able to enjoin use by the junior user or to obtain damages for use by the junior user, except perhaps with respect to limited geographic areas where the junior's use was established in good faith without knowledge of the senior's usage, prior to the senior's federal registration or prior to the senior's filing of an intent-to-use application. To

---

88. Note that in Sands, Taylor & Wood Co. v. Quaker Oats Co., supra note 1, 978 F2d at 960, 24 USPQ2d at 1012, the Seventh Circuit found that junior user Quaker's display of its famous GATORADE mark in conjunction with the subject mark THIRST AID was "an aggravation, not a justification." However, the senior user held a federal registration dating back to 1950 on the mark and the court (dubiously) held the mark to be strong. Note also that use of a housemark which is not famous can indeed be found by the courts to aggravate, rather than ameliorate. Eg, Americana Trading Inc. v. Russ Berrie & Co., supra note 9 at 1288, 23 USPQ2d at 1035.

"win," in the case of a junior user means to be able to continue to use a mark in all geographic areas except those areas where the senior user is already using the mark and those other limited areas into which the senior user can reasonably be expected to expand in the near future.

It is obvious that the seven criteria mentioned above do not cover all possible situations or combinations of facts. However, they do cover most of those which have thus far been encountered in the case law, and presumably, they represent the most frequently recurring situations.

In five of the seven hypotheticals, the senior user wins and in two the junior user wins. This is but a reflection of the bias in the law favoring senior users. Indeed, why should there not be such a bias in favor of seniors, especially in the context of reverse confusion, when the junior user is often a large company with substantial resources and, presumably, able counsel? Whatever the case might have been at an earlier time, there is little excuse today for a large and sophisticated company knowingly to create reverse confusion. Excellent computerized trademark search options are available at reasonable cost. Furthermore, intent-to-use applications are now available as well. By such means, a junior user may now avoid the creation of reverse confusion in most instances by ascertaining in advance and with more certainty whether a proposed trademark is available for use. If the junior user fails to take these steps when it has the "last clear chance" to avoid confusion, it is hard to see how or why equity should come to the rescue. This consideration should apply with special force where, as in the usual reverse confusion situation, the junior user is relatively large and sophisticated.

Accordingly, the junior user is protected, under the rules proffered above, only where: (1) it takes prudent steps to determine availability and obtains information reasonably supporting the belief that the proposed mark is available and then, after its adoption, expands its usage while the senior user stands pat; or (2) the junior user has a famous name which it conspicuously uses in conjunction with a challenged weak mark which the junior user has adopted in good faith while the senior user has done nothing to obtain protection under federal registration procedures. It could well be argued that failure to take reasonable steps to determine availability should be fatal to the junior's rights, as indeed it usually is. However, there seems to be a fair amount of support for more flexibility where the junior user is famous and uses its famous name in conjunction with the senior's conflicting mark. Perhaps the courts recognize that in the ordinary work-a-day world trademark searches are not always performed, especially on

MR

e to
the
ited
l to

not
ver,
ered
10st

d in
s in
t be
erse
vith
ever
cuse
eate
arch
t-to-
s, a
a in
cer-
the
lear
uity
vith
ion,

ules
1ine
the
its
r (2)
es in
user
1ing
ould
1ine
d it
port
s its
ark.
-day
y on

weak marks, even though they should be; and it seems a shame to penalize a famous junior user of a weak mark, which the junior has adopted in good faith, when there is little chance of real confusion, when no special benefit will accrue to the junior user, and when the senior user has not sought federal protection.

Westward Coach[89] is a case in point. While the court in that case may be subject to criticism for rejecting the then new and developing doctrine of reverse confusion, the actual result is not inconsistent with the above criteria. The quarrel is merely with the Seventh Circuit's articulation of its decisional rationale. Instead of unnecessarily rejecting the doctrine of reverse confusion,[90] the court needed merely to point out, as it did, that the MUSTANG mark was adopted in good faith by Ford and was always used in conjunction with the famous FORD mark, which gave rise to very little likelihood of confusion, given the weakness of the MUSTANG mark.

We now turn to the five enumerated situations where, we submit, the senior user should always win. The first two rules are but statements of hornbook law, which are in no way unique to cases involving reverse confusion but are included here for the sake of a more comprehensive treatment of the more likely situations. Those two rules essentially say that bad faith junior users always lose,[91] and that junior users who begin use after a senior's registration or intent-to-use application always lose.[92] To put it conversely, the senior user wins in both of those situations whether or not there is any reverse confusion.

The third rule, that a senior user of a strong mark always wins against a junior user who proceeds without making an adequate trademark availability search, is based on the premise that a junior's failure to investigate availability of an inherently strong mark is inexcusable.[93] It is perhaps understandable that a junior user might fail to check out weak marks because of the limited scope of protection accorded weak marks. On the other hand, inherently strong marks generally receive strong protection, and junior users should be expected to search for conflicts.

The fourth rule relates to saturation advertising by a junior user in a market where a senior user is already using the mark

89. Supra note 13. See also Galaxy Chemical Co. v. BASF Corp., supra note 8.

90. The Seventh Circuit has now reversed its earlier view set forth in Westward Coach. See Sands, Taylor & Wood Co. v. Quaker Oats Co., supra note 1.

91. See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., supra note 2.

92. See H. Lubovsky, Inc. v. Esprit de Corp, supra note 11.

93. Eg, Ameritech, Inc. v. American Information Technologies Corp., supra note 3; Tanel Corp. v. Reebok International, Ltd., supra note 65.

**Vol. 84 TMR**

and where the mark is strong. This situation is exemplified by the Big O case, among others.[94]

The fifth rule reflects the fact that junior users rarely win in reverse situations except where the senior user has taken no concrete steps to expand but instead has statically served only a small geographic area.[95]   Where the senior user has diligently expanded its use of a strong mark, the junior user loses an important potential equity, and there are few other equities compelling enough to compensate for that loss.   In fact, it is hard to imagine good faith adoption by a junior user where there has been a steady pattern of expansion by a senior user.

The main battleground, however, concerns criteria 6 and 7, where the results will not always be predictable. The dispute here involves a weak mark, as to which federal registration possibilities have not been utilized, one or both of the parties are expanding gradually, and the junior user does not use a famous mark in conjunction with the weak conflicting mark.   While such cases exist, most of them will involve forward confusion rather than reverse confusion, which usually revolves around sudden and massive advertising by a large and sophisticated junior user intent on fast expansion.

As a matter of statistics, it might be noted, in any event, that the majority of forty or so decisions involving reverse confusion to date have found for the defendants.   In most of these cases, the actions of the junior user have been held not to create any likelihood of confusion vis-a-vis the senior user and, thus, no likelihood of reverse confusion.

## XI.  A NOTE ON REMEDIES

Once all the equities have been taken into account, the courts should consider whether there are remedies which ameliorate a harsh winner-take-all result.   Perhaps all confusion, including reverse confusion, can be eliminated by relatively modest modifications of the junior user's mark.   One remedy which seems unjust is to allow a junior user to appropriate a senior user's federally registered mark by payment of a lump sum figure of damages for past infringement, with no payments for future use.   It is submitted that such a remedy in Stuart v. Collins[96] was not advisable.

---

94.  See supra note 85.  See also: Ameritech, Inc. v. American Information Technologies Corp., supra note 3; Tanel Corp. v. Reebok International, Ltd., supra note 65.

95.  Lobo Enterprises Inc. v. Tunnel Inc. supra note 8; Pump Inc v. Collins Management Inc., supra note 8; Andy Warhol Enterprises Inc. v. Time Inc., supra note 8.  Compare H. Lubovsky, Inc. v. Esprit de Corp, supra note 11.

96.  Supra note 86.

The court correctly ruled for the plaintiff, but essentially awarded the defendant a paid-up perpetual license based on plaintiff's recovery of defendant's past profits. The court in Stuart refused to enter an injunction against future infringement, holding that plaintiff had already been compensated "far in excess of his loss."[97] Nevertheless, since the Lanham Act provides for recovery of the defendant's profits,[98] which may well exceed plaintiff's actual losses, it is clear that recovery in excess of losses is contemplated by the Lanham Act without forfeiture of future rights on the part of plaintiff. The capture of lost profits deprives the infringer of the fruits of past infringement and should act as a disincentive against future infringement, a policy which is frustrated when a court effectively rewards the infringer with a paid-up future license. Equally, a court should not unfairly and unqualifiedly enjoin an active defendant's use, thereby enabling an inactive plaintiff to claim a monopoly reward for a license for defendant's continued use, or a sale of plaintiff's rights in the mark and good will.

Remedies should also involve remedial advertising where real damage has been done and where the restoration of misappropriated good will needs a major infusion of remedial counter-advertising.[99] Unfortunately, one court in a reverse confusion case has held that damages to enable an injured senior user to place corrective advertising to overcome the effects of reverse confusion cannot be awarded unless the senior user is unable to afford the advertising on its own.[100] Such a decision is difficult to defend, since it would seem to require a moderately sized company to spend perhaps a majority of its net worth, if it can "afford" to do so, on corrective advertising made necessary by a defendant's wrongdoing; on the other hand, an impoverished plaintiff could obtain full value from remedial advertising. In this particular case, the court felt that the plaintiff's customer base was limited and could be reached readily by other means to correct the confusion. Clearly, there is a countervailing danger that damages for corrective advertising would be a windfall for a plaintiff who could possibly include the corrective information in advertising already planned or committed, in which case corrective advertising really would pay all or a part of such regular advertising. Yet the alternative is inevitably a windfall for the wrongdoer who does not have to pay for the damage it has caused.

---

97. Id at 835, 208 USPQ at 664.
98. Lanham Act §35, 15 USC §1117.
99. Eg, Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., supra note 2.
100. MasterCard International Inc. v. Arbel Corp., supra note 71 at 1964.

Case 2:00-cv-00299-wks   Document 176   Filed 07/01/03   Page 49 of 53

Injunctive relief also provides countless possibilities for the tailoring of relief to the particular situation. There are signs that some courts may be tailoring relief more conservatively in the case of reverse confusion than in the usual situation. Two different judges of the Southern District of New York have fashioned tightly circumscribed relief in reverse confusion cases, perhaps considerably narrower than would have been true in cases of direct confusion.

In H. Lubovsky, Inc. v. Esprit de Corp,[101] a relatively small importer and national distributor of women's shoes, sold under the federally registered ESPRIT trademark, sued the large and well known retailer of women's and children's sportswear, Esprit de Corp, which sold various items of apparel, including shoes, under the trademark ESPRIT and ESPRIT DE CORP. The court, clearly influenced by the fact that only reverse confusion was involved, substantively found no significant likelihood of confusion as to the clothing line.[102] The court did find likelihood of confusion as to the shoe line, but even here the court seemed almost apologetic in finding infringement:

> As sins go in the area of trademark infringement, this was far from the most heinous. It does not compare, for example, to free riding on another's reputation [i.e., direct confusion], deceiving the public.[103]

With respect to relief the court did not accede to the defendant's argument that "since it is 'reverse confusion, . . .' the plaintiff has suffered no harm and is entitled to no relief."[104] But the court showed concern that a blanket injunction against defendant's sales of shoes under the ESPRIT mark "would cost the defendant millions."[105] The court also had doubts as to the extent of plaintiff's real damages, and worried that a broad injunction would give plaintiff "a lever for unconscionable extortion."[106] The court in general terms expressed its inclination to require the defendant to "take more effective steps to distinguish its shoe mark."[107] A second trial phase on the scope of relief was to be held later, but there is no reported decision as to the precise relief ultimately granted.

101. Supra note 11.
102. Id at 492, 228 USPQ at 821.
103. Id at 496, 228 USPQ at 824.
104. Ibid.
105. Ibid.
106. Id at 497, 228 USPQ at 824-25.
107. Id at 497, 228 USPQ at 825.

The Elizabeth Taylor case,[108] also in the Southern District of New York, involved use by Elizabeth Taylor Cosmetics and Chesebrough-Pond's, Inc. of the mark PASSION, identical with that mark owned, developed, and previously used by the senior user Goutal for fragrances.   Here, as in Lubovsky, the court recognized infringement by the larger and better-known Elizabeth Taylor Cosmetics, but was unwilling to enter a broad injunction. Indeed, the court, in this declaratory judgment case, enjoined Taylor from selling PASSION brand fragrances or perfumes only in "first-tier" stores, which Goutal had traditionally targeted, leaving Taylor free to sell in all other stores on a royalty-free basis.[109]   The injunction finally entered was even more limited, giving permanent injunctive relief only as to seven stores where Goutal was already selling its product and awarding only a six-month initial injunction as to some forty-seven other first-tier stores, in order to give Goutal time to conclude distribution arrangements with those stores.[110]

In the Big O case,[111] the jury awarded plaintiff $2,800,000 in compensatory damages and $16,800,000 as punitive damages, based upon an innovative method of calculating such damages from the amount of advertising expenditures of Goodyear in the fourteen state market of Big O.   The appellate court faulted that method of determining damages and reduced the award to $678,302 compensatory and $4,069,812 punitive damages, still a substantial sum, but perhaps not in accordance with the seeming gravity of the offense.

Sands, Taylor & Wood[112] also presents an interesting example of judicial award tinkering to adjust the damages to "make the penalty fit the crime."[113]   The district court had awarded plaintiff damages, because of defendant's bad faith, equal to ten percent of Quaker's profits on sales of GATORADE for the period during which the THIRST AID campaign had run, amounting to an award of $24,730,000.   On appeal, the court considered the amount excessive.   Reexamining the evidence, the court held that the finding of Quaker's bad faith, while not clearly erroneous, was "marginal at best,"[114] in large part because Quaker had, reasonably, relied on the opinion of counsel.   It was recognized that while

---

108.  Supra note 71.
109.  Id 673 F Supp at 1249, 5 USPQ2d at 1314.
110.  Id 677 F Supp at 145-46, 6 USPQ2d at 1573.
111.  Supra note 2.
112.  Supra note 1.
113.  With thanks to Gilbert and Sullivan's "The Mikado."
114.  Sands, Taylor & Wood, supra note 1, 978 F2d at 962-63, 24 USPQ2d at 1014.

Quaker was unjustly enriched, the award of $24 million amounted to a windfall and bore no relationship to the amount by which Quaker was enriched.[115]

> A reasonable royalty, . . . would more accurately reflect both the extent of Quaker's unjust enrichment and the interest of STW that has been infringed. We therefore reverse . . . and remand for a redetermination of damages. A generous approximation of the royalties Quaker would have had to pay STW for the use of the THIRST-AID mark had it recognized the validity of STW's claims seems to us an appropriate measure of damages, although perhaps not the only one. In any event, we can conceive of no rational measure of damages that would yield $24 million.[116]

The lower court's permanent injunction against Quaker's further use of "Thirst Aid" was not, however, reconsidered by the appellate court.

Such "relief," as exemplified in the previous cases, is or may be little short of a total victory for the wrongdoing defendants. One must wonder at the value of a federally registered mark if a larger company can appropriate a registered mark royalty-free, except for the minor inconvenience of being excluded from a few stores or adding a bit of mild differentiation to trademarks used on a limited part of one's line. Consider also the ultimate relief granted in the Plus Products decision.[117] This disturbing line of cases produces results which are inconsistent with the Big O Tire[118] case and tends to emasculate the doctrine of reverse confusion. Thus far, the line seems limited to the Southern District of New York where Stuart,[119] MasterCard,[120] Lubovsky,[121] Elizabeth Taylor[122] and Plus Products[123] were all decided, and some comfort may be taken from the fact that other courts have been more sympathetic with the plight of a small company whose marks have been misappropriated by a larger, wealthier company. But the Southern District of New York has traditionally been an

---

115. Id at 963, 24 USPQ2d at 1014.
116. Id at 963, 24 USPQ2d at 1014-15.
117. Supra note 37.
118. See supra note 2.
119. Supra note 86.
120. Supra note 71.
121. Supra note 11.
122. Supra note 71.
123. Supra note 37.

4 TMR

Vol. 84 TMR

ounted
which

ct both
erest of
. . and
nerous
to pay
gnized
opriate
ne. In
mages

urther
y the

or may
dants.
rk if a
y-free,
a few
s used
relief
line of
Big O
everse
ithern
sky,[121]
some
been
whose
ipany.
en an

important and trend-setting court for trademark cases, and future decisions in that court and in the Second Circuit bear watching.[124]

It is recognized that equitable considerations do and should affect the scope of relief, and it may well be that there are instances of outright infringement where the wrong seems relatively small in comparison with the enormity of traditionally broad injunctive relief. But there is a middle ground which should be considered by the courts. In addition to requiring differentiating measures and narrowly tailoring the geographic and product scope of relief, courts should consider future compulsory royalties under compulsory license arrangements. While the courts are understandably reluctant to involve themselves in the details of licensing agreements and the assessment of reasonable royalties, such approach is not very different in fact from a determination of damages for past infringement based upon the court's judgment as to a reasonable royalty rate. Furthermore, the court could provide several options to the infringer: (1) discontinue the infringement and select another trademark (the courts' protestations against monopolizing of a mark by a small company are unpersuasive in light of the nearly infinite possibilities of marks which are available to the junior user); (2) submit to arbitration with the consent of all parties; or (3) accept the court's royalty and licensing terms as a condition for the lifting or modification of a broad injunction.

## XII. CONCLUSION

Reverse confusion involves considerations of substantive law and of remedies which differ in many respects from traditional trademark infringement and unfair competition cases. It brings to the surface those facts which cause us to protect senior users and those facts which warrant an exception. It thus provides insights into the fundamentals of trademark law. In this difficult area of conflicting equities, the courts are still developing principles, some of which have been described in this article. There remain many other principles and sub-principles which will be developed in the laboratory of commercial experience as new and different variations of facts emerge and are tested. For the most part, the initial efforts look promising. Remember however, initially there must be a likelihood of confusion in order for reverse confusion to exist.

---

124. The Second Circuit has indicated it will give somewhat more expansive, though by no means generous, injunctive relief than the Southern District of New York. Banff, Ltd. v. Federated Department Stores, Inc., supra note 3 (broadening somewhat the scope of injunctive relief accorded by the New York District Court).

IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

HARLAND A. MACIA, III, D/B/A          ]
CATAMOUNT SOFTWARE, Plaintiff         ]
                                      ]        Civil Action No.
          v.                          ]          2:00-CV-299
                                      ]
MICROSOFT CORPORATION, INTUIT,INC.,]
and MECA SOFTWARE, LLC Defendants     ]
                                      ]

### CERTIFICATE OF SERVICE

I hereby certify that true copies of the following documents:

**PLAINTIFF CATAMOUNT'S RESPONSE TO MICROSOFT'S MOTION FOR RECONSIDERATION**

**PLAINTIFF CATAMOUNT'S MEMORANDUM IN SUPPORT OF HIS RESPONSE TO MICROSOFT'S MOTION FOR RECONSIDERATION**

were filed with the Vermont United States District Court and were served upon the defendant Microsoft Corporation, by first class mail of the same to the court at Elmwood Ave., Burlington, Vermont 05402 and by mailing the same to defendant's attorneys at the following address:

Microsoft Corporation
John T. Brown, Esq.
Pattishall, McAuliffe, Newbury, Hilliard & Geraldson
311 South Wacker Drive, Suite 5000
Chicago, IL 60606

DATED AT BURLINGTON, VERMONT THIS 1ST DAY OF JULY    , 2003.

BY: _____
MARKUS BRAKHAN, ESQ.
P.O. BOX 5851
44 CHURCH ST., SUITE 1
BURLINGTON, VT 05402
(802) 660-8210