228

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2004 AUG 3 PM 4 55

BY _____
DEPUTY CLERK

| | |
|---|---|
| HARLAND A. MACIA, III d/b/a | ) |
| CATAMOUNT SOFTWARE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| MICROSOFT CORPORATION, INTUIT, | ) |
| INC., and MECA SOFTWARE, LLC, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 2:00-CU-299

## MICROSOFT'S TRIAL BRIEF

John Thompson Brown
Michael La Porte
WILDMAN HARROLD ALLEN & DIXON, LLP
225 West Wacker Drive - Suite 3000
Chicago, IL  60606-1229

John T. Sartore
PAUL, FRANK & COLLINS
One Church Street
P.O. Box 1307
Burlington, VT  05402-1307
Counsel for Microsoft Corporation

228

## TABLE OF CONTENTS

ARGUMENT ........................................................................................................ 2

I.   CATAMOUNT HAS NO PROTECTABLE
     RIGHTS IN "POCKETMONEY" ...................................................................2

     A.   *Microsoft Has Senior Rights in the mark "MONEY"* ..................................2

     B.   *Microsoft Has a Right to Use Generic or Descriptive Terms
          To Identify the Hardware for Which its Software is Designed.* ..................3

          1.   *The Phrase "Pocket PC" Is Generic and Descriptive of Small-
               Sized Computers and Does not Identify the Source of those
               Devices.* ........................................................................................4

          2.   *The Term "Pocket" Is Merely Descriptive of Software
               Designed to Run on Pocket-Sized Computers.* ................................6

     C.   Microsoft Cannot Be Liable for Third-Party References to Its
          Product as "Pocket Money." ........................................................................6

II.  CONSUMERS OF FINANCIAL MANAGEMENT COMPUTER
     SOFTWARE ARE NOT LIKELY TO BE CONFUSED THAT
     CATAMOUNT'S PRODUCT ACTUALLY COMES FROM MICROSOFT. ......7

     A.   *"PocketMoney" Is a Weak Mark, if Protectable at All.* .............................7

     B.   *"PocketMoney" is not Similar to "Microsoft® Money for
          Pocket PC."* .............................................................................................10

     C.   *Marketplace Proximity is Diminished as a Factor Because
          of Distinct Commercial Impressions.* ........................................................11

     D.   *Catamount Will Not Be Able to Establish Evidence of Actual
          Confusion.* ...............................................................................................12

     E.   *In Good Faith, Microsoft Sought to Avoid Any Association
          with Catamount* ........................................**Error! Bookmark not defined.**

     F.   *Microsoft® MONEY for Pocket PC is a Quality Product.* ..........................14

     G.   *Purchasers of Financial Management Software Are
          Very Sophisticated.* ..................................................................................14

III. THERE IS NO FACTUAL BASIS FOR A DAMAGES AWARD FOR
     CORRECTIVE ADVERTISING...................................................................15

i

IV.    EVEN IF CORRECTIVE ADVERTISING WERE WARRANTED,
       CATAMOUNT'S DAMAGES WOULD BE LIMITED TO
       THE VALUE OF ITS MARK. ................................................................18

V.     IF THIS IS AN EXCEPTIONAL CASE, IT IS ONE IN WHICH
       ATTORNEY'S FEES ARE WARRANTED FOR MICROSOFT,
       NOT CATAMOUNT. .........................................................................20

VI.    CATAMOUNT HAS NO BASIS FOR RECOVERY ON HIS STATE
       LAW CLAIMS ..................................................................................21

       A.    *Since there Is No Likelihood of Confusion, There can be
             No Trademark Infringement or Unfair Competition Claim.* ......21

       B.    *Vermont Has Neither Recognized a Tort of Trademark
             Disparagement, Nor Could Catamount Satisfy Any of the
             Commonly-Required Elements in States that Recognize
             Such a Claim.* ..................................................................21

VII.   CATAMOUNT CANNOT RECOVER BECAUSE IT HAS
       KNOWINGLY MISUSED THE "®" SYMBOL. ...................................23

VIII.  IF THERE IS A LIKELIHOOD OF CONFUSION, THEN IT WAS
       CAUSED BY THE PLAINTIFF'S INFRINGEMENT OF MICROSOFT'S
       "MONEY" MARK. ...........................................................................23

CONCLUSION .........................................................................................24

# TABLE OF AUTHORITY

**Cases**

*20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*
  747 F.2d 81 (2d Cir. 1984)...................................................................... 4
*Adray v. Adry-Mart, Inc.*
  76 F.3d 984 (9th Cir. 1995). ................................................................... 19
*Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*
  205 F.3d 137 (4th Cir. 2000). ................................................................. 4
*American Cyanamid Corp. v. Connaught Labs, Inc.*
  800 F.2d 306 (2d Cir. 1986)..................................................................... 3
*American Express Co. v. CFK, Inc.*
  947 F. Supp. 310 (E.D. Mich. 1996)........................................................ 15
*Arrow Fastener Co. v. The Stanley Works*
  59 F.3d 384 (2d Cir. 1995)....................................................................... 14
*Autozone, Inc. v. Tandy Corp.,*
  373 F.3d 786 (6th Cir. 2004). ................................................................. 9
*Avnet Am., Inc. v. Playtex Products, Inc.*
  68 F. Supp. 2d 920 (N.D. Ill. 1999). ....................................................... 10
*Bada Co. v. Montgomery Ward & Co.*
  426 F.2d 8 (9th Cir. 1970). ...................................................................... 3
*Banff, Ltd. V. Federated Dep't Stores, Inc.*
  *841 F.2d 486 (2d Cir. 1988).* .................................................................. 8
*Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*
  561 F.2d 1365 (10th Cir. 1977). ................................................... 16, 17, 20, 22
*Bigelow v. RKO Radio Pictures, Inc.*
  327 U.S. 251 (1946)................................................................................. 16
*Blisscraft of Hollywood v. United Plastics Co.*
  294 F.2d 694 (2d Cir. 1961)..................................................................... 10
*Blue Bell Bio-Medical v. Cin-Bad, Inc.*
  864 F.2d 1253 (5th Cir. 1989). ............................................................... 22
*Brattleboro Publishing Co. v. Winmill Publishing Corp.*
  250 F. Supp. 215 (D. Vt. 1966). ............................................................. 21
*Bristol-Meyers Squibb Co. v. McNeil – P.P.C., Inc.*
  973 F.2d 1033 (2d Cir. 1992)......................................................... 4, 10, 22
*Burndy Corp. v. Teledyne Indus., Inc.,*
  748 F.2d 767 (2d Cir. 1984)........................................................ 16, 18, 19
*Children's Factory, Inc. v. Benee's Toys, Inc.*
  160 F.3d 489 (8th Cir. 1998). ................................................................. 22
*Cleary v. News Corp.*
  30 F.3d 1255 (9th Cir. 1994). ................................................................. 22
*Computer Assocs. Int'l, Inc. v. AJV Computerized Data Mgmt., Inc.*
  889 F. Supp. 630 (E.D.N.Y. 1995). ................................................. 14, 15
*Cumberland Packing Corp. v. Monsanto Co.*
  140 F. Supp. 2d 241 (E.D.N.Y. 2001). ................................................... 9

*Cunningham v. Laser Golf Corp.*
  222 F.3d 943 (Fed. Cir. 2000)................................................................. 2, 3
*DeClemente v. Columbia Pictures Indus., Inc.*
  860 F. Supp. 30 (E.D.N.Y. 1994). ................................................................ 8
*Duluth New-Tribune v. Mesabi Publishing Co.*
  84 F.3d 1093 (8th Cir. 1996). .................................................................... 13
*Fox-Stanley Photo Prods., Inc.*
  339 F. Supp. at 1295. ................................................................................. 24
*Gillette Co. v. Wilkinson Sword, Inc.*
  89 CV 3586, 1992 U.S. Dist. Lexis 1265 (S.D.N.Y. Jan. 31, 1992). ......... 16
*Gruner + Jahr USA Publishing v. Meredith Corp.*
  991 F.2d 1072 (2d Cir. 1993)......................................................................... 8
*Illinois High School Assn. v. GTE Vantage, Inc.,*
  99 F.3d 244 (7th Cir. 1996). .......................................................................... 7
*In re Cooperativa Produttori Latte E Fontina Valle D'Acosta*
  230 U.S.P.Q. 131 (T.T.A.B. 1986). .............................................................. 5
*In re EBS Data Processing, Inc.,*
  212 U.S.P.Q. 964, 966 (TTAB 1981). ........................................................... 6
*Indianapolis Colts, Inc. v. Metro. Baltimore Football Club L.P.*
  34 F.3d 410 (7th Cir. 1994). .......................................................................... 9
*J&J Snack Foods, Corp. v. The Earthgrains Co.*
  220 F. Supp. 2d 358 (D.N.J. 2002). ............................................................... 9
*Johnson Publishing Co. v. Etched-In-Ebony*
  *Inc.*, 213 U.S.P.Q. 995 (D.D.C. 1981). ...................................................... 23
*King of the Mountain Sports, Inc. v. Chrysler Corp.*
  185 F.3d 1084 (10th Cir. 1999). .................................................................. 13
*King-Seeley Thermos Co. v. Aladdin Industries, Inc.*
  321 F.2d 577 (2d Cir. 1963)........................................................................... 4
*King-Size, Inc. v. Frank's King Size Clothes, Inc.*
  547 F. Supp. 1138 (S.D. Tex. 1982). ............................................................ 5
*L.F. Gaubert & Co. v. Inst. Of Electric & Electronics Engineers, Inc.*
  563 F. Supp. 122 (E.D. La. 1983)............................................................... 23
*Lambda Elecs. Corp. v. Lambda Tech.*, Inc.
  515 F. Supp. 915 (S.D.N.Y. 1981). ............................................................ 15
*Lang v. Retirement Living Publishing Co.*
  949 F.2d 576 (2d Cir. 1991)....................................................... 7, 8, 12, 14
*Life Indus. Corp. v. Star Brite Distrib., Inc.*
  31 F.3d 42, 46 (2d Cir. 1994)........................................................................ 8
*Luigino's Inc. v. Stouffer Corp.*
  170 F.3d 827 (8th Cir. 1999). ...................................................................... 10
*M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*
  250 F. Supp. 2d 91 (E.D.N.Y. 2003). ............................................................ 8
*M.B.H. Enters., Inc. v. Woky, Inc.*
  633 F.2d 50 (7th Cir. 1980). ........................................................................ 23
*Malarkey-Taylor Assocs., Inc. v. Cellular Telecomm. Indus. Ass'n*
  929 F. Supp. 473 (D.D.C. 1996). ................................................................ 15

*MasterCard Int'l, Inc. v. Arbel Corp.*
No 86 CIV 6801 U.S. Dist. Lexis 12433 (S.D.N.Y. Oct. 18, 1989)..........................................16

*McGregor-Doniger, Inc. v. Drizzle, Inc.*
599 F.2d 1126 (2d Cir. 1979)..........................................................................................8

*Mejia & Assocs., Inc. v. IBM Corp.*
920 F. Supp. 540 (S.D.N.Y. 1996). ..................................................................................8

*Merriam-Webster, Inc. v. Random House, Inc.*
35 F.3d 65 (2d Cir. 1994)..............................................................................................13

*Middletown Trust Co. v. Middletown Nat'l Bank*
147 A. 22 (Conn. 1929). ..............................................................................................21

Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.
349 F.2d 389 (2d Cir. 1965)..........................................................................................16

*Nabisco, Inc. v. Warner-Lambert, Co.*
220 F.3d 43 (2d Cir. 2000)..............................................................................10, 11, 12

*Nat'l Distillers Products, LLC v. Refreshment Brands, Inc.*
198 F. Supp. 2d 474 (S.D.N.Y. 2002)...............................................................................9

*Nat'l Information Corp. v. Kiplinger Washington Editors, Inc.*
771 F. Supp. 460 (D.D.C. 1991). ...................................................................................15

*Nora Beverages, Inc. v. Perrier Group of America, Inc.*
269 F.3d 114 (2d Cir. 2001)..........................................................................................13

*Northland Aluminum Prods., Inc.*
221 U.S.P.Q. 1110 (T.T.A.B. 1984), aff'd, 777 F.2d 1556 (Fed. Cir. 1985). ...........................5

*Otokoyama, Ltd. v. Wine of Japan Import, Inc.*
175 F.3d 266 (2d Cir. 1999)............................................................................................5

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*
469 U.S. 189 (1985)......................................................................................................5

*Polaroid Corp. v. Polarad Electronics Corp.*
287 F.2d 492 (2d Cir. 1961)..............................................................................7, 13, 23

*Popular Bank of Fla. V. Banco Popular N.A.*
9 F. Supp. 2d 1347 (S.D. Fla. 1998). ..............................................................................10

*Schiller & Schmidt, Inc. v. Nordisco Corp.*
969 F.2d 410 (7th Cir. 1992). .......................................................................................16

*Small Business Assistance Corp. v. Clear Channel Broadcasting, Inc.*
210 F.3d 278 (5th Cir. 2000) ..................................................................................3, 4, 6

*Sterling Acceptance Corp. v. Tommark, Inc.*
227 F. Supp. 2d 454 (D. Md. 2002). ...............................................................................23

*Sterling Drug, Inc. v. Bayer AG*
14 F.3d 733 (2d Cir. 1994)..............................................................................................8

*Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc.*
823 F. Supp. 1077 (S.D.N.Y. 1993)..................................................................................9

*Streetwise Maps, Inc. v. Vandam, Inc.*
159 F.3d 739 (2d Cir. 1998)......................................................................................7, 10

*Sunenblick v. Harrell*
895 F. Supp. 616 (S.D.N.Y. 1995), aff'd, 101 F.3d 684 (2d Cir. 1996). .................................8

*Thompson Med. Co. v. Pfizer*
753 F.2d 208 (2d Cir. 1985)............................................................................................4

*Time Inc. v. Petersen Publishing Co.*, L.L.C.
   976 F. Supp. 263 (S.D.N.Y. 1997) ............................................................... 3, 4, 6
*Trovan, Ltd. v. Electronic Identification Devices, Inc.*
   No. CV-98-0094, 2000 U.S. Dist. Lexis 7522 (C.D. Cal. May 23, 2000)............................. 19
*Trustees of Columbia Univ v. Columbia/HCA Healthcare* Corp.
   964 F. Supp. 733 (S.D.N.Y. 1997). ...................................................................... 8
*Urecal Corp. v. Masters*
   413 F. Supp. 873 (N.D. Ill. 1976). ................................................................... 23
*W.W.W. Pharmaceutical Co. v. Gillette* Co.
   984 F.2d 567, 574 (2d Cir. 1993)........................................................... 7, 8, 10, 14
*Western Publishing Co., Inc. v. Publications Int'l, Ltd.*
   No. 94 C 6803, 1995 U.S. Dist. LEXIS 5917 (N.D. Ill. May 2, 1995). .................................. 10
*Wyckoff, Seamans & Benedict v. Howe Scale Co.*
   122 F. 348 (2d Cir. 1903, *rev'd on its facts*, 198 U.S. 118 (1905). ......................... 21
*Zazu Designs v. L'Oreal, S.A.*
   979 F.2d 499 (7th Cir. 1992). ..................................................................... 16, 17, 19

**Statutes**

15 U.S.C. § 1111 (1997) ............................................................................ 23

**Other Authorities**

*McCarthy on Trademarks and Unfair Competition* § 23:10 ........................................... 13, 18, 19

Microsoft submits this trial brief in support of its case at trial. As the underlying facts have been addressed at length in the parties' briefs on summary judgment and will be presented at trial, Microsoft only briefly restates them here. At trial, the facts will show that if any relief is warranted, it should be in favor of Microsoft, not Catamount.

Catamount sued Microsoft for using "Microsoft MONEY for Pocket PC" in connection with Microsoft's software application designed to run on pocket-sized computers, or "Pocket PCs." This is a companion application for Microsoft's desktop software "Microsoft® MONEY." Microsoft has used the "MONEY" and "Microsoft® MONEY" marks with its award-winning software since 1991.

In 1994, Catamount introduced its own software called "PocketMoney." Catamount claims rights in the trademark "PocketMoney" and alleges that Microsoft infringed that mark when it introduced "Microsoft® MONEY for Pocket PC." It claims that consumers who encounter its product are likely to think that the product comes from Microsoft. Among other things, it claims that Microsoft purportedly caused this likelihood of confusion by advertising Microsoft® MONEY for Pocket PC.

The evidence at trial will not support Catamount's claims. In particular, the evidence will show that:

- Catamount has no prior protectable rights in "PocketMoney";

- Microsoft has prior rights in the trademark "MONEY" and "Microsoft® MONEY" for use in connection with financial management software;

- in the realm of computer software, the word "Pocket" is merely descriptive of software that is designed to run on pocket-sized computers, also known as "Pocket PCs";

- consumers of computer software are not likely to be confused and think that Catamount's product is really made by Microsoft;

- Microsoft did not advertise "Microsoft® MONEY for Pocket PC" so corrective advertising damages are inapplicable;

- were there a finding of liability against Microsoft, any damages that might be awarded must be limited to the value of Catamount's mark; and

- if there is any likelihood that such confusion would occur, it is because Catamount chose to use Microsoft's "MONEY" name and simply add the descriptive term "Pocket" to it.

## ARGUMENT

I.    **CATAMOUNT HAS NO PROTECTABLE RIGHTS IN "POCKETMONEY"**

A.    *Microsoft Has Senior Rights in the mark "MONEY"*

A junior user cannot create a protectable mark by merely misappropriating the trademark of a senior user and adding a descriptive term. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 947 (Fed. Cir. 2000). In *Cunningham*, Laser Golf Corporation had used the mark "LASER" for golf clubs for several years before Cunningham came along and began using LASERSWING in connection with a golf club. Laser Golf successfully challenged the later use in a proceeding to cancel Cunningham's trademark registration. In affirming the cancellation, the Federal Circuit said that the addition of the "common and descriptive" term "SWING" to Laser Golf's pre-existing mark was insufficient to distinguish it from LASER and give Cunningham rights in LASERSWING.[1]

Evidence will show that since its first release nearly 15 years ago, Microsoft has made substantial sales of its software application Microsoft® MONEY. Microsoft® MONEY has also received critical acclaim and won numerous industry awards for excellence. And, Microsoft has spent substantial sums advertising and marketing the Microsoft® MONEY software application.

---

[1] The *Cunningham* court also implicitly rejected the notion that examining each component in relation to the whole did not violate the so-called "anti-dissection" rule. *Id.* at 947 ("the Board was justified in examining each component of the mark LASERSWING and the effect that component had . . . as between the respective marks in their entireties.")

Microsoft's first use of MONEY in connection with financial management software pre-dates Catamount's first use of PocketMoney by several years. Catamount has admitted it was aware of Microsoft's prior use in connection with financial management software when it selected PocketMoney and later began to use PocketMoney in June of 1994. Evidence will further show that Catamount's counsel was also well aware of Microsoft's use of MONEY and discussed Microsoft's prior use with his client. As the court in *Cunningham* noted, trademark rights cannot be obtained simply by adding a descriptive term to a pre-existing mark. *Cunningham*, 222 F.3d at 947.

> **B.**     *Microsoft Has a Right to Use Generic or Descriptive Terms To Identify the Hardware for Which its Software is Designed.*

Microsoft has the right under the Lanham Act to use a generic or descriptive term that identifies pocket-sized personal computers in connection with software designed to run on those computers. *Time Inc. v. Petersen Publishing Co.*, L.L.C., 976 F. Supp. 263, 264 (S.D.N.Y. 1997); *see also Small Business Assistance Corp. v. Clear Channel Broadcasting, Inc.*, 210 F.3d 278, 279 (5th Cir. 2000). This principle applies to single-word marks as well as composite marks. *E.g., American Cyanamid Corp. v. Connaught Labs, Inc.*, 800 F.2d 306, 308 (2d Cir. 1986). "A trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term . . ." *Id.; see also Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir. 1970) (noting the social and commercial harm in permitting a party to co-opt a generic or descriptive term and disable others from merely describing their products). Determination that a term is generic or merely descriptive ends a trademark infringement inquiry. *See, e.g., Time, Inc. v. Petersen Publishing Co.*, 976 F. Supp. 263 (S.D.N.Y 1997); *see also Small Bus. Assistance Corp. v. Clear Channel Broadcasting, Inc.*, 210 F.3d 278, 279 (5th Cir. 2000).

The distinction between generic or merely descriptive terms on the one hand and suggestive marks on the other hand is significant because generic terms do not receive protection at all and descriptive marks are protected only if they have acquired a "secondary meaning." *Bristol-Meyers Squibb Co. v. McNeil – P.P.C., Inc.*, 973 F.2d 1033, 1039-41 (2d Cir. 1992). "Whether a term is generic or descriptive is determined in relation to the product, and the possible significance that the term would have to the average purchaser of the product."[2] The characterization of a mark is not necessarily static over time. *Id.* For example, an originally-suggestive term can become descriptive over time through a change in meaning or usage. *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 747 F.2d 81, 87-88 (2d Cir. 1984); *see also Thompson Med. Co. v. Pfizer*, 753 F.2d 208, 213 (2d Cir. 1985). Similarly, a term may be inherently generic or descriptive, or may be shown to have become generic or descriptive by public usage. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140-41 (4th Cir. 2000); *King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir. 1963) (holding that the mark THERMOS had become generic over time, since great majority of the public no longer were aware of its trademark significance). In all cases, the focus is on the words in context rather than in the abstract. *Bristol-Meyers Squibb Co.*, 973 F.2d at 1041.

      1.    *The Phrase "Pocket PC" Is Generic and Descriptive of Small-Sized Computers and Does not Identify the Source of those Devices.*

The evidence will show that "Pocket PC" generically refers to an entire class of small-sized computers and does not identify the source of those computers. Words that designate the entire category of goods are generic. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). Additionally, sub-classifications or varieties of goods, sometimes referred to as the "species" of the goods, can also be or become generic. *Otokoyama, Ltd. v. Wine of Japan*

---

[2] June 3, 2003, Opinion and Order Denying Summary Judgment ("Summary Judgment Order") at 20.

*Import, Inc.*, 175 F.3d 266, (2d Cir. 1999); *In re Cooperativa Produttori Latte E Fontina Valle D'Acosta*, 230 U.S.P.Q. 131 (T.T.A.B. 1986 (holding FONTINA to be generic for a type of cheese); *In re Northland Aluminum Prods., Inc.,* 221 U.S.P.Q. 1110 (T.T.A.B. 1984), aff'd, 777 F.2d 1556 (Fed. Cir. 1985) (finding BUNDT to be generic for a type of cake). "Pocket PC" identifies a category of small-sized computers in that the term has been used to identify at least 25 different brands of small-sized computers, which run on both the Microsoft® Windows CE operating system, and on the Palm operating system.  But even if the term were limited in its reference to those computers that run on the Microsoft® Windows CE operating system, it would still be generic because the term does not identify the source of the hardware. *Id.*  Evidence will also show that the public was using the term "Pocket PC" to refer to pocket-sized computers prior to the time Catamount first used PocketMoney.

The phrase "Pocket PC" also describes pocket-sized personal computers, or pocket-sized PCs.  A descriptive term is one that conveys to the public some information about the nature, characteristics, or benefits of the product or service. *Id.*; *see also King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp. 1138, 1156 (S.D. Tex. 1982).  The phrase Pocket PC describes the characteristics of computers small enough to fit into a pants or coat pocket.  The "PC" aspect of that term is a well-known acronym for "personal computer." Together, the phrase describes a pocket-sized personal computer.

In addition to widespread third-party usage of Pocket PC to refer to pocket-sized computers, Catamount and its contractor-developer of PocketMoney for the Pocket PC use the phrase with their software designed for these devices.  These widespread and common uses show that "Pocket PC" is used to identify a particular type of computer – i.e., pocket-sized computers, and not to indicate the source of any given Pocket PC.

2.    *The Term "Pocket" Is Merely Descriptive of Software Designed to Run on Pocket-Sized Computers.*

The term "pocket" describes software designed to operate on pocket-sized computers. Evidence will show that well over two hundred software programs currently available to users in the United States contain the word "pocket" in the title of the software. These applications run on various operating systems, including those of Microsoft, Palm, and others. Additionally, the United States Patent and Trademark Office has required applicants to disclaim the term "pocket" in other contexts because the term is merely descriptive. See, *In re EBS Data Processing, Inc.*, 212 U.S.P.Q. 964, 966 (TTAB 1981) (requiring an applicant to disclaim "Pocket Profile" in its registration of "Phacts Pocket Profile" for use in connection with a personal medical history summary). According to the board, "the term 'Pocket Profile' merely describe[d] applicant's condensed record of patient's medical information . . . [and] [a]s such the term is merely descriptive of goods." Id. Any harm that Catamount has purportedly suffered is due to its own choice to use Microsoft's MONEY trademark with the descriptive term "Pocket."

Thus, the Court may grant judgment in Microsoft's favor without needing to consider likelihood of confusion. *See, e.g., Time, Inc.,* 976 F. Supp. at 263; *see also Small Bus. Assistance Corp.*, 210 F.3d at 279

C.    **Microsoft Cannot Be Liable for Third-Party References to Its Product as "Pocket Money."**

If Catamount attempts to introduce evidence of any third parties using "Pocket Money" to refer to Microsoft's application, this evidence would be irrelevant. The Lanham Act does not impose liability on a party for third-party use of another's mark in reference to a defendant's product. *See Illinois High School Assn. v. GTE Vantage, Inc.*, 99 F.3d 244 (7th Cir. 1996) (referred to as "the March Madness" case). In the March Madness case, the Seventh Circuit noted that the plaintiff could not sue the defendant for a third-party's (mis)use of the term. *Id.* at

246-47. Similarly, since evidence will show that Microsoft has not sanctioned use of the term

"Pocket Money" in conjunction with its software – and indeed, has made efforts to correct any

incorrect reference to its product – there can be no liability on this basis.

## II.    CONSUMERS OF FINANCIAL MANAGEMENT COMPUTER SOFTWARE ARE NOT LIKELY TO BE CONFUSED THAT CATAMOUNT'S PRODUCT ACTUALLY COMES FROM MICROSOFT.

In a reverse confusion case, the only relevant confusion is of purchasers  or prospective

purchasers of Catamount's product who mistakenly believe that the plaintiff's product was

produced by or affiliated with the defendant's. *See Lang v. Retirement Living Publishing Co.*,

949 F.2d 576, 583 (2d Cir. 1991).  And the only confusion to be avoided is confusion that affects

purchasing decisions.  *Id.*  Any other confusion is irrelevant.  *Id.*; *see also W.W.W.*

*Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir. 1993).

As for the level of confusion, it must be more than a mere possibility.  Confusion must be

probable.  *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). To prevail,

Catamount would have to show that an appreciable number of actual or potential purchasers of

the product would be confused as to the source of its software.  *Id.*  Courts evaluate whether

there is a likelihood of confusion under the multi-factor test articulated in *Polaroid Corp. v.*

*Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961). Each of those factors is addressed

below.  The evidence will not show that confusion is probable.

### A.    *"PocketMoney" Is a Weak Mark, if Protectable at All.*

Even in reverse confusion cases, the relative strength of a mark is a factor in deciding

how much protection a mark should be given.[3]  The "strength" of a mark is its "tendency to

---

[3] *Lang*, 949 F.2d at 580 (adopting the *Polaroid* factors in a reverse confusion case).
While some courts outside of the Second Circuit look at the strength of the junior user's mark in this analysis,
almost without exception courts within the Second Circuit apply this *Polaroid* factor the same in both reverse and
forward confusion cases – examining the strength of the senior user's mark. *See Sterling Drug, Inc. v. Bayer AG,* 14
F.3d 733, 743 (2d Cir. 1994); *W.W.W. Pharm. Co.*, 984 F.2d at 572-73; *Lang*, 949 F.2d at 581; *Banff, Ltd. V.*

identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979). Factors that are considered in determining the strength of Catamount's mark include how distinctive it is, *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993), how long and how strong a presence it has had in the marketplace, *Life Indus. Corp. v. Star Brite Distrib., Inc.*, 31 F.3d 42, 46 (2d Cir. 1994), whether it is registered, Gruner + Jahr USA Publishing, 991 F.2d at 1075, and whether there are multiple uses of the same or similar marks in the same product category. E.g., *Prime Media, Inc. v. Primedia, Inc.,* 33 F. Supp. 2d 932, 938 (D. Kan. 1998).

Evidence will show that the term "pocket" is used throughout the software industry to identify software that runs on pocket-sized computers, including Pocket PCs running the Windows® CE operating system, the Palm operating system, and other operating systems. Hundreds of software applications exist that use the term "pocket" to denote use on a pocket-sized computer of some sort. Furthermore, Microsoft has used its marks Microsoft® MONEY and MONEY in relation to financial management software prior to Catamount's use of PocketMoney.

Moreover, Catamount sold or gave away only about 6,000 units worldwide before Microsoft entered the market with Microsoft® MONEY for Pocket PC. The relatively low figure is further evidence of the weakness of Catamount's mark, a fact which is confirmed by Catamount's own evidence. Even the survey that Catamount commissioned shows that the

---

*Federated Dep't Stores, Inc., 841 F.2d 486, 491 (2d Cir. 1988); M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha,* 250 F. Supp. 2d 91, 101 (E.D.N.Y. 2003); *Trustees of Columbia Univ v. Columbia/HCA Healthcare* Corp., 964 F. Supp. 733, 744 (S.D.N.Y. 1997); *Mejia & Assocs., Inc. v. IBM Corp.*, 920 F. Supp. 540, 546 (S.D.N.Y. 1996); *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30, 47 (E.D.N.Y. 1994). *But see Sunenblick v. Harrell*, 895 F. Supp. 616, 626 (S.D.N.Y. 1995), *aff'd,* 101 F.3d 684 (2d Cir. 1996) (unpublished table decision).

commercial recognition of its mark is weak. As this Court has previously recognized,

Catamount's "PocketMoney" mark "is relatively weak."

     Finally, the survey that Catamount commissioned by Dr. Rappeport purports to measure

the strength of the plaintiff's mark, but the survey is as unreliable as many of his other surveys.

See, e.g., *J&J Snack Foods, Corp. v. The Earthgrains Co.*, 220 F. Supp. 2d 358, 370-72 (D.N.J.

2002) (finding a similar survey conducted by Dr. Rappeport flawed and unreliable); *Nat'l*

*Distillers Products, LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484-85 (S.D.N.Y.

2002) (attacking Rappeport's methodology and overly broad universe); *Cumberland Packing*

*Corp. v. Monsanto Co.*, 140 F. Supp. 2d 241 (E.D.N.Y. 2001) (noting that Rappeport's survey

was unreliable because it was over inclusive); *Stern's Miracle-Gro Products, Inc. v. Shark*

*Products, Inc.*, 823 F. Supp. 1077, 1085 (S.D.N.Y. 1993) (discussing Rappeport's

inappropriately selected universe in rejecting survey); *Indianapolis Colts, Inc. v. Metro.*

*Baltimore Football Club L.P.* 34 F.3d 410, 415 (7th Cir. 1994) (Rappeport affidavit labeled

"perfunctory" by Judge Posner in stating "[district court gave Rappeport's affidavit] little weight.

That was a kindness…. Rappeport has been criticized before for his methodology, and we hope

that he will take these criticisms to heart in his next courtroom appearance.*"); Autozone, Inc. v.*

*Tandy Corp.*, 373 F.3d 786 (6th Cir. 2004)  (citing Indianapolis Colts and attacking Rappeport's

methodology); *Avnet Am., Inc. v. Playtex Products, Inc.*, 68 F. Supp. 920, 930-31 (N.D. Ill.

1999) (finding "major flaws" in Rappeport's methodology); *Popular Bank of Fla. V. Banco*

*Popular N.A.*, 9 F. Supp. 2d 1347 (S.D. Fla. 1998) (noting that Rappeport reached legal

conclusion not supported by evidence he had gathered); *Western Publishing Co., Inc. v.*

*Publications Int'l, Ltd.*, No. 94 C 6803, 1995 U.S. Dist. LEXIS 5917, *29, *45 (N.D. Ill. May 2,

1995) (calling Rappeport's study and testimony "disappointing"). If Catamount relies on

Rappeport's survey at trial, various errors in the survey's methodology will warrant according it little or no weight. *See Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 699 (2d Cir. 1961) (critical question is whether mark is descriptive to prospective purchasers, not general public).

**B.**    *"PocketMoney" is not Similar to "Microsoft® Money for Pocket PC."*

In assessing the similarity of marks, this Court does not simply examine the words in a vacuum. Instead, it examines the commercial impression as a whole, including the form in which the marks are displayed to consumers. *W.W.W Pharm. Co.*, 984 F.2d at 573. The use of different colors and typefaces, undermines a "similarity" finding. *Nabisco, Inc. v. Warner-Lambert, Co.,* 220 F.3d 43, 46-47 (2d Cir. 2000). So does a prominent display of a house mark along with the product. *Bristol-Meyers Squibb Co.,* 973 F.2d at 1045-46 (packages for EXCEDRIN PM and TYLENOL PM for analgesics were not confusingly similar). Additionally, differences in logos undermine the similarity of similarly-worded marks. *Streetwise Maps, Inc.*, 159 F.3d at 744 (different folds, colors, and typefaces made the similarly-worded marks STREETSMART and STREETWISE dissimilar); *Luigino's Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) (MICHELINA'S LEAN 'N TASTY was not confusingly similar to STOUFFER'S LEAN CUISINE as a matter of law because the "use of different colors and typefaces, as well as the prominent display of the house marks convey[ed] perceptible distinctions between the products.") Finally, when common elements are merely descriptive terms, a finding of "similarity" is less likely. Dissimilarity can be a dispositive factor completely undermining a plaintiff's claim. *Nabisco, Inc.*, 220 F.3d at 46.

In Nabisco, the Court held that the "cumulative effect of the differences between the parties' products and in the commercial presentation of their marks creates distinct marketplace impressions" and therefore make confusion unlikely. *Id.* at 47. The plaintiff in Nabisco owned

ICE BREAKERS for breath freshening chewing gum and sued the defendant for use of

DENTYNE ICE for competing goods. The Court held that the defendant's use of the famous

DENTYNE house mark virtually eliminated any chance of confusion. *Id.* at 46. Moreover, even

beyond the use of the house mark, whatever confusion might have existed was removed by other

aspects of the parties' commercial presentations of their respective marks, including different

styles and typefaces for the marks, different product packaging shape, size and dimension, and

delivery to the public in different forms.

Considered in this context, evidence will show that PocketMoney and Microsoft®

MONEY for Pocket PC are quite distinct – enough so to avoid any likelihood of confusion. They

create different overall impressions to consumers in the manner in which they are displayed.

Furthermore, even viewed in isolation, the phrases are not confusingly similar. Microsoft®

MONEY for Pocket PC is not simply an inversion of the word order of Catamount's alleged

mark as Catamount has sometimes suggested. In other words, consumers are not faced with:

"PocketMoney" on the one hand, and "MoneyPocket" on the other hand. Rather, consumers are

faced with "PocketMoney" and "Microsoft® MONEY for Pocket PC." Microsoft does not simply

use "pocket," but uses the generic term "Pocket PC" to designate the category of devices on

which the software is intended to operate.

> **C.**    *Marketplace Proximity is Diminished as a Factor Because of Distinct Commercial Impressions.*

When a plaintiff's mark and an accused mark have distinct commercial impressions, the

fact that the parties' products are related is not dispositive. *Nabisco, Inc.*, 220 F.3d at 47.

Microsoft formerly licensed use of the Microsoft® MONEY for Pocket PC software to OEMs

like Casio, Hewlett-Packard, and Compaq, who included the program pre-loaded on their brand

of Pocket PC. Now, Microsoft® MONEY for Pocket PC is available to the public from

Microsoft's web site www.microsoft.com, where consumers can download it free of charge. Evidence will show that the web site displays Microsoft's house mark and describes the product as "Microsoft® MONEY for Pocket PC" or "MONEY for the Pocket PC."

By contrast, Catamount's PocketMoney is available directly to consumers through retail outlets, or as a website download. Evidence will show that Catamount's product packaging includes distinguishing source identification. When consumers purchase the product online, they also encounter distinguishing source identification. Thus, regardless of any proximity of the products, the different presentations and different modes of availability vastly weaken this factor in the confusion analysis.

   **D.**    *Catamount Will Not Be Able to Establish Evidence of Actual Confusion.*

Evidence of actual confusion must show purchasers or prospective purchasers of Catamount's product who believed that the product was produced by or affiliated with Microsoft. *Lang*, 949 F.2d at 580.  As the Second Circuit has noted, "[r]elevant confusion is that which affects the purchasing and selling of goods in question . . .. Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Id. at 583*. What's more, even if a plaintiff shows some evidence of actual confusion, this Polaroid factor is not met when such evidence is *di minimus. E.g., Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 269 F.3d 114, 124 (2d Cir. 2001).  Anecdotal evidence of two, Id., "several isolated," *Duluth New-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093, 1098-99 (8th Cir. 1996), and seven, *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092 (10th Cir. 1999) instances of actual confusion have been deemed *di minimus.* Finally, while survey evidence showing confusion can be relevant, an absence of a survey going to likelihood of

confusion counts against finding actual confusion. *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994).[4]

As this Court noted on summary judgment, the only evidence Catamount presented was the "wrong kind" of confusion and thus irrelevant.[5] Specifically, each example simply "tend[ed] to show that consumers ha[d] acquired or intend to acquire Microsoft's product." *Id.* None of it was "evidence of actual confusion that would support Catamount's reverse confusion claim." Id. Since the summary judgment ruling, Catamount has not produced any new evidence of actual confusion.[6]

### E.    *In Good Faith, Microsoft Sought to Avoid Any Association with Catamount*

A defendant who adopts its mark without the intent to "capitaliz[e] on the plaintiff's reputation and goodwill . . ." acts in "good faith" for purpose of analysis under this *Polaroid* factor. *Lang*, 949 F.2d at 583. Prior knowledge of the senior user's mark is not in and of itself dispositive on this factor. *Id.* at 583-84. In reverse confusion cases like this one, this is a difficult factor to prove because the relative size and market strength of the parties necessary to make a reverse confusion case, also dictates that the junior user does not intend to trade on the senior user's reputation. *W.W.W. Pharm. Co.*, 984 F.2d at 575. Moreover, the selection of an

---

[4] In its summary judgment papers, Catamount claimed that a survey in a reverse confusion case would be improper in every instance. But this assertion is based on a grossly erroneous reading of Professor McCarthy, which Catamount cites in support of that claim. In fact, Professor McCarthy simply states that a confusion survey "cannot be run in a reverse confusion case *prior to the junior user's saturation of the market* . . .." *McCarthy on Trademarks and Unfair Competition* § 23:10 (emphasis added). While Professor McCarthy notes a limitation on the timing of such surveys, he by no means condemns them all as futile, as Catamount has suggested.

[5] Summary Judgment Order at 20.

[6] Catamount will also not offer any survey evidence on the issue of actual confusion. The survey that it has commissioned by Dr. Rappeport is not a confusion survey, but purports to measure the strength of Catamount's mark.

alleged mark that describes the attributes of the product is evidence of good faith. *Arrow Fastener Co. v. The Stanley Works*, 59 F.3d 384, 397-98 (2d Cir. 1995).

According to this Court, none of the evidence that Catamount presented on summary judgment "would lead to the inference that Microsoft intended to capitalize on Catamount's reputation or good will."[7] As of the date of this filing, Catamount has not identified any new exhibits that it suggests show bad faith on Microsoft's part.

**F.**    *Microsoft® MONEY for Pocket PC is a Quality Product.*

The sum total of Catamount's "evidence" thus far in support of its accusation that Microsoft's product is substandard is its owner's self-serving opinion and the lay opinions posted on internet chat rooms. While this Court noted on summary judgment that Microsoft had not shown an absence of material fact, if Catamount cannot carry its burden of proof in this respect, it is not incumbent on Microsoft to disprove this factor. Moreover, any evidence Catamount may attempt to introduce of software glitches that are commonplace in the software industry in the early stages of a product's release, will not show that Microsoft® MONEY for Pocket PC is a low-quality application. *Computer Assocs. Int'l, Inc. v. AJV Computerized Data Mgmt., Inc.*, 889 F. Supp. 630, 638 (E.D.N.Y. 1995); *see also*,

http://www.catamount.com/PocketPCApps/PocketMoneyHistoryCE.html (noting over 50 instances where Catamount's PocketMoney for Pocket PC had problems, was "fixed" or "corrected," or was unable to be fixed, including one "improve[ment]" to the "ActiveSync Facilities").

**G.**    *Purchasers of Financial Management Software Are Very Sophisticated.*

Confusion is less likely where the consumers or potential consumers are sophisticated. *Computer Assocs. Int'l, Inc.*, 889 F. Supp. at 638. In the context of consumers of financial

---

[7] Summary Judgment Order at 21.

management instruments and tools, courts have routinely held that such consumers are

sophisticated and exercise significant care in their purchases. *E.g., Nat'l Information Corp. v.*

*Kiplinger Washington Editors, Inc.*, 771 F. Supp. 460, 465 (D.D.C. 1991); *American Express Co.*

*v. CFK, Inc.*, 947 F. Supp. 310, 318 (E.D. Mich. 1996); *Computer Assocs. Int'l, Inc.*, 889 F.

Supp. at 638; *M&G Elecs. Sales Corp.*, 250 F. Supp. 2d at 104; *Malarkey-Taylor Assocs., Inc. v.*

*Cellular Telecomm. Indus. Ass'n*, 929 F. Supp. 473, 477 (D.D.C. 1996); *Lambda Elecs. Corp. v.*

*Lambda Tech.*, Inc., 515 F. Supp. 915, 927-28 (S.D.N.Y. 1981). Even Catamount will not

dispute that such consumers are sophisticated.

## III.   THERE IS NO FACTUAL BASIS FOR A DAMAGES AWARD FOR CORRECTIVE ADVERTISING.

Unable to point to any evidence of actual damage either in the form of lost revenues or

reputational harm, Catamount relies almost exclusively on the theory of recovery for prospective

corrective advertising. But in its zeal to chip off a percentage of Microsoft's total advertising

budget and call it an entitlement for "corrective advertising," Catamount has lost sight of the

basic principles of awarding damages and has not identified a single trial exhibit that purports to

lend support to this theory.

In the absence of statutory damages, a plaintiff is entitled to damages only after showing

that it has suffered an actual loss. *E.g., Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767 (2d

Cir. 1984); Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co., 349 F.2d 389 (2d Cir. 1965). It

is Catamount's burden to show both that an actual loss has occurred and to show the amount of

that loss. *MasterCard Int'l, Inc. v. Arbel Corp.*, No 86 CIV 6801, 1989 U.S. Dist. Lexis 12433 at

*21-*22 (S.D.N.Y. Oct. 18, 1989). As one court noted, "people who want damages have to

prove them, using methodologies that need not be intellectually sophisticated but must not insult

the intelligence." *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 505 (7th Cir. 1992) (citing

*Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992); *see also Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)..

Where a plaintiff in a trademark infringement case has undertaken advertising expenditures in an effort to combat confusion in the market place, courts will award those expenses as damages, so long as they were reasonably incurred. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374-76 (10th Cir. 1977)(citing cases). This basis for damages has been extended in limited circumstances to situations where a plaintiff has not yet undertaken such advertising, but has a reasonable explanation for why it has not done so. *Id.; see also MasterCard Int'l, Inc.,* 1989 U.S. Dist. Lexis 12433 at *22 (noting that the reason in Big O was that the plaintiff was unable to fund such advertising). But "[t]he cost-of-advertising measure for damages is permissible only if it is a surrogate for plaintiff's damages or defendant's profit, given that § 35(a) explicitly limits recovery to those two items (in addition to costs)." *Gillette Co. v. Wilkinson Sword, Inc.* 89 CV 3586, 1992 U.S. Dist. Lexis 1265 at *14 (S.D.N.Y. Jan. 31, 1992).

In *Big O,* the plaintiff was a tire-buying organization that assisted tire dealers who distributed a private-brand automobile tire called the "Bigfoot." *Big O Tire Dealers, Inc.*, 561 F.2d. at 1367-68. After using that trademark in commerce for a period of time, the defendant, Goodyear began marketing and selling a tire also called "Bigfoot." *Id.* at 1368. Not only did Goodyear aggressively market its "Bigfoot" tire, spending millions of dollars specifically on the "Bigfoot" brand, but it also falsely claimed in advertisements that it was the exclusive dealer of the Bigfoot tire – *i.e.*, implying that any other dealers with "Bigfoot" tires were unauthorized. *Id.* at 1373.

The plaintiff sued Goodyear for "reverse confusion" trademark infringement under the Lanham Act. At trial, it recovered substantial damages for "corrective advertising." On appeal, the Tenth Circuit rejected this argument, noting that the plaintiff lacked resources to counteract a massive deceptive advertising campaign, which "deeply penetrated the public consciousness." *Id.* at 1375. The Court allowed a modified damages award on the theory that "the Federal Trade Commission often requires businesses who engage in misleading advertising to spend 25 percent of their advertising budget on corrective advertising." *Id.* (citations omitted). According to the Court, the amount awarded was necessary to "place Big O in the position it was in before" the infringement and false advertising began.[8]

Even were the type of corrective advertising award in *Big O* appropriate here, evidence will show that the factual predicate present in *Big O* that was necessary to trigger such an award is completely absent here. Contrary to the situation in *Big O*, Microsoft did not engage in a massive advertising campaign with respect to Microsoft® MONEY for Pocket PC which falsely disparaged Catamount. As Microsoft pointed out in its responses to Catamount's interrogatories and as it will show at trial, Microsoft did not spend any money advertising Microsoft® MONEY for Pocket PC. Microsoft is not aware of even one single advertisement directly promoting Money for Pocket PC.[9] As it explained in that interrogatory, Microsoft launched several "concept based" ad campaigns over the years that related to Pocket PCs and the Windows® CE

---

[8] *Id.* There is no indication that the Tenth Circuit was presented with or considered the argument that "repair" damages are necessarily limited to the value of the property damaged. *Cf. Zazu Designs*, 979 F.2d at 507 ("repair cost" assessment of damages is capped by the actual value of the property to be repaired).

[9] Microsoft did present Money for Pocket PC on part of its web site. In that vein, evidence will show that Microsoft is aware of one small article that was commissioned to describe the features of Money for Pocket PC for which Microsoft paid about $1,000. But even if this web site presence can be deemed "advertising" it is *di minimus*.

Catamount has not identified a single witness or document supporting his theory of damages. The only exhibit listed for corrective-advertising damages is Microsoft's answer to interrogatories.

operating system generally but not a single one of these even mentions Microsoft® MONEY for Pocket PC.

Furthermore, no evidence will show that Microsoft suggested that "PocketMoney" was available only from Microsoft as Goodyear did in *Big O*. Indeed, Microsoft's product is not even called "PocketMoney." Microsoft has never run advertisements for Microsoft® MONEY for Pocket PC, let alone advertising that referred to it as PocketMoney. Nothing in the Tenth Circuit's *Big O* decision suggests in any manner that plaintiff would have been entitled to corrective advertising damages for such unrelated advertisements that did not in any way claim exclusive rights over that plaintiff's product.

## IV. EVEN IF CORRECTIVE ADVERTISING WERE WARRANTED, CATAMOUNT'S DAMAGES WOULD BE LIMITED TO THE VALUE OF ITS MARK.

Even if damages are appropriate, they are limited to an amount appropriate to compensate Catamount for an actual loss, they are not intended to provide a windfall. *Burndy,* 748 F.2d at 767; *see also McCarthy*, supra, at § 30:84. Corrective advertising damages are "repair costs" and should not exceed the value of the thing repaired. This is a longstanding principle of tort law, applicable in reverse-confusion trademark-infringement cases. *See, e.g. Zazu,* 979 F.2d at 507; *see also Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988-89 (9th Cir. 1995) (remanding for trial with an instruction to limit any corrective advertising damages to the value of plaintiff's trademark); *Trovan, Ltd. v. Electronic Identification Devices, Inc.*, No. CV-98-0094, 2000 U.S. Dist. Lexis 7522 at *42-44 (C.D. Cal. May 23, 2000) (noting rule capping "repair" damages at value of trademark to be "repaired"). As Professor McCarthy notes:

> There is something basically unseemly and grossly uneconomical in an award to a small company of an amount of money several times its net worth to resuscitate an infringed trademark. When such an award is many times the value of the trademark property, then it appears that the plaintiff has received a windfall, not compensation. *McCarthy*, supra at § 30:84 (emphasis added).

Trademark law does not condone bestowing such a windfall. *See Burndy*, 748 F.2d at 767; see also *Zazu*, 979 F.2d at 507.

In *Zazu Designs v. L'Oreal, S.A,* the plaintiff claimed rights in the name "Zazu," which was the name of its hair salon and also the name under which it claimed that it intended to market a line of hair products. After the plaintiff used the name "Zazu" for its salon,[10] L'Oreal began marketing a hair-coloring product also called "Zazu."

The Seventh Circuit reversed the district court's damage award. The Court held that "corrective advertising" was a form of "repair" damages and that under traditional principles of tort law, repair damages must be limited to the pre-tort value of the thing to be repaired. Judge Easterbrook noted that in the absence of this rule of damages, the owner of destroyed property could reap a windfall. The example that he used was that of a $4,000 used car, which would require $ 10,000 to repair it. Judge Easterbrook noted the waste that would result in the absence of this damages rule. The court also pointed out that such a plaintiff would likely keep the repair costs rather than actually repair the lesser-valued property, and thus reap a windfall.[11] Because the district court's award of damages far surpassed what it would cost to "repair" the plaintiff's, the Seventh Circuit set aside the award.

Even if there had been advertising sufficient under *Big O* to trigger such an award, any damage award for Catamount would be limited to the value of its trademark. Microsoft's expert, Aron Levko, previously estimated the value of that mark but is currently updating that estimate

---

[10]  It was not clear whether the plaintiff had used the name in connection with any hair care products. The Seventh Circuit determined that it had not and ruled, as one basis for its holding, that the plaintiff did not have prior rights. The alternative basis for its ruling is discussed in the text here.

[11]  In claiming that this rule of damages has no basis in the law, Catamount uses a hypothetical that is nearly identical to the one that Judge Easterbrook, but amazingly, asserts that there is no authority for this principle. *See* Pl's. Mot. in Limine to Exclude Microsoft's Expert at.

based on recently-updated discovery from Catamount.[12] Catamount is not calling any expert to testify on damages or the value of Catamount's purported trademark. It has also not identified any exhibit that would constitute circumstantial evidence of the mark's value. In sum, the only evidence at trial as to the value of Catamount's mark will be that of Mr. Levko. Any corrective advertising award would necessarily be limited to his valuation.[13]

## V.    IF THIS IS AN EXCEPTIONAL CASE, IT IS ONE IN WHICH ATTORNEY'S FEES ARE WARRANTED FOR MICROSOFT, NOT CATAMOUNT.

Under the Lanham Act, attorneys fees are warranted in only "exceptional" cases. Catamount claims that this is an "exceptional" case that favors fees for his attorney. This is not such an exceptional case. But if the threshold is as low as Catamount asserts, it favors Microsoft, not Catamount.

Catamount chose a mark that it knew tread extremely close to Microsoft's famous MONEY mark. Catamount was aware that its attorney anticipated encountering the Microsoft® MONEY mark in the trademark search of PocketMoney. Despite knowing this, Catamount decided to pair the descriptive term "pocket" with Microsoft's existing MONEY mark. And, it did so expecting to trade off of Microsoft's popularity in the realm of financial-planning software.

By contrast, despite knowing of Catamount's dubious choice of the descriptive "pocket" paired with Microsoft's "MONEY" trademark, Microsoft decided to avoid conflict and decided against calling its application "Pocket Money." Instead of running roughshod over Catamount, Microsoft used its MONEY mark along with the generic phrase "for Pocket PC."

---

[12]  Microsoft has not received fully updated discovery responses from Catamount as of the filing of this brief.

[13]  Catamount has suggested in its counsel's damage calculation that a multiplier of 6 would be appropriate as a measure of punitive damages. There is no evidence warranting such an award. Also, the multiplier of 6 that it cites is taken from Colorado law. Catamount offers no basis for importing that Colorado rule here.

## VI.    CATAMOUNT HAS NO BASIS FOR RECOVERY ON ITS STATE LAW CLAIMS

A.    *Since there Is No Likelihood of Confusion, There can be No Trademark Infringement or Unfair Competition Claim.*

Under Vermont law, claims of trademark infringement, and of unfair competition, all require Catamount to show a likelihood of confusion to succeed. *E.g. Wyckoff, Seamans & Benedict v. Howe Scale Co.*, 122 F. 348, 353 (2d Cir. 1903, *rev'd on its facts*, 198 U.S. 118 (1905); *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 250 F. Supp. 215, 219 (D. Vt. 1966).  As the court stated in *Vermont Motor Company v. Monk*, the issue in these state-law claims is whether:

> the name is such as to cause confusion in the public mind as between plaintiff's business and that of the defendant, resulting in injury to plaintiff. *The test is whether the public is likely to be deceived . . .*  It is not sufficient that some person may possibly be misled, but the similarity must be such that any person, with such reasonable care and observation as the public generally are capable of using  and may be expected to exercise, would be likely to mistake one for the other. 75 A.2d 671, 673 (Vt. 1950) (emphasis added) (quoting *Middletown Trust Co. v. Middletown Nat'l Bank*, 147 A. 22, 25 (Conn. 1929)).

Courts outside of Vermont have reached similar conclusions with respect to the necessity of showing a likelihood of confusion for these claims. *Bristol-Meyers* Squibb Co., 973 F.2d at 1039-41; *Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1261 (5th Cir. 1989); *Cleary v. News Corp.,* 30 F.3d 1255, 1262-63 (9th Cir. 1994); *Children's Factory, Inc. v. Benee's Toys, Inc.,* 160 F.3d 489, 491 n.2 (8th Cir. 1998).  Since Catamount will not be able to show a likelihood of confusion, judgment will be warranted for Microsoft on Catamount's common law claims also.

B.    *Vermont Has Neither Recognized a Tort of Trademark Disparagement, Nor Could Catamount Satisfy Any of the Commonly-Required Elements in States that Recognize Such a Claim.*

There is no case law supporting the existence of a common-law action for trademark disparagement in Vermont. Catamount so far has not cited a single authority applying Vermont

law that would suggest that Vermont would recognize this claim. The Court ought to grant

judgment in Microsoft's favor on this claim even before hearing any evidence since no Vermont

court has ever recognized this tort.

In addition to there being no Vermont case ever recognizing such a state-law cause of

action, even under the law of those states that recognize such a claim, Catamount could not prove

the most commonly-identified elements underlying that tort. Under those states' laws,

Catamount would have to show that Microsoft made a statement: (a) that was likely to cast doubt

or confusion about the validity of Catamount's mark; (b) that was made with malice, intending to

vex, injure or annoy Catamount; and (c) that caused Catamount to suffer an adverse economic

effect. *E.g., Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 408 F. Supp. 1219 (D.

Colo. 1976), aff'd as modified, 561 F.2d 1365 (10th Cir. 1977).

With respect to the first element, most courts hold that in the absence of a likelihood of

confusion, there can be no recovery under this theory. *E.g., M.B.H. Enters., Inc. v. Woky, Inc.,*

633 F.2d 50 (7th Cir. 1980); *Johnson Publishing Co. v. Etched-In-Ebony, Inc.,* 213 U.S.P.Q. 995

(D.D.C. 1981). Further, Catamount will be unable to show that Microsoft acted with malice,

intending to vex, injure or annoy Catamount. In sharp contrast to the defendant in *Big O*, for

example, Microsoft, after engaging Catamount directly on the potential issues between them,

decided against using "Pocket Money" to identify its new application before its launch to the

public. As noted with respect to the "good faith" *Polaroid* factor, this Court never has been

presented with any evidence (nor has Catamount identified any new evidence since summary

judgment) that Microsoft acted in bad faith or with malice. The failure of proof on this element

also precludes recovery. Finally, Catamount offers nothing other than self-serving testimony of

its owner regarding damages. In fact, it will be shown that since Microsoft introduced Microsoft[®]

MONEY for Pocket PC, Catamount's sales have greatly increased.

## VII.    CATAMOUNT CANNOT RECOVER BECAUSE IT HAS KNOWINGLY MISUSED THE "®" SYMBOL.

Under the Lanham Act, trademark owners are permitted to display the circle-R symbol

("®") only with their U.S.P.T.O-registered trademarks. *See* 15 U.S.C. § 1111 (1997).[14] When

unregistered trademark owners use the ®, it can constitute "unclean hands" and preclude

recovery in a trademark-infringement action. *Urecal Corp. v. Masters*, 413 F. Supp. 873, 876

(N.D. Ill. 1976).  Under certain circumstances, improper use of the ® can preclude both legal and

equitable relief. *Id.; L.F. Gaubert & Co. v. Inst. Of Electric & Electronics Engineers, Inc.*, 563 F.

Supp. 122, 128 (E.D. La. 1983).  Misuse of the ® may bar relief, even if such use is not

intentional. *Sterling Acceptance Corp.*, 227 F. Supp. 2d at 468; *Fox-Stanley Photo Prods., Inc.*,

339 F. Supp. at 1295.  It is undisputed that Catamount used the ® symbol with a trademark that

was not registered with the United States Patent and Trademark Office.[15]  The evidence will

show that it did so with the intent to convey falsely to the public or knowing that it would falsely

convey to the public that it had a registered trademark from the USPTO for that name, when in

fact it did not.

## VIII.   IF THERE IS A LIKELIHOOD OF CONFUSION, THEN IT WAS CAUSED BY THE PLAINTIFF'S INFRINGEMENT OF MICROSOFT'S "MONEY" MARK.

Only if this Court finds that there is a likelihood of confusion between Catamount's

PocketMoney mark and the phrase Microsoft[®] Money for Pocket PC will the Court need to reach

Microsoft's alternative counterclaim for trademark infringement under the Lanham Act. But if

---

[14]  Although the Trademark Manual of Examining Procedure (T.M.E.P.") permits foreign applicants to use the "®" symbol when based on a foreign registration, (*Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 468 (D. Md. 2002); *Fox-Stanley Photo Prods., Inc. v. Otaguro*, 339 F. Supp. 1293, 1295 (D. Mass. 1972)), there are no such provisions for domestic registrants who have foreign registrations.

[15]  Summary Judgment Order at 23.

there is a finding of confusion, it was caused by Catamount, who knowingly selected a mark similar to the Microsoft® MONEY mark. Microsoft has used the Microsoft® MONEY and MONEY marks in connection with goods in commerce in the United States continuously since 1991, three years before Catamount introduced its software. If there is any confusion, it is because Catamount simply appended the descriptive term "pocket" to Microsoft's pre-existing and well-known "MONEY" mark. Moreover, Catamount has admitted that it knew of Microsoft's use of MONEY and Microsoft® MONEY when it began to use its alleged trademark "PocketMoney." If there is any confusion, it is because Catamount is trading off of Microsoft and not vice versa.

### CONCLUSION

For the reasons stated above, judgment should be entered in Microsoft's favor on all of the claims in Catamount's complaint.  And if the Court finds that there is a likelihood of confusion, it is due to the plaintiff's wrongful conduct, entitling Microsoft to judgment in its favor on Microsoft's counterclaim, including disgorgement of Catamount's profits in trading off of Microsoft's famous MONEY mark.

Respectfully submitted,
WILDMAN, HARROLD, ALLEN & DIXON LLP


By:

_m. n. Hall fiat JT Brown, M La Porte and JT Sartore_

John Thompson Brown
Michael La Porte
WILDMAN HARROLD ALLEN & DIXON, LLP
225 West Wacker Drive
Suite 3000
Chicago, IL  60606-1229

PAUL, FRANK & COLLINS
John T. Sartore
One Church Street
P.O. Box 1307
Burlington, VT  05402-1307
Attorneys for Microsoft

## CERTIFICATE OF SERVICE

I Mark Hall, Esq. certify that I served the foregoing MICROSOFT'S TRIAL BRIEF on:

Markus Brakhan
The Law Office of Markus Brakhan
P.O. Box 5851
44 Church Street Suite 1
Burlington, VT 05402-5851
brakhanm@sover.net

and

David Putter
Attorney at Law
15 East State Street
Montpelier, VT 05602

by sending a copy via e-mail and U.S. Mail on August 3, 2004.

Mark Hall, Esq.