241.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

HARLAND A. MACIA, III d/b/a )
CATAMOUNT SOFTWARE, )
　　　　　　　　　　Plaintiff, )
v. )
　　　　　　　　　　　　　　　 )
MICROSOFT CORPORATION, INTUIT, )
INC., and MECA SOFTWARE, LLC, )
　　　　　　　　　　　　　　　 )
　　　　　　　　　　Defendants. )

2004 AUG 31   PM 4 46

CLERK

BY _____
DEPUTY CLERK

Civil Action No. 2:00-CV-299

### MICROSOFT'S BRIEF IN SUPPORT OF ITS RULE 52 MOTION

John Thompson Brown
Michael La Porte
WILDMAN HARROLD ALLEN & DIXON, LLP
225 West Wacker Drive - Suite 3000
Chicago, IL 60606-1229

John T. Sartore
PAUL, FRANK & COLLINS
One Church Street
P.O. Box 1307
Burlington, VT 05402-1307

Counsel for Microsoft Corporation

# I.     INTRODUCTION

At the close of Catamount's case,  Microsoft orally moved for judgment under Rule 52 of the Federal Rules of Civil Procedure. Microsoft argues that the following facts, established in the plaintiff's case in chief, warrant judgment in Microsoft's favor on all of Catamount's claims:

- Catamount had a marked increase in sales of PocketMoney after Microsoft introduced Microsoft® Money for Pocket PC (Day 1 Tr. at 197);
- Catamount admits its alleged trademark increased in value after Microsoft entered the market (*Id.* at 194:5-10);
- Catamount offered no evidence to support its claim that  PocketMoney sales or the value of its trademark would have or should have been more (*Id.* at 193:18 to 194:4);
- Catamount offered no concrete evidence of harm allegedly flowing from any supposed Microsoft advertising campaign;
- Chat room evidence and email evidence of incorrect identification of Microsoft's product, produced on summary judgment and again at trial, was admittedly not evidence of actual consumer confusion (Day 2 Tr. at 33-39); (Day 3 Tr. at 46:19-47:11);
- Catamount produced no new evidence of any consumer who was actually confused that Microsoft was the source of Catamount's product;
- Catamount uses the descriptive term "pocket" with Microsoft's pre-existing MONEY mark and thus Catamount's alleged mark is not protectable or is weak, at best;
- Catamount's owner, its expert witness, its product packaging, and its counsel all refer to "Pocket PC" in a generic sense to refer to various brands of pocket-sized computers from different manufacturers (Day 1 Tr. at 178:23 to 179:2 and Day 2 Tr. at 90:16-21) (by Mr. Macia); Day 2 Tr. at 199:20 to 199:10 (by Mr. Jaros referring to Pocket PC as a "category" of device); Day 2 Tr. at 59:17 to 60:2 and Exs. W and X (product packaging); Day 1 Tr. at 156 (by Mr. Brakhan))

# II.    THE COURT MAY AND SHOULD WEIGH THE EVIDENCE IN DETERMINING WHETHER CATAMOUNT HAS FAILED TO PROVE ITS CASE

Judgment in favor of Microsoft is appropriate because after presenting all of its evidence, Catamount failed to establish that it is entitled to any relief. *See* Fed. R. Civ. P. 52(c). Rule 52(c) provides that:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue

Fed. R. Civ. P. 52(c). Unlike on summary judgment, the Court on a Rule 52 motion evaluates and weighs all the evidence, makes determinations regarding credibility, and may resolve the case on the basis of the preponderance of the evidence to make findings of fact and conclusions of law. *MacDRAW Inc. v. CIT Group Equip. Fin. Inc.*, 157 F.2d 956 (2d Cir. 1997).[1]  Similarly, the Court is not required to draw any special inferences in favor of the nonmoving party. *See In re Regency Holdings Inc.*, 216 B.R. 371, 374 (Bankr. S.D.N.Y. 1998).  Courts can grant a Rule 52 Motion even when the non-moving party has established a *prima facie* case. Furthermore, even if the plaintiff presented a *prima facie* case, which would otherwise withstand a motion for a directed verdict, the Court may still dismiss the case under Rule 52(c).  *Huber v. American President Lines Ltd.*, 240 F.2d 778, 779 (2d Cir. 1957) (referring to predecessor Rule 41(b)).

In its summary judgment ruling, this Court deferred, until trial, ruling on several issues that favored Microsoft on the evidence then presented based on the possibility further evidence could be introduced at trial. In essence, this Court invited Catamount to prove certain elements in support of its claims at trial. No such additional evidence was presented by Catamount at trial.[2]

---

[1] Appellate courts review a district court's findings of fact for clear error, *Burger v. New York Institute of Technology*, 94 F.3d 830, 835 (2d Cir. 1996), and its conclusions of law *de novo. Mentor Ins. Co. (UK) Ltd. v. Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993) (conclusions of law).  In granting a Rule 52(c) motion, the Court must make findings of fact and conclusions of law to warrant a deferential "clearly erroneous" standard of review. Otherwise, the appellate courts do not accord such rulings deference.  *Burger*, 94 F.3d at 830.

[2] The law of the case doctrine provides that courts should not reopen issues decided in earlier stages of the same litigation.  The doctrine of the law of the case "posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (citations and internal marks omitted).  Courts apply the law of the case doctrine when their prior decisions either expressly resolved an issue or necessarily resolved it by implication.  *Id.*  The doctrine promotes the finality and efficiency of the judicial process. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988).  Although not a strait jacket, "[t]he doctrine requires a court to adhere to its previous rulings in the same litigation unless there is a compelling reason, such as an intervening change of law or newly discovered evidence, to reexamine them." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1014 (N.D. Ill. 2003) (Posner, J., sitting by designation).

### III.   MICROSOFT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BASED ON CATAMOUNT'S FAILURE TO PROVE ITS CASE.

The grounds for entitling Microsoft to judgment are set forth below. With respect to its claim for monetary relief, Catamount has not shown that it has suffered any harm from what it claims to be a likelihood of confusion. It has not lost sales, lost profits, lost value to its purported trademark, and has suffered no other business harm. Because Catamount has not been harmed, it is not entitled to damages. In addition, Catamount's claim to damages is undermined by: (1) the absence of evidence of actual confusion; and (2) Microsoft's good faith. These two issues also undermine its claim for injunctive relief, along with other elements under the likelihood-of-confusion analysis.

Without even reaching the issue of likelihood of confusion, though, Microsoft is entitled to judgment because "Pocket PC" is a generic reference to pocket-sized personal computers. Catamount cannot prevent others from using this generic term to describe the form factor on which software is designed to run – just as it has done with "PocketMoney for Pocket PC" and as its expert witness and programmer has done with "Seymour for Pocket PC."

Finally, Microsoft is entitled to judgment as a matter of law on an additional independent basis because the plaintiff's purported "PocketMoney" mark is not protectable. Microsoft was prior in using the mark "Money" and Catamount simply put the descriptive term "pocket" before that mark.

### A.   Catamount Offered No Evidence In Support of its Claim for Monetary Relief.

As Professor McCarthy sets out in his treatise, there are only five categories of monetary relief available to a trademark plaintiff. *See* J. McCarthy, 5 *McCarthy on Trademarks & Unfair Competition* at 30:57, p. 30-112 to 30-113 (hereafter, "McCarthy at ___"). These five categories are:

    (1)   an award of defendant's profits (as a proxy for either the plaintiff's loss or to avoid unjust enrichment);

    (2)   compensation for actual business damages and losses;

    (3)   compensation for the plaintiff's lost profits;

    (4)   punitive damages; and

    (5)   reasonable attorneys' fees.

Catamount failed to offer proof justifying a monetary award based on any of these five categories.

The first and third bases[3] can be addressed together. As to profits, there was no evidence presented whatsoever about either party's profits (or losses). In fact, counsel for Catamount admitted that:  (1) there was no evidence of lost sales; and (2) establishing any such loss would be "entirely *speculative*." *See* Day 3 Tr. at 149:4-7. ("MR. BRAKHAN:  Well, there's no evidence to show what the reduction in sales could be because that would be entirely speculative. I mean -- I don't know that it's even possible to measure that, your Honor.") Thus, profits cannot be a basis for a monetary award.

Second, Catamount has failed to demonstrate actual harm to it. Under the Lanham Act, plaintiff is entitled to a monetary award only to the extent that the injury is shown already to have been suffered. *W.W.W. Pharm. Co. v. Gillette Co.*, 808 F. Supp. 1013, 1020 (S.D.N.Y. 1992) (citing *Monsanto Chem. Co. v. Perfect Fit Prods Mfg. Co.*, 349 F.2d 389, 392 (2d Cir. 1965)). The Second Circuit requires proof of real and precise actual consumer confusion in order to recover damages under the Lanham Act. Cases claiming reverse confusion are no exception to this requirement. *Id.*

---

[3] Catamount offered no evidence in support of punitive damages or attorney's fees.  This Court noted in ruling on summary judgment that the "good faith" *Polaroid* factor favored Microsoft at that stage.  Catamount offered no new evidence at trial.  Thus, on the same evidence it is still apparent that Microsoft acted in good faith.

Catamount admitted that sales of PocketMoney increased since the introduction of Microsoft® Money for Pocket PC. Day 1 Tr. at 189:5 to 191:4 (noting an increase in overall revenue from PocketMoney from $24,000 to $260,000 from 1999 to 2001). With respect to the value of the alleged PocketMoney trademark, Catamount also admitted that the value has increased as well. (Day 1 Tr. at 194:5-10). Furthermore, Catamount's counsel's argument notwithstanding, there are commonly-accepted methods of offering evidence through expert testimony as to whether a company has suffered harm to its trademark.[4] Catamount did not offer any such evidence. *E.g.*, Day 1 Tr. at 193:18 to 194:4; *see also* 197:18-25. Catamount's owner even admitted that it did not have any formal business plans, *see* Day 1 Tr. at 189:16-20, against which to compare Catamount's actual sales.

The Court put the question of damages proof directly to Catamount's counsel in oral argument. Counsel's only response was to claim that whenever there is a likelihood of confusion, damages are presumed. *See, e.g.,* Day 3 at 145-46; *id.* at 150:11-15; *id.* at 150:17-20. Not only did counsel tacitly admit that there had been no proof, he also incorrectly stated the law. In fact, a monetary award is not presumed simply by showing a likelihood of confusion. A plaintiff is entitled to damages only after showing that it has suffered an actual loss. *E.g., Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767 (2d Cir. 1984). It was Catamount's burden to show both that an actual loss has occurred and to show the amount of that loss. *MasterCard Int'l, Inc. v. Arbel Corp.*, No. 86 CIV 6801, 1989 U.S. Dist. Lexis 12433 at *21-*22 (S.D.N.Y. Oct. 18, 1989). As one court noted, "people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence." *See, e.g., Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 505 (7th Cir. 1992) (citations omitted). Speculative evidence is

---

[4] A reasonable royalty is an accepted method of calculating damages in trademark infringement cases. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970); *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340 (7th Cir. 1994).

insufficient. *Id; see also* Day 3 Tr. at 149:11-15 (where the Court noted the "universal" principle that a monetary award cannot be based on a speculative assertion of damage).

Catamount failed to prove any lost sales on account of any confusion with Microsoft® Money for Pocket PC. In fact, it admitted that in the first full year that Microsoft® Money for Pocket PC was on the market, gross revenue for sales of PocketMoney was about one thousand per cent (1000%) greater than the year before Microsoft® Money for Pocket PC came on the market. *See* Day 1 Tr. at 193:7-17.

Catamount also failed to offer any proof that Microsoft acted in bad faith or that consumers were actually confused by Microsoft's use of Microsoft® Money for Pocket PC and Catamount's use of Microsoft's MONEY mark in connection with the descriptive term "pocket." Proof of either one or the other of these elements is required to recover a monetary award. *Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 655 (2d Cir. 1989) (to warrant an award of damages, a Lanham Act plaintiff must prove either "'actual consumer confusion or [intentional] deception resulting from the violation.'") (quoting *PPX Enter, Inc. v. Audiofidelity Enter, Inc.*, 818 F.2d 266, 271 (2d Cir. 1987)); *see also Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481 (2d Cir. 1998). Each of these points is discussed, *infra* at 9-14 (concerning the lack of actual confusion), and at 14 (concerning Microsoft's good faith), as related to the *Polaroid* factors.

Finally, Catamount has not proven that it is entitled to any so-called "corrective advertising." Like other measures of damages, "corrective advertising" is a compensatory measure, *Zazu Designs*, 979 F.2d at 505, not a strict-liability punishment to provide a windfall to a plaintiff. *See, e.g.*, 5 McCarthy, § 30:84. It is available as a "repair cost" remedy in reverse confusion cases when the senior user has undertaken advertising to counter a

harmful advertising campaign by the junior user. *See, e.g., Zazu Designs*, 979 F.2d at 507. Catamount, however, has never actually engaged in any "corrective advertising."

In limited circumstances, an award for corrective advertising is also available to plaintiffs who have not yet undertaken such advertising but only because they lack the financial resources to do so. Catamount also has not proven entitlement to an award of corrective advertising under this theory. Although claiming to be unable to afford to counter Microsoft's advertising (presumably in reference to the total spent on all advertising within the Mobile & Embedded Devices Group, none of which directly promoted or mentioned Microsoft® Money for Pocket PC), it also acknowledged that Handmark now handles all of its advertising and promotion. There was no evidence that Handmark would be unable to undertake such an advertising campaign, or whether Handmark had even contemplated such a campaign. *See Mastercard Int'l, Inc.*, No. 86 Civ. 8601 (SWK) 1989 U.S. Dist. Lexis 12433 at *24 (S.D.N.Y. Oct. 18, 1989).

As noted above, Catamount has not shown any harm that requires any "repair." Catamount has never actually engaged in any "corrective advertising." There was no testimony from any of Catamount's witnesses or experts claiming ever to have seen or even heard about an advertisement for Microsoft® Money for Pocket PC.[5] Likewise, Catamount did not offer into evidence a single advertisement for Microsoft® Money for Pocket PC.[6] Also, Mr. Macia never claimed that Catamount had been harmed specifically as a result of any alleged advertising by Microsoft. Microsoft has not advertised. And Catamount has not been harmed – contrary

---

[5] Catamount deposed Microsoft's designee, Andy Haon, who was unavailable to testify at trial in August due to paternity leave, but is prepared to testify in September, if necessary. The plaintiff offered portions of Mr. Haon's testimony as evidence in its case in chief. The Court has not ruled on the admissibility of that testimony. None of that testimony, however, supports the claim that (a) Microsoft even did any advertising and (b) that Catamount was supposedly harmed by such advertising, even assuming any was done.

[6] Catamount relies entirely on Microsoft's initial answer to an interrogatory in which Microsoft stated that it ". . . did not spend any amounts directly advertising the Microsoft Money for Pocket PC application" and that to the extent that any unrelated ad *might* have mentioned Microsoft® Money for Pocket PC, Microsoft specifically answered in that interrogatory that the amounts were "negligible." Microsoft has since amended that answer to reflect the fact that it is now definitively known that no advertisement ever mentioned Microsoft® Money for Pocket PC.

evidence has not been presented. Catamount is simply seeking a windfall by asking for a portion of unrelated advertising, not compensation for harm that it has proved.[7] The law doesn't sanction that. *See* Microsoft's Trial Brf. at 26.

**B.    Catamount's Evidence Did Not Establish A Likelihood of Confusion.**

        1.    *Catamount Did Not Submit Evidence of Actual Consumer Confusion.*

In a reverse confusion case, the only relevant confusion is of purchasers or prospective purchasers of a plaintiff's product who mistakenly believe that the plaintiff's product was produced by or affiliated with the defendant. *See Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991). The only confusion to be avoided is confusion that affects purchasing decisions. *Id.* Any other confusion is irrelevant. *Id.*; *see also W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 574 (2d Cir. 1993). A person's simply calling a product by the wrong name, without confusion as to source, is *not* "confusion" under the Lanham Act.

        a.    *Catamount Offered No New Evidence Since Summary Judgment.*

All of Catamount's evidence regarding alleged actual consumer confusion had already been submitted in opposition to Microsoft's motion for summary judgment, including all of the internet postings. On that record, this Court concluded:

> Catamount's evidence tends to show that consumers have acquired or intend to acquire Microsoft's product, and that they refer to it incorrectly. . .. The Court has as yet seen no evidence of actual confusion that would support Catamount's reverse confusion claim. . . .On the current state of the record, this factor favors Microsoft.

06/03/04 Mem. Op. & Order at 20. No new evidence of any person who was confused and thought that Microsoft was the source of Catamount's PocketMoney application was presented at trial. This factor must continue to favor Microsoft. A summary of the evidence presented then and the Court's treatment of it on summary judgment is presented below:

---

[7] Catamount's counsel's argument that advertising of Pocket PC devices has harmed Catamount is incorrect. It admitted that its sales of PocketMoney have increased on account of sales of Pocket PC devices. (Day 1 Tr. at 197).

### Fabio Spagnuolo[8] & Jenny Madewell

| | |
|---|---|
| • Offered in opposition to Summary Judgment and considered by the Court.<br>• Rejected as evidence of confusion or, at best, *di minimus* evidence.<br>• Presented again at trial.<br>• Catamount conceded that it was not evidence of consumers believing Microsoft was the Source of Catamount's product. | 06/03/03 Mem. Op. & Order at 18-19<br>*Id.* at 19<br><br>Day 1 Tr. at 129-132<br>Day 2 Tr. at 27:5-9 (concession by Macia as to Spagunuolo); Day 3 Tr. at 40:25 to 41:5) (concession by Jaros as to Madewell). |

### Chat Room Evidence

| | |
|---|---|
| • Offered in Opposition to Summary Judgment.<br>• Rejected as not being evidence of confusion "affecting purchasing decisions";<br>• Presented again at trial;<br>• Catamount conceded that it was not evidence of consumers believing Microsoft was the Source of Catamount's product. | 06/03/03 Mem. Op. & Order at 18<br>*Id.* at 19, 20<br><br>Catamount Exs. 22 and 23<br>Day 2 Tr. at 33-39 (concession by Macia being unaware that any person on a chat room believed that Microsoft was the source of Catamount's product); Day 3 Tr. at 46:14 to 47:11 (same by Jaros). |

### Rappeport Survey

| | |
|---|---|
| • Offered in Opposition to Summary Judgment;<br><br>• Not a confusion survey<br>• Presented again at trial<br>• Did not testify beyond the evidence presented on summary judgment.[9] | 06/03/03 Mem. Op. & Order at 12-13<br>Day 3 Tr. at 154:7-12<br>Day 2 Tr. at 104, 119, 174 |

### New Evidence of Consumer Confusion Since Summary Judgment

| |
|---|
| • None |

---

[8] Spagnuolo is Italian. This case concerns U.S. usage. Moreover, it is clear from the emails from Sr. Spagnuolo that he was looking for Microsoft's product, not Catamount's. Further, it was the plaintiff's counsel, not Sr. Spagnuolo who introduced the "confusion" concept into the email exchange.

[9] One survey respondent, who answered that she thought that PocketMoney might come from Microsoft, despite not being asked volunteered that she believed this because she knew that Microsoft also offered its MONEY software. *See* Ex. 1 (Questionnaire No. 212).

Catamount's counsel admitted that there was no new evidence, yet claimed the testimony at trial was new. Day 3 Tr. at 161:10-13 (by Mr. Brakhan, ". . . with respect to the law of the case, argument raised by Mr. Brown, that is, the new evidence that has been offered since that time is the testimony of our witnesses.")  None of Catamount's three witnesses, however, testified about any previously unknown people who thought that Microsoft was the source of Catamount's PocketMoney. They merely commented on evidence previously considered by this Court. There was no new evidence of any relevant confusion.[10]

> b.    *Catamount's Evidence Does not Support*
>        *a Presumption of Actual Confusion.*

Unable to show any actual confusion, Catamount has argued that such confusion ought to be presumed. In its Trial Brief and again in opposition to Microsoft's oral Rule 52 Motion, Catamount claimed that Microsoft's prior knowledge of the alleged PocketMoney mark "gives rise to the presumption of a likelihood of confusion and shifts the burden of proof to the defendant to disprove the infringement." Pl.'s Trial Br. at 9 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987); McCarthy, § 23:111); *see also* Day 3 Tr. at 160:6-16.

Catamount misstates the standard under which such a presumption arises. The authorities cited in its trial brief do not support Catamount's far-reaching characterization of that standard. Nor does the record support application of such a presumption under the proper legal standard. Further, on summary judgment, this Court rejected Catamount's conclusion. *See* 06/03/03 Mem. Op. & Order at 21. This Court should again reject this argument.

---

[10] The absence of actual confusion is highly probative of an absence of a likelihood of confusion since the products in question have coexisted in the marketplace for over four years. *See, e.g., Oreck Corp. v. U.S Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (lack of actual confusion over time supports no likelihood of confusion).

> (i)    *No Case In The Second Circuit Has Ever Held That Mere Knowledge Of A Plaintiff's Trademark Is Sufficient To Establish An Intent To Infringe.*

Under Second Circuit law, a rebuttable presumption that consumers are actually confused arises when a defendant "has intentionally set out to deceive the public," engaging in "deliberate conduct" of an "egregious nature." *Johnson & Johnson v. SmithKline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) (citations omitted). Indirect and controverted evidence is insufficient to create this presumption. *Id.* at 299. Prior knowledge can be evidence of such intent, but only if coupled with "similarities so strong [between the two marks] that it seems plain that deliberate copying has occurred." *Paddington Corp. v. Attiki Imp. & Distrib., Inc.*, 996 F.2d 577, 587 (2d Cir. 1992); *see also W.W.W. Pharm. Co.*, 984 F.2d at 567; *Swanson v. Georgetown Collection, Inc.*, No. 94-CV-1283, 1995 U.S. Dist. Lexis 1972 at *38 (N.D.N.Y. Feb. 14, 1995) ("[e]ven actual knowledge of a pre existing trademark does not necessarily give rise to an inference of bad faith. There must be additional evidence of an intention to promote confusion between the two products.") (citations omitted)). Contrary to the plaintiff's unsupported assertions, prior knowledge alone has never been held sufficient to show bad faith intent and create a rebuttable presumption of actual confusion.[11]

> (ii)    *Neither of Catamount's Cited Authorities Support Its Position.*

Although Catamount invokes both *Mobil Oil* and Professor McCarthy's treatise, neither of these authorities supports Catamount's proposition. *Mobil Oil* is consistent with the decisions

---

[11] The notion that Microsoft merely *considered* but rejected the use of an identical mark, *see* Day 3 Tr. at 162:18-23, also does not trigger such an assumption as counsel suggested in opposition to Microsoft's Rule 52 motion. *Id.* ("MR. BRAKHAN:  If I may respond with one sentence. The marks at question in *Mobil Oil* were identical. I would like to point out to the Court that at the time when Microsoft first contacted plaintiff, they proposed using an identical mark, Pocket Money"). In fact, Microsoft's change before introducing its application underscores the differences in the plaintiff's mark and Microsoft® Money for Pocket PC.

Although the issue is not before the Court on Microsoft's Rule 52 Motion, if accepted, Catamount's interpretation of the *Mobil Oil* case would provide significant problems for Catamount on Microsoft's Counterclaim, since: (a) Catamount knew of Microsoft's prior use of MONEY yet chose to use PocketMoney anyway; and (b) Catamount actually made a profit selling PocketMoney, which could be awarded to Microsoft as damages.

cited above, i.e., knowledge alone is not sufficient to support a finding of bad faith. The Court in *Mobil Oil* expressly found that the defendant did not "innocently" select its mark, specifically rejecting testimony that the defendant did not intentionally copy the plaintiff's mark. Professor McCarthy, cited in *Mobil Oil,* agrees:

> [w]here we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well-known mark.

McCarthy § 23:33 at 148. This principle, which presumes "freedom of choice" among any product name and also presumes that a defendant who chooses an identical mark from all the options available does so in bad faith, does not apply where a defendant has chosen a name that describes its product, *see, e.g., W.W.W. Pharm.*, 984 F.2d at 575 (citations omitted), which is precisely what Microsoft has done. As this Court stated in ruling on summary judgment, "Microsoft's selection of Microsoft® Money for Pocket PC is its fairly literal characterization of its product, a version of its Money software designed to run on Pocket PCs." *See* 06/03/03 Mem. Op. & Order at 21. In essence, Microsoft's choice to use the generic term Pocket PC, which is *not* identical to Catamount's alleged mark, negates any inference of poaching on Catamount's mark. Mere knowledge does not create a rebuttable presumption of confusion.

         (iii)    *This Court has already rejected Catamount's premise.*

    This Court was well aware that Microsoft knew about Catamount's alleged mark when it ruled on summary judgment. Indeed, Microsoft readily concedes that fact. And, despite deferring the ultimate ruling on "bad faith" until trial, this Court expressly stated that *at that stage,* "Catamount ha[d] presented *no evidence* that would lead to the inference that Microsoft intended to capitalize on Catamount's reputation or good will." Op. & Order (June 3, 2003) at 21 (emphasis added). Put another way: the fact that Microsoft knew of Catamount's mark is not

evidence of bad faith intent to infringe. Catamount presented no additional evidence at trial that would require this Court to change its previous conclusions.

> 2.  *Microsoft Acted in Good Faith in Naming Its Software Around Catamount's PocketMoney.*

As with actual confusion, this Court previously ruled that this factor favored Microsoft on the summary-judgment record. *See* 06/03/04 Mem. Op. & Order at 21. As set forth above, Catamount presented at trial no evidence that Microsoft intended to capitalize on Catamount's reputation or good will or any evidence undermining Microsoft's good faith selection of its product name.[12]

If there is any bad faith present, it is by Catamount, not Microsoft. Catamount admitted choosing to use PocketMoney knowing that Microsoft already was using MONEY in connection with financial-management software. Day 1Tr. at 35:17-23. Additionally, Catamount knew that Intuit was using the descriptive modifier "pocket" in connection with Quicken for its financial-management software for pocket-sized computers. Day 1Tr. at 36:3-8. Catamount also was aware of other, similar uses of "pocket." Day 2 Tr. at 56:1-11 (was aware of "Pocket Call," which was released at roughly the same time as PocketMoney). If there is any bad faith intent here, it is by Catamount, not Microsoft.

> 3.  *The Phrases PocketMoney and Microsoft® Money for Pocket PC are not Confusingly Similar.*

"Pocket PC" refers to a device and has a different meaning than "pocket" in reference to software that runs on pocket-sized computers. "Pocket PC" and "Pocket" are different elements.

---

[12] Indeed, the evidence corroborated these conclusions. For example, the plaintiff's expert, Thomas Jaros, testified that he also uses the phrase "for Pocket PC" to describe the form factor on which his software runs. *See* Day 3 Tr. at 7:16-20. Mr. Macia testified similarly about PocketMoney for Pocket PC. Day 1 Tr. 178:23 to 179:2.

Catamount introduced instances where Microsoft or its employees had used the name "Pocket Money" to refer to Microsoft's product Microsoft Money for Pocket PC. It is unclear for what purpose these were introduced. These instances are not evidence of consumer confusion. And they were rare, inadvertent, and when possible, corrected. *See, e.g.*, Day 2 Tr. at 42-45 (Mr. Macia testifying regarding a "knowledge base" article that had corrected an

Mr. Jaros, Catamount's expert, testified "Pocket" does not appear in the name of his own application identified as "Seymour for Pocket PC." Day 3 Tr. at 7:16-20. He further testified that "Pocket" was not part of the alleged trademark Money for Pocket PC. *Id.* at 85:229 to 86:2. Mr. Jaros characterizes the "for Pocket PC" element as a descriptor for the form factor on which the software is designed to run. So any rights that Catamount might have are narrow. Given the separate meaning of "Pocket PC" as a type of device, PocketMoney and Microsoft® Money for Pocket PC are not similar.

4. *There Was no Evidence that Microsoft's Application Is of Poor Quality Compared to Catamount's.*

Although Catamount attempted to malign Microsoft's application, it did not prove the two applications are of different quality. Neither was without fault. For example, in response to only the second question Catamount's counsel asked, Mr. Macia agreed that no software in which he had ever been involved developing had been completely bug-free. Day 1 Tr. at 31:24 to 32:1. Additionally, Exhibit Z shows all of the versions of the PocketMoney application and the bugs that existed, including some that were never fixed. While there was some testimony that Microsoft® Money for Pocket PC and PocketMoney had different features, there was no substantive evidence that Microsoft's application was a bad product, or independent expert evaluation to that effect.[13]

C. Dr. Rappeport's Survey Should be Given Little If Any Weight.

Microsoft moved to exclude the survey and testimony of Michael Rappeport as unreliable. Although the Court allowed the witness to testify and admitted related exhibits, the

---

inadvertent reference shortly after being brought to Microsoft's attention). Virtually none were public, and others pre-date the release of Microsoft Money for Pocket PC. *E.g.*, Ex. 23.

[13] Although Catamount offered evidence on chat rooms as to the quality of the parties' programs, the Court made clear that such evidence was not offered as substantive evidence as to the actual quality of the programs but only to the reputation of the programs.

Court should give the testimony and exhibits no weight, or alternatively, little weight. *See*, Microsoft's Trial Br. at 4.[14]

The survey failed to test the relevant population, namely people who use or own pocket-sized computers and software for those devices. 2 McCarthy § 11:20 ("the meaning of a term to a non-purchasing segment of the population is neither relevant nor important") (citations omitted); *see also id.*("If a product is marketed to technically knowledgeable buyers, it is their understanding of the designation that determines whether or not it is descriptive.") The universe included anyone over the age of 18. Only 14 of the 140 respondents in the survey stated that they use "a handheld PDA such as a Palm or Handspring." (Day 2 Tr. at 135-36) Thus, only 10% of the survey's respondents are relevant to the issues before the Court. Rappeport's defense of using a universe limited only to those above age 18, as opposed to those who own or use a pocket-sized computer, was unconvincing. With respect to the impact of this universe on the issue of the "descriptiveness" of PocketMoney, Rappeport candidly admitted the shortcomings of his research, stating:

> Now, I understand that that raises problems in lots of different ways, but within the fact that you are limited to imperfect surveys, it seems to me, it's arguable, *I am sure I can bring in another expert who I respect, would say the opposite*, but it seems to me that it's fair when I am dealing with descriptiveness, to be concerned with first contact among people who might buy this instrument, and anybody who owns a computer at home and a computer at the office surely might buy this instrument. I mean, that's the market for potential. Not the software, but the instrument itself.

Day 2 Tr. at 168: 1-11 (emphasis added). Rappeport also stated that it appeared about 10 percent of the U.S. adult population owned or used a pocket-sized computer at the time of his survey, Day 2 Tr. at 143, but added: "I had some vague idea but not very good. Nobody seemed to be

---

[14] Microsoft is not alone it its critique of Dr. Rappeport's methodologies. *See, e.g.,* Microsoft Trial Brief at 9 (citing critical cases).

able to give me a very firm number. It would appear from our data that roughly 10 percent, *but we don't know." Id.*

Tellingly, Rappeport admitted he did not design the survey to test for likelihood of confusion between PocketMoney and Microsoft® Money for Pocket PC. *See* Day 2 Tr. at 154: 11-12. While he stated that one could infer a "possibility" of a likelihood of confusion, Day 2 Tr. at 154: 8-10, this is not even the test for finding trademark infringement. *Eastern Wine Corp. v. Winslow-Warren LTD,* 137 F.3d 955, 960 (2d Cir. 1943) (mere possibility of confusion is not actionable, there must be a likelihood of confusion). The survey lacked important elements for a likelihood of confusion survey. For example, when asked why he didn't add a question to determine *why* respondents who replied they thought Catamount's software might come from Microsoft, replied as they did, Rappeport said:

> Counselor, I did what I did. We deal with the questionnaire. We do as much as we think is necessary. We didn't think it would be office efficient of additional information when we wrote the questionnaire. *Would I write the same questionnaire the following week, let alone now? Who knows.*

(Day 2 Tr. at 137) (emphasis added)  Furthermore, of the 14 respondents who use "PDAs," only one respondent thought PocketMoney came from  Microsoft, a dramatically smaller, and insignificant, result than the 18% Rappeport credits his survey with finding.[15]  *See* Ex. 11 at 10.

Finally, Rappeport responded that the term "Pocket PC" means a computer that can be put in a pocket, Day 2 Tr. at 159:9-19, consistent with the testimony of Catamount's other witnesses.

D.    Pocket PC is A Generic Term for Pocket-Sized Personal Computers.

Finding that "Pocket PC" is generic is dispositive of the entire case because "a trademark holder cannot appropriate a generic or descriptive term for its exclusive use, and a trademark

---

[15] One respondent, although not a user of a "PDA," who responded that PocketMoney was made by one company, and said "Probably Microsoft," further volunteered "Cause they've already got a program called Money."  (Ex. 11, Questionnaire No. 212)

infringement cannot be based on the use of a generic or descriptive term." *American Cyanamid Corp. v. Connaught Labs, Inc.*, 800 F.2d 306, 308 (2d Cir. 1986). A generic term is one that tells what the thing is – it does not identify or limit the source of that thing. 2 McCarthy at 12:1. Additionally, sub-classifications or varieties of goods sometimes referred to as the "species" of the goods, can also be or become generic. *E.g., Otokoyama, Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, (2d Cir. 1999). The "genericness" inquiry is focused on the time that the defendant enters the marketplace. *See, e.g., Nora Beverages, Inc. v. The Perrier Group of America, Inc.*, 269 F.3d 114, 120 n.3 (2d Cir. 2001).

     The evidence at trial showed that "Pocket PC" is a generic term used to refer to an entire class of pocket-sized computers, regardless of the manufacturer. For example:

- "Pocket PC" appears on the packaging for Catamount's product (Tr. Exs. W & X)
- Macia has content approval on that packaging; (Day 2 Tr. at 61:4-9)
- The packaging distinguishes between the two types of devices on which the software is designed to operate. "For Palm OS® devices, "Palm, Handspring, Sony, others," and "for Pocket PC *devices*, Compaq iPAQ, HP Jornada, others." Day 2 Tr. at 59-17 to 60:2 (emphasis added)

A similar usage of the term "Pocket PC" appears on Handmark's website in promoting Catamount's product. *See* Ex. A-5, and on Catamount's own web site. *See* Tr. Ex. R. Additionally, Mr. Macia also testified that trial Exhibit J was a "Pocket PC" made by Toshiba, not Microsoft. Counsel for the plaintiff made similar generic usage of "Pocket PC" throughout trial. *E.g.* Day 1 Tr. at 156 ("Compaq is the manufacturer of the iPAQ *brand* Pocket PC.") (statement by Mr. Brakhan) (emphasis added).

     Contrary to Catamount's argument, Pocket PC is not a Microsoft trademark for its operating system. Catamount's own expert, Thomas Jaros, testified that there were two operating systems for "PDAs" – Palm OS and Windows CE. Day 2 Tr. at 198:7-10. Mr. Macia also expressly admitted that he did not refer to "Pocket PC" as a trademark on his packaging, even

though he designated other terms such as "Newton" and "Palm" as trademarks. *Id.* at 187:20 to

188:11. Mr. Jaros also testified that "PocketMoney" is the name of Catamount's product and "for

Pocket PC" designates the "form factor" on which the software runs. *See* Day 3 Tr. at 7:16-20.

This cannot be the basis for trademark liability. *Cf. Cosmetically Sealed Indus., Inc. v.

Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (evaluating the fair use of a term

in its non-trademark sense and stating that "if any confusion results, that is a risk the plaintiff

accepted when it decided to identify its product with a mark that uses a well known descriptive

phrase.")

    E.    <u>PocketMoney is not Protectable Under the Lanham Act.</u>

    Catamount does not have a protectable mark in "PocketMoney." Microsoft was first in

the marketplace for computer software with "Money." Mr. Macia knew this. He chose to use the

term "pocket," which this Court has already found to be descriptive, *see* 06/03/03 Mem. Op. &

Order at 10 ("'[p]ocket,' . . . in connection with computer software . . . is descriptive of software

designed to run on 'pocket-sized' computers"),[16] in combination with Microsoft's MONEY

mark. He chose this descriptive term, even knowing that Intuit – the market leader in financial-

management software for desktop PCs – was using "pocket" as a descriptive term for the version

of its Quicken software to be used on pocket-sized computers. *See* Day 1 Tr. at 188:12-15.[17] Mr.

Macia said he may have been aware of other instances where "pocket" was used for software.

---

[16] Although the primary focus for genericness and descriptiveness is the time when the defendant enters the
marketplace, *see supra* § III.D (citing *Nora Beverages*, 269 F.3d at 120 n.3), courts must also evaluate these at the
time any relief is contemplated to determine whether a previously protectable mark has fallen into the public domain
or become otherwise unprotectable. *See, e.g., Coca-Cola v. Standard Bottling Co.*, 138 F.2d 788, 789 (10th Cir.
1943) (originally-valid consent decree injunction had to be modified to account for the fact that "cola" had ceased
being protectable).

[17] Although this Court pointed out that Mr. Macia claimed to have chosen "money" over "change" in conjunction
with "pocket" to avoid having the product sound cheap. (Day 3 Tr. at 127:15 to 22), the plaintiff's motives for
picking a mark so close to Microsoft® MONEY are not relevant to this analysis but would be to Microsoft's
alternative counterclaim, which is not at issue on this motion. Nevertheless, Catamount's selection of "pocket" plus
the name of Microsoft's financial software for desktop PCs (*i.e.* "Money") knowing of Intuit's selection of "pocket"
plus its desktop software name "Quicken" raises doubts as to the veracity of Mr. Macia's stated motive for picking
that name.

Catamount's use of a descriptive term with Microsoft's pre-existing name Money cannot give rise to protectable trademark rights. But even if it did, the rights would be extremely narrow.

Moreover, Catamount did not attempt to create an association between itself and PocketMoney. Quite to the contrary, the product packaging (over which Catamount had approval authority) did not contain any reference to Catamount other than in "fine print" trademark notices and instead, in several instances, the Microsoft name and Microsoft marks are prominently displayed on the packaging. *See* Ex. W. Often, the only reference to Catamount was hidden on the sides and in the seams of the packaging. *See* Exs. W. In these examples, "Handmark," the name of Catamount's major distributor appears much more prominently than Catamount's name and in close proximity to "PocketMoney." *Id.* This too is strong evidence that Catamount's mark is weak at best, and not infringed by Microsoft® Money for Pocket PC.

F.    Third Parties References to Microsoft's Product By the Wrong Name is not Actionable.

Catamount's heavy reliance on third party references to Microsoft's application by the wrong name is misplaced. Although this Court sometimes referred to this evidence as an "aura of confusion," or "general" confusion, *see* Day 3 Tr. at 122, it has already ruled that such evidence, is not the relevant type of confusion and not sufficient to sustain a claim in a reverse-confusion case. *See* 06/03/02 Mem. Op. & Order at 20 ("Catamount's evidence tends to show that consumers have acquired or intend to acquire Microsoft's product, and that they refer to it incorrectly. . .. The Court has as yet seen no evidence of actual confusion that would support Catamount's reverse confusion claim.")  This third party evidence was previously rejected by the Court on summary judgment. *Cf. Illinois High School Ass'n v. GTE Vantage, Inc.*, 99 F.3d 244 (7th Cir. 1996) (finding that widespread public use not only didn't impose liability on the junior user for the public's incorrect use of an  NCAA mark, but created rights in the NCAA sufficient to permit licensing of that mark based on the public's use). Thus, the so-called "aura" of

19

confusion – as that phrase has been used to describe third parties who know of Microsoft's product but call it by the wrong name – is irrelevant to the proper analysis of likelihood-of-confusion under *Polaroid*, and cannot be the basis for liability against Microsoft.

## IV.    CONCLUSION

For the reasons stated in this brief, in its Trial Brief, and in open court at oral argument, Microsoft respectfully submits that Catamount has not proven its case for relief of any kind on any of its claims. Catamount's selection of a mark that combines the descriptive term "pocket" and Microsoft's prior MONEY mark merits little if any protection. Also, Microsoft's use of its previous mark with a generic term designating the devices on which it runs cannot subject it to liability. Furthermore, there is no actual consumer confusion or likelihood of confusion between PocketMoney and Microsoft® Money for Pocket PC. To the extent that there could be any confusion, it is the result of Catamount's knowingly combining a descriptive term with Microsoft's MONEY mark. Finally, Catamount has not shown any harm as a result of the introduction of Microsoft's software application Microsoft® Money for Pocket PC. On the contrary, sales have gone up and so has the value of its trademark. Microsoft thus respectfully asks the Court to grant its motion and enter judgment in Microsoft's favor on each of Catamount's claims.

August 31, 2004

John Thompson Brown
Michael La Porte
WILDMAN HARROLD ALLEN & DIXON, LLP
225 West Wacker Drive - Suite 3000
Chicago, IL  60606-1229

John T. Sartore
PAUL, FRANK & COLLINS
One Church Street
P.O. Box 1307
Burlington, VT  05402-1307

Counsel for Microsoft Corporation

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   THE COURT MAY AND SHOULD WEIGH THE EVIDENCE IN
      DETERMINING WHETHER CATAMOUNT HAS FAILED TO PROVE ITS
      CASE ........................................................................................................... 1

III.  MICROSOFT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW
      BASED ON CATAMOUNT'S FAILURE TO PROVE ITS CASE. ................................. 3

      A.   Catamount Offered No Evidence In Support of its Claim for Monetary
           Relief. ............................................................................................. 3

      B.   Catamount's Evidence Did Not Establish A Likelihood of Confusion. ................. 8

           1.   Catamount Did Not Submit Evidence of Actual Consumer
                Confusion. ................................................................................ 8

                a.   Catamount Offered No New Evidence Since Summary
                     Judgment. ........................................................................ 8

                b.   Catamount's Evidence Does not Support a Presumption of
                     Actual Confusion. ............................................................. 10

                     (i)    No Case In The Second Circuit Has Ever Held That
                            Mere Knowledge Of A Plaintiff's Trademark Is
                            Sufficient To Establish An Intent To Infringe. .................. 11

                     (ii)   Neither of Catamount's Cited Authorities Support
                            Its Position. ........................................................ 11

                     (iii)  This Court has already rejected Catamount's
                            premise. ............................................................. 12

           2.   Microsoft Acted in Good Faith in Naming Its Software Around
                Catamount's PocketMoney. ...................................................... 13

           3.   The Phrases PocketMoney and Microsoft® Money for Pocket PC
                are not Confusingly Similar. ...................................................... 13

           4.   There Was no Evidence that Microsoft's Application Is of Poor
                Quality Compared to Catamount's. ............................................. 14

      C.   Dr. Rappeport's Survey Should be Given Little If Any Weight. ...................... 14

      D.   Pocket PC is A Generic Term for Pocket-Sized Personal Computers. ................. 16

      E.     PocketMoney is not Protectable Under the Lanham Act. .................................... 18

      F.     Third Parties References to Microsoft's Product By the Wrong Name is not Actionable. ........................................................................................................ 19

IV.    CONCLUSION .................................................................................................. 20

TABLE OF AUTHORITIES ................................................................................................ iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Cyanamid Corp. v. Connaught Labs, Inc.,*
    800 F.2d 306 (2d Cir. 1986) ............................................................................... 19

*Aramony v. United Way of Am.,*
    254 F.3d 403 (2d Cir., 2001) .............................................................................. 3

*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*
    145 F.3d 481 (2d Cir. 1998) ............................................................................... 7

*Burger v. New York Institute of Technology,*
    94 F.3d 830 (2d Cir. 1996) ................................................................................ 2

*Burndy Corp. v. Teledyne Indus., Inc.,*
    748 F.2d 767 (2d Cir. 1984). ............................................................................. 6

*Christianson v. Colt Indus. Operating Corp.,*
    486 U.S. 800 (1988)........................................................................................... 3

*Coca-Cola v. Standard Bottling Co.*
    138 F.2d 788 (10th Cir. 1943) ........................................................................... 21

*Cosmetically Sealed Indus. Inc. v. Chesebrough-Ponds's USA,*
    125 F.3d 28 (2d Cir. 1997) ................................................................................ 20

*Eastern Wine Cor. V. Winslow-Warren LTD,*
    137 F.3d 955 (2d Cir. 1943) .............................................................................. 18

*Georgia-Pacific v. U.S Plywood Corp.,*
    318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................................. 6

*Getty Petroleum Corp. v. Island Transp. Corp.*
    878 F.2d 650 (2d Cir. 1989) .............................................................................. 7

*Huber v. American President Lines,*
    240 F.2d 778 (2d Cir. 1957) .............................................................................. 2

*Illinois High School Ass'n v. GTE Vantage, Inc.,*
    99 F.3d 244 (7th Cir. 1996) ............................................................................... 22

*In re Regency Holdings,*
    216 B.R. 371 (Bankr. S.D.N.Y. 1998). ............................................................ 2

*Johnson & Johnson v. SmithKline Beecham Corp.,*
    960 F.2d 294 (2nd Cir. 1992)............................................................................. 13

*Lang v. Retirement Living Publishing Co.,*
  949 F.2d 576 (2d Cir. 1991) ............................................................................... 9

*MacDraw Inc. v. CIT Group Equip. Fin.,*
  157 F.2d 956 (2d Cir. 1997) ............................................................................... 2

*Mastercard Int'l, Inc.*
  No. 86 Civ. 8601 (SWK) 1989 U.S. Dist. Lexis 12433 at *24 (S.D.N.Y. Oct. 18, 1989) ........ 8

*MasterCard Int'l, Inc. v. Arbel Corp.,*
  No 86 CIV 6801 U.S. Dist. Lexis 12433 (S.D.N.Y. Oct. 18, 1989)........................................... 6

*Mentor Ins.  Co.  (UK) Ltd.  v.  Brannkasse,*
  996 F.2d 506 (2d Cir.  1993) ............................................................................... 2

*Mobil Oil Corp. v. Pegasus,*
  818 F.2d 254 (1987).......................................................................................... 12, 13, 14

*Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.,*
  349 F.2d 389 (2d Cir. 1965). ............................................................................. 5

*Nora Beverages, Inc. v. The Perrier Group of America, Inc.*
  269 F.3d 114 n.3 (2d Cir. 2001) ........................................................................ 19

*Oreck Corp. v. U.S. Floor Sys., Inc.*
  803 F.2d 166 (5th Cir. 1986) ............................................................................. 12

*Otokoyama, Ltd. v. Wine of Japan Import, Inc.,*
  175 F.3d 266 (2d Cir. 1999). ............................................................................ 19

*Paddington Corp. v. Attiki Importers & Distributors, Inc.,*
  996 F.2d 577 (2nd Cir. 1992) ............................................................................ 13

*PPX Enter, Inc. v. Audiofidelity Enter, Inc.*
  818 F.2d 266 (2d Cir. 1987) .............................................................................. 7

*Sands, Taylor & Wood Co.  v.  Quaker Oats Co.,*
  34 F.3d 1340 (7th Cir.  1994) ............................................................................ 6

*SmithKline Beecham Corp.  v.  Apotex Corp.,*
  247 F.  Supp.2d 1011 (N.D.  Ill.  2003) ............................................................... 3

*Swanson v. Georgetown Collection, Inc.,*
  No. 94-CV-1283, 1995 U.S. Dist. Lexis 1972  (N.D.N.Y. Feb. 14, 1995) ............................ 13

*W.W.W. Pharmaceutical Co. v. Gillette Co.,*
  984 F.2d 567 (2d Cir. 1993). ............................................................................. 5, 9, 13, 14

**Rules**

Fed. R. Civ. P. 52(c) ................................................................................................. 1, 2

Rule 41(b) ...................................................................................................................... 2

Rule 52 ........................................................................................................................... 2

**Other Authorities**

J. McCarthy, 5 *McCarthy on Trademarks & Unfair Competition* at 30:57.......................... passim

Lanham Act ................................................................................................................ 5, 9

383833_v1: 6975-00001

IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |
|---|---|
| HARLAND A. MACIA, III, d/b/a CATAMOUNT SOFTWARE, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| MICROSOFT CORPORATION, INTUIT, INC., and MECA SOFTWARE, LLC, | ) ) ) |
| Defendants. | ) ) |

Civil Action No. 2:00-CV-299

## NOTICE OF FILING

To:   Markus Brakhan                      David Putter                  Prof. Kenneth Kreiling
      The Law Office of Markus Brakhan    Putter & Edson                Vermont Law School
      P.O. Box 5851                       15 E State St                 P.O. Box 96
      44 Church Street Suite 1            Montpelier, VT 05602          Chelsea Street
      Burlington, VT  05402-5851                                        South Royalton, VT 05068


    PLEASE TAKE NOTICE that on August 31, 2004, we caused to be filed with the United
States District Court for the District of Vermont, MICROSOFT'S BRIEF IN SUPPORT OF ITS
RULE 52 MOTION, a copy of which is served upon you.

                        Respectfully submitted,

                        WILDMAN, HARROLD, ALLEN & DIXON LLP

            By:   _John Sartore for_

                        John Thompson Brown, Esq.
                        Michael R. La Porte, Esq.
                        WILDMAN HARROLD ALLEN & DIXON, LLP
                        225 West Wacker Drive
                        Suite 3000
                        Chicago, IL  60606-1229

                        John T. Sartore, Esq.
                        PAUL, FRANK & COLLINS
                        One Church Street
                        P.O. Box 1307
                        Burlington, VT  05402-1307

                        Attorneys for Microsoft Corporation

## CERTIFICATE OF SERVICE

I hereby certify that I served the MICROSOFT'S BRIEF IN SUPPORT OF ITS RULE

52 MOTION on the following on August 31, 2004 in the manner described below:

| | | |
|---|---|---|
| Markus Brakhan | David Putter | Prof. Kenneth Kreiling |
| The Law Office of Markus Brakhan | Putter & Edson | Vermont Law School |
| P.O. Box 5851 | 15 E State St | P.O. Box 96 |
| 44 Church Street Suite 1 | Montpelier, VT 05602 | Chelsea Street |
| Burlington, VT  05402-5851 | | South Royalton, VT 05068 |
| | | |
| Via U.S. Mail | Via U.S. Mail | Via U.S. Mail |

John T. Sartore, Esq.

383811_v1: 6975-00001